**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF THE UNITED STATES**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ROBERT WOODARD** | § | |
| **TDCJ ID#999388** | § | |
| PETITIONER | § | |
| V. | § | |
| | § | |
| **NATHANIEL QUARTERMAN, Director** | § | Civil Action No. 08-CV-2036 |
| | § | |
| **Texas Department of Criminal Justice, Institutional Division** | § | |
| | § | |
| RESPONDENT | § | |

---

**THIS IS A DEATH PENALTY CASE**

---

**AMENDED PETITION PURSUANT TO 28 U.S.C. SECTION 2254**
**PETITION FOR WRIT OF HABEAS CORPUS**
**BY A PRISONER IN STATE CUSTODY**

ROSA ALEXANDER ELIADES
Texas Bar No. 00789278
306 Main Street, Floor 3
Houston, Texas 77002
Tel:(713) 222-0610
Fax: (713) 236-0733

`

November 17, 2008

**TABLE OF CONTENTS**

PROCEDURAL HISTORY……………………………………………………..….........1

OVERVIEW OF FACTS……………………………………………………..…….1

Overview of Procedure at the District Court……………………………………..2
Overview of the Facts of Mr. Woodard's History……………………….…….2
Statement of Facts from Trial Testimony………………………………………...3
Guilty innocence Testimony……………………………………………...3
Punishment Testimony……………………………………………………10

CLAIMS FOR RELIEF AND ARGUMENT AND AUTHORITIES

I. MR. WOODARD'S ARREST WAS IN VIOLATION OF THE FOURTH AMENDMENT AND THE INTRODUCTION OF THE SUBSEQUENT EVIDENCE OBTAINED FROM THE ARREST HARMED HIM AT TRIAL.

A. Background Facts……………………………………………………..16
B. Mr. Woodard did not receive full and fair consideration of his Fourth Amendment claim by the State Court……………………………………..17
C. Mr. Woodard was illegally arrested without a warrant in violation of the Fourth Amendment…………………………………………………….19
D. Mr. Woodard was harmed by the violation of his Fourth Amendment right…………………………………………………………………….21

II. THE REPEATED PRETRIAL IDENTIFICATION PROCEDURES WERE IMPERMISSIBLY SUGGESTIVE AND RESULTED IN SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION.

A. Factual Background……………………………………………………22
B. The Pretrial identification proceedings were impermissibly suggestive
C. There was a substantial likelihood of misidentification from the pretrial proceedings…………………………………………………………....25
D. Mr. Woodard was harmed by the erroneous admission of the unconstitutional pretrial identification procedures………………………………………27

III. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY ADMONISH MR. WOODARD ON HIS RIGHT TO TESTIFY

A. Factual Background……………………………………………………29
B. An accused's right to testify belongs solely to the defendant on trial………31
C. Mr. Woodard's right to testify was violated when trial counsel failed to permit him to testify…………………………………………...……32
D. Mr. Woodard was prejudiced by the failure of trial counsel to permit him to testify in guilty innocence………………………………………..…33

IV. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO HIRE AN EXPERT TO ATTACK THE CREDIBILITY OF THE EYEWITNESS TESTIMONY BOTH AT PRETRIAL AND BEFORE THE JURY.

A. Factual background…………………………………………………………35
B. Effective assistance of counsel includes the right to have experts employed to assist to impeach the State's evidence……………………………………36
C. Trial counsel cannot rely on financial barriers to justify a failure to present expert testimony……………………………………………………………….37
D. Expert eyewitness testimony was admissible at Mr. Woodard's trial…………………………………………...……………………...38
E. Expert eyewitness testimony would have assisted in establishing reasonable doubt in Mr. Woodard's case……………………………………………39
F. Failure to use expert eyewitness testimony rendered trial counsel's performance deficient…………………………………………………41
G. Trial counsels' deficient performance prejudiced Mr. Woodard…………..43

V. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND INTRODUCE RELEVANT IMPEACHMENT EVIDENCE AGAINST THE STATE'S WITNESSES.

A. Background facts……………………………………………………………45
B. The Sixth Amendment requires trial counsel to conduct a thorough investigation of the facts…………………………………………………..…46
C. Trial counsel were ineffective for failing to investigate and present evidence to impeach the State's witnesses…………………………………………48
   1. Trial counsel failed to fulfill their duty to investigate impeachment evidence…………………………………………………………...….50
   2. Trial counsel failed to properly impeach the State's witnesses.
D. Trial counsels' deficient performance prejudiced Mr. Woodard and resulted in violation of his Sixth Amendment right to counsel………………………51

VI. TRIAL COUNSEL WERE INEFFECTIVE DURING PUNISHMENT FOR FAILING TO PREPARE PUNISHMENT EXPERT TESTIMONY
A. Factual Background…………………………………………………………53
B. It is a fundamental require of competent capital counsel to hire experts to assist in presenting and explaining mitigating evidence……………………56
C. Trial counsels' failure to properly prepare their expert witness resulted in a deficient performance……………………………………………………59
D. Trial counsels' deficient performance in failing to prepare their expert punishment witness prejudiced Mr. Woodard with harmful evidence…….61

VII. TRIAL COUNSEL WERE INEFFECTIVE DURING PUNISHMENT FOR FAILING TO OBJECT TO PROSECUTOR'S IMPROPER ARGUMENT……………………………………………...……………63

VIII TRIAL COUNSEL WERE INEFFECTIVE AS A RESULT OF THE CUMULATIVE EFFECT OF TRIAL ERRORS.

A. Trial counsel committed numerous failures in their investigation, strategy and error preservation during the guilt innocence portion of trial………………67
B. Trial counsels' numerous errors cumulatively rendered a deficient performance…………………………………………………………..67
C. Trial counsels' error prejudiced Mr. Woodard's right to a fair trial and but for the cumulative effect of the errors, the outcome could have been different.68.

IX. MR. WOODARD RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

A. Factual background……………………………………………………71
B. Appellate counsel failed to properly brief Mr. Woodard's Fourth Amendment claim……………………………………………………………………...72
C. Mr. Woodard has a Sixth Amendment right to effective assistance of counsel on his appeal…………………………………………………………..….73
D. Mr. Woodard's appellate counsel's representation fell below an objective standard of reasonableness……………………………………………….74
E. The failure of appellate counsel to render effective assistance on appeal prejudiced Mr. Woodard…………………………………………………75

X. THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT MR. WOODARD WAS A FUTURE DANGER.

A. Factual Background…………………………………………………….77
B. The evidence that Mr. Woodard was a future danger was insufficient……78

XI. THE FUTURE DANGER SPECIAL ISSUE SUBMITTED AT MR. WOODARD'S TRIAL WAS UNCONSTITUTIONAL BECAUSE THE INDICTMENT FAILED TO PLEAD AGGRAVATING ELEMENTS CONTAINED IN THE INSTRUCTION AS REQUIRED BY *RING* AND *APPRENDI* TO ESTABLISH MR. WOODARD SHOULD RECEIVE A SENTENCE OF DEATH……………………………………………………80

XII. THE FUTURE DANGER SPECIAL ISSUE SUBMITTED AT Mr. WOODARD'S TRIAL WAS UNCONSTITUTIONAL BECAUSE IT FAILED TO ASSIGN THE BURDEN OF PROOF ON THE STATE BEYOND A REASONABLE DOUBT TO ESTABLISH MR. WOODARD SHOULD RECEIVE A SENTENCE OF DEATH……………………………………...91

XIII. THE MITIGATION SPECIAL ISSUE SUBMITTED AT MR. WOODARD'S TRIAL WAS UNCONSTITUTIONAL BECAUSE IT FAILED TO ASSIGN THE BURDEN OF PROOF BEYOND A REASONABLE DOUBT UPON THE

STATE TO ESTABLISH MR. WOODARD SHOULD RECEIVE A SENTENCE OF DEATH……………………………………………………….93

XIV. THE DUAL-TRACK HABEAS APPLICATION SYSTEM VIOLATES DUE PROCESS OF LAW, AS GUARANTEED BY U.S. CONST. AMEND. XIV……………………………………………………………………………..97

XV. THERE IS NEW EVIDENCE OF MR. WOODARD'S INNOCENCE THAT WOULD EXCUSE PROCEDURAL DEFAULTS………………………….103

XVI. THE STATE'S MISCONDUCT IN FAILING TO DISCLOSE EXCULPATORY AND IMPEACHMENT INFORMATION REGARDING THEIR WITNESSES PREJUDICED MR. WOODARD………………...110

PRAYER FOR RELIEF……………………………………………………………114

CERTIFICATE OF SERVICE…………………………………………….............114

APPENDIX OF EXHIBITS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF THE UNITED STATES**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ROBERT WOODARD** | § | |
| **TDCJ ID#999388** | § | |
| **P**etitioner | § | |
| V. | § | **Misc. H-07-510** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division** | § | |
| Respondent | § | |

**THIS IS A DEATH PENALTY CASE**

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS**
**BY A PRISONER IN STATE CUSTODY**

ROBERT LEE WOODARD, petitions this Court for relief from an unconstitutional conviction and sentence of death. The judgment and sentence under attack were entered by the 339th Criminal District Court of Harris County, Texas. This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d) and 2254.

**Procedural History**

Mr. Woodard is convicted of capital murder in the 339th Criminal District Court of Harris County Texas on March 5, 2001 and is sentenced to death on March 8, 2001. Direct appeal is filed on July 10, 2002 and on October 20, 2004 the Court of Criminal appeals denies relief. *Woodard v. State*, 2005 WL 77143 (Tex. Crim. App. 2005) (unpublished). A State writ of habeas corpus is filed on March 31, 2003, and on September 19, 2006, trial court issues

findings on the writ denying relief. On June 27, 2007, the Court of Criminal appeals denied relief on the writ. *Ex parte Woodard*, No W-46,501-02 (Tex. Crim. App. 2007).

**Overview of the Procedure at the District Court**

Mr. Woodard is arrested on February 17, 2000 for a double murder and placed into a live line up that same day. The criminal complaint is filed on February 18, 2000.[1] CR1 February 19, 2000, Mr. Woodard goes before a magistrate and is Mirandized. CR3 February 21, 2000, he has his first appearance in the 339th Criminal district court. CR4

The district court appoints trial counsel Robert Loper on February 24, 2000. CR5 On March 15, 2000, trial counsel requests funds for an investigator. CR18 The indictment is handed down on May 5, 2000 and the State announces that they are seeking the death penalty on this case. CR25 On June 16, 2000, Loretta Muldrow is appointed as co-counsel. CR27 On January 5, 2001, trial attorneys file a stack of motions. Capital jury selection commences on January 26, 2001.

On February 7, 2001, Loper and Muldrow request funds for appointment of an expert psychiatrist. CR212-214 Dr. Gruen is hired two weeks before trial testimony begins and she interviews defendant one week before her testimony on March 7, 2001. Exh21

**Overview of Facts of Mr. Woodard's History**

The Petitioner, Mr. Robert Lee Woodard, [hereinafter referred to as Mr. Woodard] is born on June 17, 1980 in Chicago, Illinois to Luetta Willis, a gang street member who is jail while she is pregnant with him. SR30:233 Mr. Woodard is raised with two older siblings, Latoya Willis and Reginald Willis, but does not know who his real father is. While Luetta is alive, they all live in various places, mostly shelters, and Mr. Woodard sees his mother bring

[1] References to record are abbreviated SR (State record) Volume: page number. The clerk's record are abbreviated CR ; Habeas Exhibits are abbreviated "EXH"

home different men every night, who mostly are abusive to her in front of him. Mr. Woodard would fight the men until he got hurt. Mr. Woodard also would see his mother drink and use drugs, which he did not even know at the time was wrong. At the age of seven, Mr. Woodard finds his mother dead and two years later, his grandmother dies. Other family members do not want to take care of him, as he is a challenging child with several problems. While he lives in Chicago, he stays with aunts and uncles. Mr. Woodard, however, basically grows up on the streets of Chicago.

At fourteen, Mr. Woodard is first arrested for an aggravated robbery, which it turns out, involves an unloaded BB gun. He later picks up juvenile charges for using and selling drugs, and evading. Mr. Woodard goes to Clarinda Academy and eventually begins doing well.

At the age of 16, Mr. Woodard is released; eventually he is sent to Houston to live with his Uncle Darryl. He gets into minor trouble as an adult, trespass and possession of marijuana. He ends up living with a girlfriend and his daughter and working several different jobs to get ahead and overcome his past.

At the age of 19, Mr. Woodard is arrested for capital murder.

**Statement of Facts from Trial Testimony**

Mr. Woodard is convicted of capital murder based upon a police investigation that spans several months but only yields faulty eyewitness testimony and self-serving or paid testimony.

On February 12, 2000, Houston Police Department officers respond to the scene of a double murder at a convenience store located at 10606 Wilcrest. SR23:8 The call comes in at approximately 11:35 p.m. The police interview two scene witnesses, Garvina Sadiki and Cory Calloway. Sadiki is inside the store when the suspect comes in, demands money and shoots at

the couple that runs the store. Sadiki never sees the suspect's face because she is looking down and the suspect is wearing a hood. SR23:89

Calloway is outside talking on the payphone while his car is left running by the pumps. He is 22 years old, driving a Lincoln Town Car that is loaded. SR24:146-159 Calloway sees the suspect run out the store and proceeds towards Calloway's vehicle. Calloway runs to his vehicle and yells for the suspect to stop. At that point the suspect turns and points a gun towards Calloway and Calloway immediately retreats back to the payphones while the suspect drives away in Calloway's vehicle, a grey Lincoln Town Car. The car turns around and heads toward South Drive. The suspect is still wearing a hood and Calloway has only seen his face for a couple of seconds when he was near him. SR23:251

On February 14, 2000, Herbert Lee Smith reports seeing the Lincoln Town car in his apartment parking lot on 9290 Woodfair after watching the news reports. Smith claims the vehicle has been there since February 13, 2000. The police recover the vehicle and eventually process it for prints and fiber and hair. None of the items tested come back to Mr. Woodard.

The incident receives a lot of news coverage, along with other convenience store robberies at the time. Interestingly, the news reports discuss the facts that the suspect grew impatient as the clerk fiddled with the register to open it and that when the suspect turned to leave, he had trouble getting out and he turned and shot at the owners. EXH15 These facts are broadcast on the major networks the next morning and *several* days thereafter. The police also post a $10,000 reward for information leading to the double murders, which expires on February 17, 2000. EXH24

**Anonymous Informant**

On February 17, 2000, an anonymous caller contacts the police with information on the Wilcrest robbery. After meeting with the informant, the police obtain a search warrant for Reginald Willis's apartment.

The informant is revealed at trial to be Kenneth Moore; he is called to testify by the defense because he originally implicates Reginald, the Petitioner's brother, in the shootings. At the time of his testimony, Kenneth Moore had a total of five felony convictions; he receives $3,000 for the information he provided the police.

The informant tells the officers that the next day after the robbery, someone he knew as "Dwayne" approached him to purchase some "music and screens" and they went to an apartment at 9290 Woodfair. Dwayne is described as being a 5'10" black male with a mustache and goatee.[2] There, Dwayne removed two screens from the back of the visors on a grey Lincoln Town Car with paper plates. Dwayne then told the informant if he wanted the "music" to go inside apartment #2211. Inside the apartment, informant says he met with "Red" who *might* have been "Dwayne's" brother, and Red showed him two music amplifiers, two Cerwin Vega speakers, and a small VCR encased in a broken black case. *Reginald told the informant that "He (Red) and Dwayne had pulled a stunt* on Wilcrest last night, used the Lincoln Town Car to get away and they needed to sell the stuff to get some money."

Once Calloway confirms that the property described by the informant belongs to him, the police request and execute a warrant for 9290 Woodfair, Apartment #2211, and name Reginald Willis, "Red," as the individual who "had custody" of the apartments.

**Search and arrest at 9290 Woodfair**

That same evening, on February 17, several police officers go to the 9290 Woodfair location to execute the search warrant. Dan Webster, Reginald Willis and Casper Hines are all

[2] Mr. Woodard is 6'0 and did not have facial hair.

at the apartment. Mr. Woodard is not there. The police recover some of the property and take everyone in for questioning. That same evening, they obtain statements from all three suspects implicating Mr. Woodard. Although no one claims they saw Mr. Woodard commit the murders, Dan Webster and Reginald Willis give statements admitting that on the evening of the robbery, they helped Mr. Woodard unload items from the grey Lincoln sitting in the parking lot of Reggie's apartments. The crux of Reginald, Dan and Casper's statements regarding the evening of February 12, 2000, are detailed below.

Dan Webster testifies that he was upstairs at Reginald's apartment when Mr. Woodard arrived and called him downstairs to ask him to help him carry some things into Reginald's apartment. SR26:67 While he helped, Mr. Woodard told Webster that he had robbed someone and shot them and might have killed "her." SR26:72 Mr. Woodard also allegedly told Webster that the lady was tripping and wouldn't open the register so he shot her. Mr. Woodard then got into a car sitting outside and drove off with only some lottery tickets from the store. Webster admits scratching off some of the tickets from the murder scene and cashing them near his house. At the time, Dan Webster lived at 9898 Club Creek, #1901 with his mother.

Reginald testifies he saw Mr. Woodard inside his apartment that evening scratching off Lottery tickets. Mr. Woodard told Reginald he got them from a store and he had to steal a Lincoln at gunpoint in order to get away. A few days later, Mr. Woodard told Reginald that he was inside the Conoco store before he took the Lincoln and he shot a lady and believed he had killed her.

Casper Hines testifies Mr. Woodard came to her house that evening and asked her to hide a gun that is "hot," which means stolen. She refused to and he got a shoebox from the bedroom to put the gun in and he followed her upstairs and then Reginald arrived from the

store. Dan Webster was also over that evening. The next day when she woke up Casper saw all of the items from the vehicle inside her apartment. SR26:31 Two guys arrived along with Mr. Woodard to purchase the items. That day she first saw the Lincoln parked in the parking lot.

**The Photo Spreads**

The police put together several photo spreads for the investigation. The first photo spread contains a photograph of Reginald. The only signature on the back of that is by Danny Williams on April 17, 2000. Danny Williams is an individual who was with the informant when he purchased some of the music from the Lincoln.

The second spread contains a photograph of Mr. Woodard. Casper Hines, Dan Webster, Carolina Romero and Ghalib Blaloch all sign in Mr. Woodard's slot. Cory Calloway's signature does not appear on the photo spread. Casper and Dan dates their signature on February 17, but the others do not put a date next to their names. Blaloch is the clerk from the Speedy Mart on 10109 Bissonnet, and Romero is the clerk from 11905 Bissonnet "Kirkwood Texaco." Blaloch however testified at trial that he was sure Woodard cashed in the tickets there in the morning, even though the tickets were cashed in the afternoon. Romero testifies she was not sure if she identified Woodard because he had been to her store before or because he cashed the tickets.

**Mr. Woodard's Arrest**

Based upon these statements made by Hines, Webster and Willis, that same evening of the 17th, the police attempt to obtain search and arrest warrants for Mr. Woodard at 11700 Bissonnet, Apartment 414 and list a pistol, a pair of black tennis shoes and unfired ammunition as items to retrieve. They arrest Mr. Woodard outside the apartment before they have the

warrant and obtain his and his girlfriend's consent to search the apartment. The police recover a black canvas bag belonging to Reginald Willis that contains Reginald's work identifications, jewelry, two cell phones, a box of bullets and rolls of undeveloped film. Mr. Woodard does not make any statements. The police also have Mr. Woodard's tennis shoes tested for DNA but the testing does not detect any evidence linking Mr. Woodard to the crime.

**Lineup**

After the arrest, the news posts a picture of Woodard. Mr. Woodard is also placed in a live lineup later that day. Both Calloway and Sadiki appear but **neither** are able to positively identify Mr. Woodard. Calloway is only able to tentatively identify Mr. Woodard. Sadiki never saw the suspect's face and she is only asked if she can identify Mr. Woodard's voice. She is not able to identify his voice.

**Final photo spread**

Calloway requests to put hoods on the individuals in the line-up but none are available. Instead, the police superimpose hoods on all of the suspects in the photo spread. The photo spread is shown to Danny Williams on April 17th and he identifies number 2, Mr. Woodard.

This photo spread however does not have Calloway's signature until April 24, 2000. Moreover, next to his signature, there is a number three under the number two and the initials of RWJ next to it. *Cory Calloway thus does not positively identify Woodard until April 24, 2000.*

**The lottery Tickets**

About a week later on February 23, 2000, the Lottery Ticket Commissioner responds to the police's request for information regarding the lottery ticket numbers that were supposedly taken from the store. The numbers from the stolen tickets are traced back to the stores the

tickets were cashed. None of the stores had videos tapes that were working. The locations of the stores are as follows:

| | | | |
|---|---|---|---|
| 1) | 2-13-00 | 7:06 | 13102 Bissonnet |
| 2) | 2-13-00 | 10:11 | 11200 Wilcrest |
| 3) | 2-14-00 | 10:41 | 9700 Club Creek |
| 4) | 2-14-00 | 12:59 | 11575 Bissonnet |
| 5) | 2-14-00 | 2:33 | 9700 Club Creek |
| 6) | 2-14-00 | 3:05, 3:06 | 10109 Bissonnet |
| 7) | 2-14-00 | 6:51 | 11905 Bissonnet |

**Murder weapon**

In the mean time, the police try to locate the murder weapon. Reginald tells the police that the gun was taken apart and then discarded into pieces, some of which were thrown into the Bayou behind Dan Webster's apartments. A Houston Police Department dive team with 14 divers search for over one hundred hours in the Bayou where Reginald says Woodard tossed the weapon. The dive team does not recover anything resembling the murder weapon. On April 5, 2000, a gentleman named Ricardo Gutierrez, working on a probation cleaning crew, finds a pack of Newport cigarettes that contained two springs.

The police also employ a jail-house snitch named Donald Ray Guzman to get information. Guzman is Sonica Hines's (Casper Hines's sister) boyfriend, also known as "Gelo." Sonica repeatedly telephones the detective in an effort to have Guzman hand over information so Guzman can help himself on the case he was in jail for. Guzman informs the police that he was around when items from the Lincoln were sold at Reginald's apartments and recalls that Red said he and his brother pulled this off together. Guzman also tells them he will wear a wire and see if he can get Reginald to lead them to the gun. *Guzman eventually testified at trial for the defense because he believed that Reginald was involved.*

In sum, Mr. Woodard was convicted on tainted eyewitness testimony and the testimony of two people who took part in selling the proceeds of the robbery. One of these two was

initially a suspect until he cooperated with the police and stated Woodard confessed the murders to him. The remaining testimony, from the people who purchased the fruits of the crime but still received deals and money for their cooperation, only proved Woodard had contact with the items from the vehicle stolen from the scene. The evidence did not prove with any certainty that Mr. Woodard killed the people in the store. Woodard was not only convicted on the above evidence, but is now sentenced to die for the above offense.

**Punishment testimony**

During the punishment portion, the State went to great lengths to present testimony from every imaginable alleged bad act Mr. Woodard had been involved in since he was 14 years old. Chicago Police Department Sergeant, Gene Rouse, was flown in to testify that in 1994, when Mr. Woodard was 14, he was apprehended for flashing gang signals with some other individuals and a search uncovered that he had rocks of cocaine in his possession. SR30:9-10 The gang signals were of the Black Disciples, a really bad gang, several higher up members of which were serving life sentences. SR30:9

A year later, Mr. Woodard was arrested driving a vehicle that was involved in an aggravated robbery that involved an unloaded Daisy BB Gun. SR30:22

The next evidence presented of Mr. Woodard's bad conduct covers the time after he was sent to live in Houston, when he was first apprehended in 1997 for a curfew violation. SR30:34-37 That same year, he was arrested for a class C trespass at the apartment where Dan Webster was living. SR30:40-49

The following year, at 17, Mr. Woodard was arrested for possession of marijuana and placed on adult probation. SR30:50-60 At the time, Mr. Woodard told the officer he was smoking because he was "having a lot of problems with his wife." SR30:55 The State brought

in the officer who arrested him as well as the lab employee who weighed the marijuana to establish Mr. Woodard was in possession of 4.7 grams of marijuana. SR30:82 The state then brought in Mr. Woodard's probation officer to testify that Mr. Woodard lied to him about getting drug counseling, that he failed to do his community service, and failed his drug tests by testing positive for marijuana. SR30:96-109 The State also brought in an employee from the Harris County Medical Examiner's Office to testify about his failed urine analysis to establish that Mr. Woodard had tested positive for marijuana as well as cocaine. SR30:109 Mr. Woodard's probation was ultimately revoked and he received 180 days in jail.

The State further introduced Mr. Milton Tyndall, who managed a building where Mr. Woodard was working security in 1998. SR30:113-135 The witnesses stated that Mr. Woodard was very articulate and pleasant with the tenants. SR30:121 A month after Mr. Woodard started working there, however, there was a series of small thefts in the office suites and Mr. Woodard had developed some film that had been traced back to a camera that was missing.

The next witness the state brought in was a reluctant witness from a fight Mr. Woodard had in 1999 with the pizza delivery man who refused to give him change. SR30:150 Mr. Barrera had never wanted to press charges for this incident.

The State also brought up the infractions Mr. Woodard had while he was incarcerated awaiting trial for this case. SR30:125-137 After his arrest in February of 2000, he was written up three times. The first was for possession of contraband: water-bags that inmates used to work out. The second was for extortion, and the third was for an assault on another inmate. In addition, the State introduced the jailer who reported that Mr. Woodard had been creating a scene in his cell block, and another jailer who testified that he had refused to come out of his cell during headcount.

The State next presented improper victim-impact testimony from Calloway and Sadiki that they had experienced some trauma from the incident. SR30:167-180 Finally, the State concluded with the daughter of the two victims who testified about the impact the loss of her parents had had on the family. SR30:180-190

The defense presented three jailers to testify that Mr. Woodard did not present any problems and was never insubordinate: Mark White, Larry Jenkins, and John Davis. SR30:190-197; 244-251 Mr. Woodard had been assigned as Davis's laundry worker and would see him on a daily basis between 1998 and 1999. Jenkins had no problems with Mr. Woodard over the 5-8 months that he supervised him in 2000.

The defense further presented testimony from Mr. Woodard's family to establish his background. Mr. Woodard's aunt, Anita Edison confirmed that his mother, Luetta Wilson did not take care of Mr. Woodard and his siblings. SR30:209 She stated Luetta did not feel the children were her responsibility because "she did not lay down to have them." SR30:210 Despite this, the children loved their mother and wanted to be with her. SR30:212 Anita's mother, Bernice Edison, tried to get custody from Luetta and had called repeatedly to report neglect to the authorities. SR30:210

Murtle Yancy, Mr. Woodard's other aunt also testified at trial SR31:218-230. Yancy stated she was raising her own children at the time and could not help out with Mr. Woodard. Yancy did note that Luetta suffered from epileptic seizures that reoccurred when her last boyfriend beat her up, and that Mr. Woodard was the one who found her in bed when she had died in her sleep in 1987. Leslie Willis, Mr. Woodard's uncle, testified that Luetta was in jail when she was pregnant with Mr. Woodard and that Luetta also had belonged to a gang, but she had quit. Leslie Willis recalled that the gang to which Luetta belonged might have been called

the "Disciples." The fathers of Luetta's children were all gang members. Luetta would vanish from time to time and abandon her children; she also had a temper and would throw tantrums when she got angry.

Both of Mr. Woodard's siblings also testified. Reginald Willis described how all three children would sleep in the same room with their mother. Reginald recalled seeing his mother's boyfriend beat his mother and shoot a firearm inside the house. Reginald recalled that he stayed at various foster homes and government homes while he was a child. Reginald also recalled that his mother had several boyfriends that would stay over and that his mother used drugs and drank alcohol in front the children often. Reginald recalled that he did get therapy when he was a child, but did not recall going to court to figure out where he would live. SR30:230-275

Reginald did confess to gang involvement and gang tattoos, but explained that where he lived with the Lucases was infested with gangs. All three children had different fathers.

The most powerful testimony came from Latoya Willis, Mr. Woodard's sister. Latoya recounted times when she and Mr. Woodard would try to fight off her mother's boyfriends that they witnessed beating her. She also testified that she had been raped by her mother's boyfriends and witnessed one of them threaten to kill her by placing a gun to her head. Latoya stated both her mother and her mother's boyfriends would "woop" on the children. While she was living with her aunt Yancey, the man then living with her aunt would refer to them all as the "bastard children" and would not feed them. SR30:3-33

Latoya explained that she had a better opportunity to bond with her mother because her mother took her everywhere because she was a girl. However, Mr. Woodard had difficulty because, unlike Reginald, he never received any counseling to get through his experience.

After her mother died, her grandmother took care of them until she also died two years later. Mr. Woodard had a hard time loving because he became afraid he was going to lose them. SR31:22 No one would take care of all of the children so they were split up. First Mr. Woodard went to live with the Lucas' in Chicago and then Mr. Woodard went to live with his uncle Darrel in Houston. Mr. Woodard took a job while living with his uncle Darrel so that he could get the things he wanted.

Finally, psychologist Dr. Shirley Gruen[3] testified. SR30:35-82 Dr. Gruen reviewed documents from the Illinois Department of Children and Family Services and interviewed Mr. Woodard. Dr. Gruen was able to get into Mr. Woodard's records and explain that he does well in a structured environment. In fact, Mr. Woodard's records from Clarinda Academy showed that he was successfully discharged from the academy in the summer 1996 and was a positive role model at the time, having earned an above-average grade level and awards for his participation on the baseball team.

Dr. Gruen noted that Mr. Woodard suffered from his mother's abandonment and from witnessing her repeated abuse. Dr. Gruen added, however, that when the aunt and Uncle Lucas got involved in his life, it might have been too late because he had already formed his view of the world. According to the records, Mr. Woodard was living with Mr. and Mrs. James Lucas at the time he was arrested for the juvenile robbery. (RR 31 at 57). Dr. Gruen followed up by stating that Mr. Woodard would continue to offend because he had chances to learn from the consequences of his behavior but they were not enough to turn him around. (RR 31at 59). Gruen ultimately opines that mitigation in Mr. Woodard's case was sufficient to excuse his behavior and that he suffered from posttraumatic stress disorder from his childhood experiences.

---

[3] The transcripts from the trial misspell the doctor's name Gruener.

On cross examination Ms. Gruen testifies that Mr. Woodard is a sociopath with antisocial behavior. SR31:71 In an effort to prejudice Mr. Woodard, the State then asks of Dr. Gruen is she was aware of the seven inmates who escaped from prison in December of 2000 and that one of the inmates who escaped had only been written up once prior to escaping. SR31:80-81

On redirect, Dr. Gruen tries to salvage her testimony by pointing out that Mr. Woodard is not a psychopath and that his antisocial personality is capable of being rehabilitated. SR31:85

## I. MR. WOODARD'S ARREST WAS IN VIOLATION OF THE FOURTH AMENDMENT AND THE INTRODUCTION OF THE SUBSEQUENT EVIDENCE OBTAINED FROM THE ARREST HARMED HIM AT TRIAL.

### A. Factual background

On February 12, 2000, police are faced with a double murder at a convenience store at 10606 Wilcrest. SR23:8 This is one of a string of unsolved convenience store robberies. News reports broadcast that the murderer ultimately escaped by stealing a Lincoln Town car from a patron getting gas. On February 14, a neighbor at 9290 Woodfair reports that the town car had been sitting in parking lot since the previous day.

Faced with pressure of community concerns to catch the killer, police offer a $10,000 reward to enlist the help of the "community" who might have useful information. That reward expires on February 17. EXH24 The press release on February 17 gives details of incident. On February 17, the police receive an anonymous call from two individuals claiming to have information on the robbery. EXH12

After meeting with the "informant," police obtain a warrant for Reginald Willis, Mr. Woodard's brother, who resides at 9290 Woodfair. The police encounter several people at the apartment whom they arrest and bring in for questioning. All three suspects, Reginald, Casper Hines, and Webster, make statements pointing fingers at Woodard.

The police are in the process of procuring a warrant, and have set up surveillance at Mr. Woodard's residence. An officer stationed at Mr. Woodard's residence spots him around 1:30 in the morning outside. Mr. Woodard is not looking or acting suspiciously and he identifies himself with valid identification. SR23:165, 183-184 Officers initiate a warrantless arrest and conducts a warrantless search of the residence. SR23:166,5

The Court of Criminal Appeals ruled this arrest was illegal under Article 14.04 of the Code of Criminal Procedure. (*Woodard v. State*, 2005 WL 77143, at 7). Article 14.04 requires that:

> Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

Tex. Code Crim. Proc. Art. 14.04.

As a result, the court ruled the video tape of the lineup was inadmissible but that the error was harmless. (*Woodard*, 2005 WL 77143, at 7). The CCA did not address the Federal Constitutional challenge to the illegal arrest, finding Appellate counsel failed to adequately brief the point. (*Woodard*, 2005 WL 77143, at 5).

**B. Mr. Woodard did not receive full and fair consideration of his Fourth Amendment Claim by the State Court.**

Ordinarily, lack of probable cause for an arrest is not a proper basis for granting relief under § 2254. *Pierson v. O'Leary*, 959 F.2d 1385, 1391 (7th Cir.), *cert. denied*, 506 U.S. 857, 1 (1992); *Colley v. Peters*, 814 F.Supp. 1390, 1397 (C.D. Ill.1992); *King v. Greer*, 672 F.Supp. 339, 340 (N.D.Ill.1987). "[W]here the State has provided an opportunity for *full and fair* litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 482 (1976). This principle is based on the long standing rule that "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474 (1980).

A petitioner has received an opportunity for full and fair litigation of his Fourth Amendment claim when "(1) the petitioner has clearly informed the State court of the factual basis for that claim and has argued that those facts constitute a violation of the petitioner's fourth amendment rights and (2) the State court has carefully and thoroughly analyzed the facts and applied the proper constitutional case law to the facts." *Pierson,* 959 F.2d at 1391.

In this case, Mr. Woodard did not receive "full and fair" consideration of his Fourth Amendment claim in State Court. The Court of Appeals refused to review his claim because the issue was inadequately briefed. *See Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008) (Fourth Amendment claim argued at trial and on appeal but "ignored" by state appellate court has not received full and fair consideration, and is not barred from consideration by habeas court); *Gamble v Oklahoma*, 583 F2d 1161 (10th Cir. 1978) (Deference to state court consideration of Fourth Amendment claims does not require federal blindness to a state court's willful refusal to apply the appropriate constitutional standard) (The court noted that although the Supreme Court in the Stone Case had announced its holding in terms of "full and fair litigation," its opinion had repeatedly spoken of "full and fair consideration" and that the court's use of the words "consideration" and "litigation" interchangeably suggested that in some instances more than procedural opportunity to raise and litigate a Fourth Amendment claim is required.)

The court in *Riley v Gray,* 674 F2d 522 (6th Cir. 1982), cert denied 459 US 948, held that federal habeas corpus relief is available when a criminal defendant has not been allowed fully to present his Fourth Amendment claim in state courts because of an "unanticipated and unforeseeable application of a procedural rule" that prevented State Court consideration of the merits of the claim, and concluded that the State Appellate Court in the instant case had

frustrated the petitioner's opportunity to litigate his Fourth Amendment claim because it had failed to remand his case to the trial court to allow him to establish his standing to challenge a search.

In *Boyd v Mintz*, 631 F2d 247 (3rd Cir. 1980), the court held that where the State provides the process but in fact the defendant is precluded from utilizing it by reason of an "unconscionable breakdown in that process", federal habeas relief may still be warranted. In *Boyd v. Mintz, supra,* the court found that such a breakdown occurred because of an unusual combination of circumstances, notably an unwritten policy on extensions and an informal repudiation of the prior practices on extensions, and therefore the defendant had been denied the opportunity to present his Fourth Amendment claim.

The court in *Cruz v Alexander*, 477 F Supp 516, (SDNY 1979)( dismissed without opinion (CA2 622 F2d 573), held that even if the court were to assume that the *Stone* case was applicable, habeas corpus relief would not be precluded because neither the trial nor the appellate courts had addressed the merits of the petitioner's wiretap claim because each believed that the other had done so or would do so.

In this case, it was completely *unfair* to Mr. Woodard to have the court find that the arrest was unlawful under State grounds, but inadequately briefed under Federal Constitutional grounds. Mr. Woodard objected at trial, and raised the issue of the constitutionality of his arrest on appeal in conjunction with his challenge under the state statute. It was not clearly foreseeable that the appeals court would not review this claim. Further, it was unconscionable under these circumstances to deny review of his meritorious challenge to his arrest.

**C. Mr. Woodard was illegally arrested without a warrant in violation of the Fourth Amendment.**

The State law would be parallel to the Federal law on this issue of illegal arrest. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In situations where the individual could not or would not wish to leave, even absent the police presence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). Circumstances that indicate a seizure include, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. Officers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist. *Payton*, 445 U.S. at 590. Exceptions to the warrant requirement, however, are "few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quotation omitted). The government bears the burden of establishing that exigent circumstances made the warrantless entry necessary.

The State Court found the State failed to establish there were exigent circumstances for the arrest. Further, the State Court held there was no attenuation between the illegal arrest and the lineup that Mr. Woodard sought to suppress. In fact, the record shows that Mr. Woodard was not brought before a magistrate until the 19th of February, two days later. CR3 Those same findings would apply to the analysis of his Fourth Amendment claim. There was clearly an unlawful arrest under the Fourth Amendment. Mr. Woodard was not free to leave when the

police officers approached him outside the apartment where he stayed and the State did not establish exigent circumstances.

**D. Mr. Woodard was harmed by the violation of his Fourth Amendment right.**

The only issue for Mr. Woodard to overcome for relief is whether there was harm from the admission of the lineup evidence. The State Court held there was no harm from the illegal actions of the police in unlawfully arresting Mr. Woodard. The State Court analysis of harm, however, was inapplicable to our constitutional standards because the State Court found the error in violation of the State statute, not on Federal Constitutional grounds. (*Woodard,* 2005 WL 77143, at 8).

Mr. Woodard was harmed by the admission of the unlawfully obtained evidence at trial and the harm was of constitutional magnitude, sufficient to warrant relief. When confronted by a preserved constitutional error, the court must set aside the judgment unless it is satisfied that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24 (1967). The harm was reversible under this standard. The illegal arrest resulted in the video-taped lineup, which, as the State Court held, had not been attenuated from taint of initial arrest. Accordingly, the error warrants reversal.

## II. THE REPEATED PRETRIAL IDENTIFICATION PROCEDURES WERE IMPERMISSIBLY SUGGESTIVE AND RESULTED IN SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MIS-IDENTIFICATION.

### A. Factual background

Calloway, who stops for gas at the convenience store, is using the payphone when he notices someone running towards his vehicle. He runs after the person and when he is 10 feet away, the runner pulls a gun at him so Calloway turns around and runs. Calloway claims he has a few seconds to look at suspect and then sees him again driving off in his Lincoln.

The police create several photo spreads, one has Mr. Woodard and another has the Mr. Woodard's brother. Calloway is not able to identify Mr. Woodard in either photo spread.

After Mr. Woodard is arrested, Calloway goes to a live lineup and makes a tentative identification of the Mr. Woodard after seeing him in the earlier photo spread. Calloway asks the police to place hoods on the lineup participants but the police are not able to. Later, the police make a computerized sketch of the same photo spread with Mr. Woodard, and impose hoods on the same six photos. Calloway identifies Mr. Woodard after seeing him for the third time.

The State Court of Criminal Appeals held as follows:

> The appellant also complains that "the repeated showing of the appellant's picture was suggestive. On February 18, 2000, Calloway viewed the lineup in which he made a strong tentative identification of the appellant, qualified only by the fact that he wished he could see the individuals in the lineup wearing hoods on their heads, as did the suspect on the night of the robberies and murders. Approximately one month later, Calloway viewed a photo spread in which all the individuals appeared to be wearing hoods. Calloway positively identified the appellant. Because Calloway had previously identified the appellant, viewing another display was not impermissibly suggestive.

The State court contrasted this case *with Cantu v. State*, 738 S.W.2d 249 (Tex. Crim.

App. 1987) and stated:

> …showing of several photo spreads on different occasions, each with picture of the appellant, is suggestive when the witness had not *previously* identified the appellant) (emphasis added).

(*Woodard*, 2005 WL 77143, at 7). However, the Court disregarded the fact that the eye witness had seen Mr. Woodard's picture in a prior photograph *before* he made the identification which the Court refers to as a "previous identification." Thus, the pretrial identification proceeding tainted the subsequent eye witness identification.

**B. The pretrial identification proceedings were impermissibly suggestive**

In *Coleman v. Quarterman*, 456 F.3d 537(5th Cir. 2006), the court held:

> "[A] conviction based on an eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir.1990) (citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must determine whether, "under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification." *Id.* Such an analysis is a mixed question of law and fact. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997).

The Court in *Sumner v. Mata*, 455 U.S. 591(1982)(*Sumner* II) held*:*

> "[T]he ultimate question as to the constitutionality of the pretrial identification procedures used ... is a mixed question of law and fact that is not governed by section 2254(d). In deciding this question, the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard. But the questions of fact that underlie

> this ultimate conclusion *are* governed by the statutory presumption .... Thus, whether the witnesses ... had an opportunity to observe the crime or were too distracted; whether the witnesses gave a detailed, accurate description; and whether the witnesses were under pressure ... are all questions of fact as to which the statutory presumption applies."

*Sumner*, 455 U.S. at 597 (emphasis original). Of course, the Federal Courts are not necessarily bound by the State Court findings. Section 2254(d) permits a Federal Court to conclude, for example, that a State Court finding was "not fairly supported by the record." But the statute does require the Federal Courts to face up to any disagreement as to the facts and to defer to the State Court unless one of the factors listed in §2254(d) is found. Although the distinction between law and fact is not always easily drawn, we deal here with a statute that requires the Federal Courts to show a high measure of deference to the fact findings made by the State Courts. To adopt the Court of Appeals' view would be to deprive this statutory command of its important significance. *Id.*

**The repeated photo spreads and line up were impermissibly suggestive**

The police had at least three photo spreads. Calloway was shown a photo spreads that contained Mr. Woodard's photo before the line up and one after. SE2 &3 While Calloway conveniently could not recall when he was shown the numerous other photo spreads, he did admit to being shown other photo spreads on at least five other occasions. SR25:227; SR23:256 The reoccurrences of one particular face might suggest to the witness that the police think that the defendant is the culprit. *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Calloway states that Mr. Woodard is the only individual who is both the photo spreads and the lineup. SR26:2

In addition, the photo spread with Mr. Woodard did not contain individuals with similar characteristics. In State's exhibit 2, all six individuals have different head shapes, coloring, eye

brows, ears, and vary with facial hair. Moreover, in State's exhibit 67, Reggie, who bears a strong resemblance to his brother, is in the identical position, number two.

The live lineup is extremely prejudicial. There are only five individuals instead of six and Mr. Woodard is the only one without facial hair or face injury. The first individual has a full grown mustache and long hair and is 6'1". The second individual has an injury on his face and long hair and is 5'11". Mr. Woodard is number three. Number four is only 5'8", with facial hair and noticeable busted mouth and teeth. Number five has a mustache and partial beard and braids, and is 5'11".

Further, prior to the live lineup, the police had Calloway identify items recovered from his vehicle, indicating that the police had apprehended the individual who had taken his vehicle. Then, the police showed Calloway photos of Mr. Woodard in different photo spreads and have Mr. Woodard appear in a live lineup. Under the circumstances, the repeated presentation of Mr. Woodard's photographs to Calloway was impermissibly suggestive.

It was more than clear who the police believed to be a suspect by the time Calloway was shown the final photo spread. Thus the pretrial identification proceedings were impermissibly suggestive.

**C. There was a substantial likelihood of misidentification from the pretrial identification proceedings**

The Court next must follow the method of analysis outlined by the United States Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98 (1977). The factors to be considered include:

(1) The opportunity of the witness to view the criminal at the time of the crime;
(2) The witness' degree of attention;
(3) The accuracy of his prior description of the criminal;
(4) The level of certainty demonstrated at the confrontation; and

(5) The time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, (1972); *Manson,* 432 U.S. at 114. These factors are to be weighed against the corrupting effect of the alleged suggestive identification itself. *Id.*

**Opportunity to view:** This factor weighs in favor for Mr. Woodard. Although at the pretrial hearing, Calloway stated he was 20-30 feet away from the suspect, RR23: 215, at the trial in front of the jury, he testified the suspect was 15-20 feet from him when he could see his face. SR25:205. In addition, it is undisputed that the incident occurred at night, the lighting was fair, and that almost the majority of the time Calloway was in the presence of the suspect, the suspect had his back to him, was wearing a hood, or had his face down. In sum, Calloway saw the suspect's face for only a couple of seconds when he was 20 feet away from him. SR25:161; SR23:251 The remainder of the time, the suspect was across the street in his vehicle driving away. Thus, the first factor would support a finding there is a likelihood of misidentification.

**Degree of attention** Calloway stated that when he finally saw the suspect's face, the suspect pulled a gun at him. Since Calloway did not notice the gun until he pointed it at him, the degree of attention is questionable because it is highly unlikely that Calloway was able to focus on the suspect's facial features. SR25:161;SR23:243 Although Calloway testified that he saw the suspect for a total of 20-30 seconds, he only was able to see him up close for a couple of seconds before he turned around and ran after he saw the gun. Thus, the degree of attention at that time was not high because he would have been focused on the gun, that he was able to describe was a 9 millimeter. SR235

**Accuracy of his prior description**: Calloway's initial description to the police the same day of the incident was a very general description. At the scene, Calloway was only able to describe a black male, 5'10" with a hooded jacket, no facial hair and dark skin.

Calloway did a sketch at the police station at some later time, however, he admitted that he seen several photo spreads before he did the composite. SR23:254

**Level of certainty of the identification from the confrontation** This factor was weak in this case, as demonstrated by Calloway's testimony that he was not sure because the suspect was wearing a hood and he would need to see the suspects wearing hoods.

**Time between the crime and the confrontation** The lineup was five days after the crime occurred. However, there were also numerous intervening events that increased the likelihood of misidentification, such as the notification that the equipment from the car was located and the news stories that showed pictures of Mr. Woodard and the other photo spread.

Using the above factors, the likelihood of misidentification from the pretrial proceedings was high. This conclusion is also supported by the affidavit of eyewitness identification expert Fisher. EXH16 As noted by Fisher, the estimator variables that related to the event itself, the gun and the hood, as well as Calloway's certainty at time of identification, signify that the reliability of the identification was questionable. Moreover, the repeated identification tests increase the witnesses' confidence in the outcome without increasing accuracy, thereby creating a risk of unfair prejudice by the testimony that should have been avoided.

**D.Mr. Woodard was harmed by the erroneous admission of the unconstitutional pretrial identification procedures**

Where the state's use of pretrial identification procedures posed a substantial likelihood of tainting the state witnesses' identifications of the defendant and both their out-of-court and in-court identifications are not shown to be independently reliable, the Court must determine if admission of the identifications into evidence is harmless error. *See Young v. Herring*, 917 F.2d 858, 864 (5th Cir.1990), *superseded on reh'g on other grounds*, 938 F.2d 543 (5th Cir.1991) (en

banc), *cert. denied*, 503 U.S. 940, (1992) (citing *Chapman v. California*, 386 U.S. 18, 23, (1967). When the state is the beneficiary of any error, the burden of proving that the error was harmless, beyond a reasonable doubt, rests at the state's door. *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir.1986), *cert. denied*, *Foltz v. Thigpen*, 482 U.S. 918 (1987) (citing *Chapman*, 386 U.S. at 24).

There is serious doubt that the error from the pretrial identification procedures was harmless in this case. Callaway's identification was the only testimony admitted that established Mr. Woodard was at the scene of the murders. The importance of Calloway's eyewitness identification testimony was evidenced by the juror notes requesting the testimony of the officers regarding the identification. Without his testimony, all that remained was the self-serving hearsay testimony by the original suspects and others who were potentially involved. The harm from the admission of the impermissibly suggestive identification procedures was sufficient to warrant reversal of this conviction for capital murder.

## III. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY ADMONISH MR. WOODARD ABOUT HIS RIGHT TO TESTIFY.

### A. Factual background

Mr. Woodard states in his affidavit that he had wanted to testify during both guilt and punishment but trial counsel did not permit him to do so. [State Writ Ex. 1] Mr. Woodard did not understand that the decision to testify was his, even against his attorney's wishes, and trial counsel told Mr. Woodard she would not *let* him testify. Mr. Woodard's testimony would explain how the other state witnesses and he were connected to the stolen property but not to the scene of the murders.

Mr. Woodard stated that he saw an individual exiting the Lincoln town car while it was parked at his brother's apartment complex and he decided to steal it. In actuality, he was stealing the property he found inside the vehicle. Mr. Woodard states that he found Lottery tickets and a gun inside the car. He also states that he, Reginald, and Webster took turns taking the vehicle apart in an effort to sell its parts for money.

The State Court made a finding that Mr. Woodard's claim was not credible and believed the trial attorneys' affidavits were more credible. Despite Mr. Woodard's request, the trial court did not conduct a hearing with live testimony.

The trial attorneys' affidavits in this case are not sufficient to deny Mr. Woodard relief on this claim. Attorney Loper states that both he and Attorney Muldrow often discussed with Mr. Woodard his right to testify and Mr. Woodard made numerous inquiries into what his testifying would entail. EXH26 Loper however never states that he specifically admonished Mr. Woodard that he had a right to decide whether or not he should take the stand in his own

defense. Attorney Loper's affidavit also makes mention of "Andrian Sipsey" which indicates that the writ was not the first time Mr. Woodard referred to him as a suspect.

Muldrow's affidavit is more descriptive. EXH25 Muldrow states that there was a great deal of discussion regarding what his testimony would entail; however, Muldrow states that Mr. Woodard "never made a sober request to testify." Muldrow stated that during conversations with Mr. Woodard, he expressed a fear that he could not just say who committed the murders because he still had family out there. Muldrow commented that Mr. Woodard would smile and give counsel clues as to who was involved, and her affidavit also states "Applicant was asked if he expected to testify about the above mentioned 'clues' and expect a jury to accept this." Although Muldrow states, "[h]e was aware that he alone controlled his ability to be a witness," Muldrow did not state she admonished him that under the law that he had a right to decide whether or not to testify. Mr. Woodard in his affidavit states that Muldrow told him she was not going to let him testify. Clearly, there was a less than harmonious relationship between counsel and client. From a careful reading of the affidavits, however, there is room to believe that even if all parties were truthful, Mr. Woodard's rights were violated.

**Ineffective assistance of counsel generally**

To prevail on a claim of ineffective assistance of counsel, Applicant must first show that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687(1984). Specifically, appellant must prove, by a preponderance of the evidence that his counsel's representation fell below the objective standard of professional norms. Second, appellant must show that this deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687("This [prejudice prong] requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable").

**B. An accused's right to testify belongs solely to the defendant on trial.**

An accused has an absolute constitutional right to testify at his own trial as guaranteed through the Fifth Amendment, the Sixth Amendment and the Fourteenth Amendment. *Rock v. Arkansas*, 483 U.S. 44 (1987). This right belongs to the accused and as such is a personal right that only a defendant can waive, not his counsel. *Emery v. Johnson,* 139 F.3d 191, 198 (5th Cir. 1997). An accused cannot waive his right to testify unless he does so knowingly and voluntarily. *Emery*, *supra; United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1990) citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("…there can be no effective waiver of a fundamental constitutional right unless there is an intentional relinquishment or abandonment of a known right or privilege.").

An attorney who does not inform a defendant that he has the right to testify and that the decision ultimately belongs to the defendant *is ineffective* for failing to ensure that the defendant knowingly waives his right to testify. *Teague v. United States*, 953 F.3d 1525, 1543 (11th Cir. 1992):

> Alternatively, if defense counsel never informed the defendant of the right to testify *and that the ultimate decision belongs to the defendant*, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary.

*Teague*, 953 F.2d at 1534(emphasis added). The court in *Teague* did not uphold the appellant's claim because the defendant's trial attorney clearly stated she informed the defendant he had a right to testify before he acquiesced to her advice not to testify. Similarly, in *Webber,* there was

a discussion on the record about the defendant's right to testify during the trial. *See also Brown*, 217 F.3d 247 (defendant claiming right to testify was violated was permitted to consult with attorney and then failed to insist to testify, thus failure to reassert right to testify was product of counsel's persuasion, not coercion).

When a defendant asserts that he desires to exercise his constitutional right to testify truthfully, counsel's duty is to inform the defendant why he believes this course will be unwise or dangerous. *United States v. Mullins*, 315 F.3d 448 (5th Cir. 2002). If a defendant insists on testifying, however irrational that insistence might be from a tactical viewpoint, counsel must accede. *Mullins*, 315 F.3d at 456. A defendant's personal constitutional right to testify truthfully in his own behalf may not be waived by counsel as a matter of trial strategy. *Mullins*, *supra.*

Some courts have held that the denial of a defendant's right to testify is trial error, and subject to a harm analysis under *Strickland*. *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). The second prong of the *Strickland* test asks whether counsel's deficient performance prejudiced the defense. It requires "... a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt" and that the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694-695. In determining whether there is prejudice in a claim of ineffective assistance for failure to permit defendant to testify, the court may examine the nature of the defendant's testimony proffered. *Sayre, supra.*

### C. Mr. Woodard's right to testify was violated when trial counsel failed to properly admonish him.

It is clear from Mr. Woodard's affidavit that Mr. Woodard was denied his right to testify as a result of counsel's error in failing to appropriately admonish him and let him testify. *See*

*Nichols,* 953 F.2d at 1552 *citing United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992)(The first prong of the *Strickland* test would be met "if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand.")

**D. Mr. Woodard was prejudiced by the failure of trial counsel to permit Mr. Woodard to testify.**

Counsel's deficient performance prejudiced Mr. Woodard's case. The testimony of a criminal defendant at his own trial is unique and inherently significant. "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States*, 365 U.S. 301 (1961). When the defendant testifies, the jury is given an opportunity to observe his demeanor and to judge his credibility firsthand. As the United States Supreme Court noted in *Rock*, 485 U.S. at 52, "the most important witness for the defense in many criminal cases is the defendant himself." Further, in a case such as this where the question was not whether a crime was committed, but whether *the defendant* was the person who committed the crime, his testimony takes on even greater importance. Indeed, "[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance." *United States v. Walker*, 772 F.2d 1172 (5th Cir. 1985).

Mr. Woodard's affidavit establishes the relevancy of his testimony in guilt/innocence. None of the material facts that Mr. Woodard would have testified to were brought out during the trial. *Compare, Mullins,* 315 F.3d at 456 (No prejudice established despite counsel's deficient performance in refusing to permit defendant to testify because testimony at trial presented much of the defendant's story to the jury without his testimony.). Mr. Woodard would have testified that he was not at the murder scene and he did not murder the

complainants, but that he saw the murderer abandon the vehicle and, without knowledge of the murders, decided to steal items from the vehicle. This would have established his innocence of the capital murder and established an explanation for possession of the items from the stolen vehicle. Mr. Woodard's testimony would have also brought forth evidence of another suspect that the jury *never heard*. Other than by a misdemeanor theft, his testimony would not have been impeached. The theft conviction would not harm his testimony because he admits to stealing the items from the vehicle. Accordingly, Mr. Woodard has established he was harmed by the denial of his constitutional right to testify.

Mr. Woodard argues violation of a defendant's right to testify appears to have a heightened standard. (Because the right to testify is a fundamental constitutional right designed to guarantee a fair trial, [citation omitted], the second prong of *Strickland* is satisfied.") *citing Lockhard v. Fretwell*, 506 U.S. 364 (1993). Having established a constitutional violation, a harm analysis would not be necessary. Alternatively, harm from his failure to testify was sufficient to have prejudiced Mr. Woodard's defense.

## IV. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO HIRE AN EXPERT TO CHALLENGE THE RELIABILITY OF THE EYEWITNESS TESTIMONY BOTH AT PRETRIAL AND BEFORE THE JURY.

### A. Factual background

Neither eye witness who testified at trial made a positive identification during the initial lineup. Sadiki was not able to pick out Mr. Woodard in the lineup, however, she testified Mr. Woodard might be the suspect because he had "thin hands." Calloway made a tentative identification of Mr. Woodard from a live lineup, followed by another identification in a photo spread, and finally an in court identification.

During guilt/innocence deliberation, the jurors sent out two notes regarding evidence of the lineup and the photo spreads with both Reggie and Mr. Woodard. CR 227, 263 The first request was asking for Cory Calloway's statement at the time of the lineup. CR 227 The jury was never read back any testimony however because the court responded, "*there was no cross-examination that fits this request*." CR 227 The second note requested the EXHibits of the composite sketch and the photo spread with both Mr. Woodard and Reginald Willis. CR 263 Those notes indicated that the jurors disputed some of the eyewitness testimony and therefore the reliability of the eyewitness identification was an important issue for the jury.

The trial attorneys stated that it was their belief that the more damaging testimony came from the witnesses testifying about the conduct that occurred after the murder. Thus, trial counsels' strategy at trial was to focus on discrediting the testimony of the remaining witnesses. In other words, they did not believe it was important to impeach the eyewitness identification from the scene.

The trial attorneys stated as follows:

> "I personally believed the combined effect of Willis, Hines, and Kenneth More [sp] would outweigh the use of an eyewitness expert referred to in the applicant's writ. Either Woodard shot the c/cw, Reginald did it, or they both participated in the getaway."

EXH25

> "With regard to our decision not to employ a defense expert to testify to the reliability of eyewitness testimony, I recall discussing that issue with co-counsel Muldrow. I believe that we considered that possibility but ultimately chose not to do so. I recall that at the time, we were not convinced that such expert testimony would be admissible, nor did we believe that employing such an expert would be the best use of defense resources. I understand that since the time of this trial, use of these types of experts has increased. However, at the time of this trial, and based upon our assessment of the case, we made the strategic decision not to employ an eyewitnesses testimony expert."

EXH26

Without a hearing on the matter, the State Court determined from trial counsels' affidavits that it was reasonable trial strategy not to hire an eyewitness identification expert.

**B. Effective assistance of counsel includes the right to have experts employed to assist counsel impeach the State's witnesses.**

Under *Ake v. Oklahoma*, 470 U.S. 68 (1985), an indigent defendant who establishes the necessity of access to an expert and that the expert's testimony is likely to be a significant factor at trial, is entitled to have an expert appointed.

The right to effective counsel incorporates the right to test our adversarial system through effective cross-examination. Consequently, the courts have also held that trial counsel's failure to properly impeach eyewitness testimony is ineffective assistance of counsel. *See Beltran v. Cockrell*, 294 F.3d 730 (5th Cir. 2002); *Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001). In *Beltran*, the court reversed a conviction for ineffective assistance of counsel when trial counsel did not impeach the eyewitness testimony with prior tentative identification. In *Dixon*, trial counsel was ineffective for failing to bring out a prior statement

from the eyewitness that identified the assailant as a black male, without any additional information.

Along the same lines, it is ineffective to not employ an expert to enhance the defensive theory. In this case, there is no clear indication what the defensive theory was. However, one way or another, it would entail establishing that Mr. Woodard was not present at the scene. Therefore, there was a need to impeach the eyewitness testimony offered.

In *Soffar v. Dretke*, 368 F.3d 441 (5TH Cir. 2004), the court held that the failure of capital murder defendant's counsel to retain expert to investigate discrepancies between ballistics evidence and state's theory of case constituted deficient performance, for purpose of determining whether defendant was deprived of effective assistance. Similarly, in *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005), the court held the state habeas court unreasonably applied settled federal law, namely, the first, "performance" prong of the *Strickland* test in the rejecting claim that petitioner's counsel was ineffective in failing to obtain forensic examination of the path of the fatal bullet.

**C. Trial counsel cannot rely on financial barriers to justify a failure to present expert testimony**

One of the reasons mentioned in Attorney Loper's affidavit was that it would not be the best use of defense resources. This reason cited is not sufficient because there was no attempt to even procure any funding for an eyewitness expert.

Counsel's choice to dispense with necessary services for budgetary reasons was unreasonable because counsel must "demand . . . all resources necessary." 2003 Guideline 10.4(D). While it is certainly laudable and necessary for court-appointed counsel to be cost-conscious, counsel cannot sacrifice the client's interests for budgetary reasons. "Defense

counsel has a duty to take all necessary steps to ensure that available mitigating evidence is presented," including, "seeking funds from the court and specifying why they were necessary." *Marquez-Burrola v. State*, 157 P.3d 749, 765 (Okla Crim. App. 2007). *See also Rios v. Rocha*, 299 F.3d 796, 803 (9th Cir. 2002) ("[R]eluctance to ask for public funds to hire his own investigator was not a proper reason for failing to pursue an initial investigation into potentially feasible defenses"); *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 288 (S.D.N.Y. 2006) ("Deciding that investigation is costly is not, as *Strickland* requires, equivalent to a reasonable and informed decision that investigation is unnecessary"); This was also in line with State law at the time. *See ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005) ("Counsel is most assuredly not required to pay expert witness fees or the costs of investigation out of his own pocket, but a reasonably competent attorney–regardless of whether he is retained or appointed–must seek to advance his client's best defense in a reasonably competent manner," including seeking necessary funding).

Nonetheless, a decision not to investigate, "must be directly assessed for reasonableness in all the circumstances," *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691), and "an attorney must look into readily available sources of evidence," *Hall*, 106 F.3d at 749-50.

D. **Expert eyewitness testimony was admissible**.

The other reason that trial counsel noted in the explanation for not employing an eyewitness identification expert was that they did not know that such testimony would be admissible. This belief would again establish that trial counsel was not effective because he did not understand the law. Further, as noted in the expert declaration of Charlton, eyewitness expert testimony in this case would have been extremely instructive for the jury in this case as well as during the pretrial motion. EXH22

Texas law provides for the admissibility of expert testimony on eyewitness identification. *See Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App.1996) (Psychologist's testimony as to factors affecting reliability of eyewitness identification was helpful on issue of eyewitness reliability and was thus relevant, even though psychologist did not testify as to every conceivable factor that might affect reliability of eyewitness identification in case; psychologist answered questions about specific facts of case and how they might be affected by factors to which he testified, stated his opinion about reliability of eyewitness identifications at issue, and identified facts in case that he believed impacted those identifications. *Stephenson v. State*, 226 S.W.3d 622 (Tex. App.-Amarillo, 2007) (Error, in failing to admit testimony from forensic psychologist regarding reliability of eyewitness identification, was harmful; accuracy and reliability of complainant's identification of defendant as perpetrator of crime was pivotal to State's case, State presented no other inculpatory evidence tying defendant to crime for which he was convicted, and defendant's defense of mistaken identity turned on ability of jury to judge reliability of that very same testimony.)

**E. Expert eyewitness testimony would have assisted in establishing reasonable doubt in Mr. Woodard's case**

Expert testimony on the science of eyewitness testimony should have been used during the pretrial hearing to exclude the eyewitness identifications made during the lineups and in the subsequent photo spread by Cory Calloway and Garvina Sadiki. Expert testimony on the science of eyewitness memory would have also helped the Mr. Woodard's defense theory at trial that the eyewitness testimony was not reliable under the circumstances in this case.

The field of eyewitness memory consists of numerous scientific studies on the accuracy of eyewitness memory and how various factors may affect it. The eyewitness experts could

testify as to the various factors at the time of event and during the identification proceedings.

An eyewitness expert could have informed the jury of the following:

a. There are scientific studies and conclusions regarding the effect of the initial crime observation and the method in which the identification tests are conducted on an eyewitness's memory.

b. In this case, there is a phenomenon referred to as "weapon focus" in which studies have revealed that the presence of a weapon interferes with the witness's perception of other salient object and events of the crime. This leads to a decreased ability to process other information such as the assailant's face and other aspects of the scene.

c. The fact that the suspect was wearing a hood at the time he was seen by the eyewitnesses covered the perpetrator's hair. There have been scientific studies that establish eyewitness recognition suffers dramatically when a hat is worn.

d. The eyewitness identification procedures did not follow specific guidelines required by the Department of Justice - National Institute for Justice for increasing reliability in identification procedures.

e. The police should have matched the characteristics in the witness descriptions with the characteristics of the foils in the lineup procedures. The police failed to match the description of the perpetrator's hands, the facial hair and height. These avoidable errors increased the probability of creating a false identification of an innocent suspect in this case by effectively lessening the number of actual participants in the identification procedures.

f. The police methods used in this case increased confidence in the eyewitness identification and memory falsely, despite the eyewitness's initial uncertainty.

g. The suggestiveness by the police in requesting that the eyewitnesses indicate why there was a selection results in artificially solidifying prior tentative identification.

h. The suggestiveness by the police in giving the eyewitness only two options after he indicated during the lineup that he was not positive also affected the reliability. When the police asked Calloway to choose between a strong tentative or tentative identification, they should not have limited his choices to tentative and strong tentative.

i. There is scientific evidence that suggests the procedures in conducting the lineup simultaneously versus sequentially also increased the likelihood of a false identification.

EXH16

**F. Failure to use expert eyewitness testimony resulted in a deficient performance by trial counsel.**

The above information could have been used in the pretrial hearing to prove to the court that the lineup identifications and the photo-spread identification were conducted in a scientifically unreliable manner and the evidence should have been suppressed. There can be no possible strategy in failing to back up suppression with expert testimony. Had counsel established through scientific evidence that the eyewitness identifications were not reliable, they would not have been admissible during the trial. Thus, counsel was deficient in failing to procure and present expert eyewitness testimony at the pretrial hearing. EXH22

Furthermore, as Dr. Fisher indicates in his report, studies show that jurors are not always aware of the above factors and jurors often do not understand the impact of improper procedures on the eyewitness's memory. Accordingly, trial counsel's attempt to impeach the eyewitness testimony without expert assistance was deficient.

Although trial counsel did point out and argue that the lineup participants did not look anything alike, counsel did NOT argue that the police's failure to use participants who resemble the original description of the perpetrator violates the national guidelines established by the Department of Justice-National Institute of Justice that were established in order to avoid conviction of innocent people. This would have presented objective evidence under the United States government's guidelines for ensuring reliability in eyewitness identifications, Calloway's identification was inherently unreliable. Further, an expert could have explained the various different reasons outlined in Dr. Fisher's report that explain that the eyewitness did not make his identification from his memory of the event, but made a relative comparison among the couple of suspects that had the same characteristic. An expert would also point out how the reliability

of the identification decreased along with each individual in the lineup who did not have similar characteristics to the original description of the perpetrator. EXH16

Trial counsel also pointed out during closing that Cory Calloway viewed numerous comparisons that contained pictures of Mr. Woodard. Although the jury might have been able to deduce that the repeated identification procedures tainted the eyewitness identification, an expert would have proven how and why the identifications were not reliable with objective scientific evidence to back it up. Again, an expert could point out that the repeated viewings of the same suspect violate Department of Justice recommendations. The expert would then further testify that any subsequent positive identification by the eyewitness, after repeated unsuccessful identification procedures, have been proven to be unreliable and a result of artificially solidifying prior uncertain identifications. An expert's testimony could have explained the fallibility of the eyewitness testimony in this case objectively by detailing how the eyewitness memory was impaired by the numerous subsequent identification proceedings.

Without the expert assistance, trial counsel was unable to mention the more serious problems with the eyewitness identification that Dr. Fisher's report points out. Trial counsel failed to present evidence that the simultaneous showing increased the potential for false identification and that scientific studies established that sequential showings are preferred and more reliable. Further, the juror never heard objective testimony to explain the phenomenon of "weapon focus." More importantly however, the jury did not know that because the perpetrator wore a hood, studies showed the likelihood of an inaccurate identification increase several fold. Dr. Fisher's report notes that the hood had even more of an effect on the eyewitness identification than the weapon used, but counsel did not bring this out at all.

Most importantly, as Dr. Fisher notes, the way the police framed the questions they asked both eyewitnesses further tainted the eyewitnesses' memories by building their confidence in the tentative identifications. Also, the timing of the questioning, after showing the recovered property, had an effect on the identifications. Because none of these factors were explained to the jury and because eyewitness identification was a crucial issue in this case, counsel's performance was deficient.

The failure to employ an expert could not be explained by trial strategy. There is no benefit in excluding the expert eyewitness memory testimony from a jury. This testimony could only have strengthened the cross-examination and defensive theory of false identification. Although a newer science, eyewitness memory recognition had been recognized and used in criminal trials for several years prior to Mr. Woodard's trial. Thus, in failing to use such an expert, more likely than not, counsel's performance fell below objective standards of professional norms.

### G. Trial counsel's deficient performance prejudiced Mr. Woodard's defense

Counsels' deficient performance prejudiced Mr. Woodard's defense. As already noted, the only evidence that placed Mr. Woodard at the actual murder scene was the eyewitness identification. The fact that the jury in this case sent two notes with specific questions regarding the witness' identification indicates the jury had an issue with the testimony. The expert assistance would have armed the jurors who doubted the testimony with a means to back up what their gut was telling them with actual scientific facts and explanations. Without the eyewitness expert, the jury was left guessing at the reliability of the testimony. Mr. Woodard was consequently prejudiced without the scientific evidence to prove the unreliability of the only factual evidence linking Mr. Woodard to the scene of the crime.

In *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007), the Court reversed the lower court on a finding of ineffective assistance of counsel for failing to introduce mitigating mental health evidence. The court explained:

> While the sentencing court was provided with some limited information about Lambright's mental health problems through the pre-sentence report and Dr. Hinton's report, the information contained in those reports was conclusory and based solely on Lambright's own accounts of his history. No medical records were offered to substantiate his reports of suicide attempts or psychiatric hospitalization, and no mental health professional was called to testify about the extent and nature of his mental health problems. Thus, while certain basic information about Lambright's mental health problems was presented to the sentencing judge, this information was incomplete, not compellingly presented, and buried in otherwise damning reports.

If "there is a reasonable probability that at least one juror would have struck a different balance," the petitioner has established prejudice. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). There is evidence in this case the jury took the eyewitnesses identification testimony seriously because they sent out notes requesting testimony from the lineup proceeding. At least one juror thus was troubled by this testimony, and thus there was prejudice that resulted.

Furthermore, under *Strickland*, Mr. Woodard argues that the accumulation of errors alleged by trial counsel resulted in a deficient performance that prejudiced Mr. Woodard's right to a fair trial. The resulting prejudice from counsel's failure to permit Mr. Woodard's to testify, failure to investigate and present evidence to impeach Reginald Willis and the lack of expert eyewitness testimony rendered a verdict not of an adversarial system and undermined confidence in the trial's outcome.

Accordingly, Mr. Woodard requests this Honorable court grant the writ application, order that a hearing be held to further develop these relevant grounds, or grant any such further relief the Court deems necessary.

## V. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND INTRODUCE RELEVANT IMPEACHMENT EVIDENCE AGAINST THE STATE'S WITNESSES

### A. Background facts

Reginald Willis testified at trial that his brother, Mr. Woodard, told him he had committed the murders. Reginald Willis had a recent felony conviction that was never brought out at trial. There was also evidence not introduced regarding Reginald Willis's retardation. EXH19 In addition, there were numerous records that could have been used to impeach Reginald Willis and establish his testimony was biased because he was a suspect. Reginald Willis denied that he went by the nickname "Red" but his records from Illinois showed "Red" was a documented nickname for him. EXH19 Records from Illinois also showed a history of violence as well as an inability to control his explosive anger, unpredictable behavior, and a pattern of shifting blame toward others. EXH19 Additionally, there is evidence that Reginald Willis pulled a gun, resembling the one used in the capital murder, the following day at his apartment on his girlfriend's baby's father. EXH8, EXH12

Calloway never mentions anything about a red Lincoln in his testimony. Further, Calloway testified that the suspect came out of the convenience store and ran at him and took his vehicle. Trial counsel did not impeach Cory Calloway with his prior inconsistent statement to the police *that someone in a red Lincoln had assaulted him*. The prior statement was inconsistent on two grounds. First, the statement mentions someone in a "red" Lincoln. Read alone, the statement implies someone drove by in a Red Lincoln and assaulted him, which would imply that someone else was there at the scene. Second, Calloway fails to state that the individual who assaulted him was running out of the store. Thus, the prior inconsistent

statement would impeach his identification and his truthfulness. Consequently, counsel's performance was deficient and resulted in prejudice to the Mr. Woodard's defense.

Trial counsel's admitted in their affidavits that they had not uncovered the above information in the investigation of the case, nor had they made any attempts to. In fact, the affidavits do not address any strategy employed by the defense team to defend against the allegations. Nevertheless, the state court found the defense strategy at trial was to blame Reginald Willis and that as a part of their strategy, they impeached Willis regarding his whereabouts during the offense. The state court also went further to volunteer that it would have been inconsistent with this so called strategy to impeach Reginald Willis and point out his mental retardation issues. Overall, the state court concluded that all of the evidence referred to above was irrelevant and that trial counsel provided effective assistance and employed sound trial strategy.

**B. The Sixth Amendment requires trial counsel to conduct a thorough investigation of the facts.**

The United States Supreme Court established that a defendant is entitled to effective counsel under the Sixth Amendment. To prevail on a claim of ineffective assistance of counsel, Mr. Woodard must first show that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687. Specifically, appellant must prove, by a preponderance of the evidence that his counsel's representation fell below the objective standard of professional norms. Second, appellant must show that this deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687("This [prejudice prong] requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable"). A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 687.

With respect to the duty to investigate, the Court held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 3466 U.S. at 691. Counsel must make an independent investigation of the facts of the case and can not entirely place his reliance on the district attorney's office or his client's version of the facts. *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979). As in the instant case, the attorney's duty to investigate was at issue in *Strickland*. The Court held such a duty exists, but its scope may fluctuate under varying circumstances:

> "...strategic choices made *after* thorough investigation of law and facts relevant to *plausible options* are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations to investigation or *to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

In the seminal decision of *Powell v. Alabama*, 287 U.S.45 (1932), the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built. It may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation that would enable him to make an informed rational decision. Counsel has a duty to bring to bear such skill and knowledge as will render the trial a "reliable adversarial testing process." *Strickland*, 466 U.S. at 688.

### C. Trial counsel were ineffective for failing to investigate and present evidence to impeach the states' witnesses.

#### 1. Trial failed to fulfill their duty to investigate impeachment evidence.

"[A]n actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results." *Soffar v. Dretke*, 368 F.3d 441, 474, *amended*, 391 F.3d 703 (5th Cir. 2004). Further, counsel's belief that a witness would not be credible did not excuse counsel's failure to interview the witness because, "[i]n a claim grounded in failure to interview, the 'quality' and potential persuasiveness of the [witness] is largely immaterial." *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003); *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005) ("C]ounsel could not have evaluated or weighed the risks and benefits of calling [a witness] as a defense witness without so much as asking [him] what he would say if called");

"[B]ecause counsel does not know what an investigation will reveal is no reason not to conduct the investigation. *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003). Counsel was obligated to find out the facts not to guess or assume or suppose some facts may be adverse"); *Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (Counsel "could not have made an informed tactical decision" concerning the benefits versus the risks of presenting the testimony of a witness that counsel had not interviewed); *Ross v. State*, 954 So. 2d 968, 1006 (Miss. 2007) ("[i]t is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover"); *Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) ("The decision not to interview witnesses, particularly your own, cannot be considered an effective strategic choice"). The Court in *Wiggins*, *supra*, noted as follows:

> In assessing the reasonableness of an attorney's investigation, . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for

> strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.* at 527. In *Wiggins*, "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's conduct in Mr. Woodard's case was deficient in this case in precisely the same fashion as in *Wiggins*.

In this case, although trial counsel employed an investigator to investigate the scene of the offense, and interview a few witnesses, counsel failed to employ any strategy to defend against the crime. Had counsel at a minimum, conducted a background check on Reginald, this would have revealed he had a prior felony conviction with which to impeach him. Additionally, the fact that there was an incident report to the very same address wherein Reginald pulled a gun on Casper Hines, would also have supported the so called defensive theory with actual facts.

A simple reading of trial counsels' affidavits, particularly Ms. Muldrow's, shows that at best, counsel did not feel they knew how to investigate the case; at worst, trial counsel formed an opinion on Mr. Woodard's guilt and supplanted it for their duty to zealously defend him. Any simple investigation on the cooperating individuals would have given them some information to use to impeach their testimony or at least reveal their motives in testifying as they did in trial. At the very least, it is obvious that the witnesses were intimidated by the police and the process and because of their involvement with the evidence after the crime, they were concerned about being implicated and therefore more motivated to cooperate with the police. None of the above was explored at trial and no defense was presented.

**2. Trial counsel failed to properly impeach the States' witnesses in order to discredit their testimony**

As pointed out in earlier argument, the appropriate investigation leads us to the requirement of proper impeachment of the State's witness. If counsel's failure to investigate possible methods of impeachment is part of the explanation for counsel's impeachment strategy, or a lack thereof, the failure to investigate may in itself constitute ineffective assistance of counsel. *See Tucker v. Ozmint,* 350 F.3d 433, 444 (4th Cir.2003) ("Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel."). *See also Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006).

In the same light, courts have held that counsel was ineffective in failing to impeach a witness with a prior inconsistent statement. *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989)(Counsel rendered IAC in defendant's murder trial when he failed to impeach a witness with prior inconsistent testimony she gave at the trial of another individual being tried for the same murder.); *Smith v. Wainwright*, 741 F.2d 1248 (11th Cir. 1984), (Trial counsel ineffective for failing to use prior conflicting statements by the state's primary witness and his wife (that witness committed murder) to impeach witness who testified at trial that defendant committed murder.); *See also Beltran v. Cockrell*, 294 F.3d 730 (5th Cir. 2002); *Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001)(failure to impeach eyewitness with prior inconsistent statement was ineffective). Thus, counsel who fails to bring out flaws in the witnesses testimony or who fails to reveal a bias or motive behind a witness's testimony is not serving his client to the level afforded the criminally accused.

Competent counsel must confront the witnesses with evidence of their bias and the

discrepancies in their statements and trial testimony. *See, e.g., Sparman v. Edwards*, 26 F.Supp.2d 450 (E.D.N.Y. 1997) (counsel ineffective for failing, *inter alia*, to cross-examine child sex abuse victims with prior inconsistent statements), *aff'd* 154 F.3d 51 (2nd Cir. 1998); *Tucker v. Prelesnik*, 181 F.3d 747, 757 (11th Cir. 1999) (counsel was ineffective in failing to impeach victim with medical records reflecting his faulty memory of the crime); *Driscoll v. Delo*, 71 F.3d 701, 711 (8th Cir. 1995) (counsel ineffective in failing to impeach the testimony of an important State witness using witness' prior inconsistent statements), *cert. denied*, 519 U.S. 110 (1996); *Smith v. Wainwright*, 799 F.2d 1442 (11th Cir. 1986) (counsel ineffective for failing to use prior inconsistent statements to impeach State witness whose credibility was essential to the State's case).

Consequently, Mr. Woodard's trial counsel were deficient for failing to impeach the State's witnesses. Trial counsel failed to conduct a sufficient investigation into the facts of this case, and any "strategy" employed was deficient.

Although trial counsel pointed out that Willis was not at work the evening in questions, the failed to also point out that according to the State's witnesses, Willis was still around the time of the offense. While Hines testified Willis went to the store, the time frame did not account for his whereabouts during the time of the robbery, which was later in the evening. Similarly, Webster also failed to establish his whereabouts during the crime. Thus trial counsel's strategy fell short.

**D. Trial counsels' deficient performance prejudiced Mr. Woodard and resulted in a violation of Sixth Amendment right to counsel.**

As a result of trial counsels' failure to impeach the State's witnesses, Mr. Woodard was prejudiced by an unfair trial. Trial counsel did not adequately cross examine the witnesses and

point out numerous areas in which the jury could be less than confident about the verdict. Although the jury was able to hear that Reginald lied about where he was that evening, they did not hear evidence to support the defensive theory that he was culpable, ie, that he used a firearm the very next day, that he had a felony and that he also had violent juvenile convictions. Without these additional facts, the jury had nothing concrete with which to disregard Reginald's testimony. Moreover, the fact that he was mentally retarded would not have, as the State court held, been inconsistent with the theory at trial.

Regarding Cory Calloway's testimony, impeachment with the initial call slip report would have established a prior inconsistent statement made at the time the incident occurred without any chance for the police or the district attorney to corrupt his memory or story. The jury was not given any reason to doubt his account of the events that evening. The jury thus had no reason to question his credibility. Mr. Woodard was prejudiced by the lack of impeachment on the State's witness at his trial.

## VI. TRIAL COUNSEL WAS INEFFECTIVE DURING PUNISHMENT FOR FAILING TO PREPARE PUNISHMENT EXPERT TESTIMONY

### A. Background facts

The only expert hired by the defense to testify during the punishment portion of Mr. Woodard's trial, Dr. Gruen, was hired a few weeks after jury selection began and a couple of weeks before testimony. Dr. Gruen met Mr. Woodard for the first time one week before she took the stand to testify and try to save his life. Dr. Gruen met his family members the day of trial in the hallway waiting to testify.

Consequently, Dr. Gruen's testimony at trial was detrimental and erroneous, leaving the jury with the wrong impression regarding Mr. Woodard:

> "In conclusion, the results of my interview with and testing of Robert Woodard provided information that does not support the conclusions of Dr. Gruen. Had an expert such as myself been given a *greater time frame*, in which to interview Mr. Woodard and *perform objective testing*, the *information conveyed to the jury* would have been more detailed, more specific, and *different diagnostic conclusions* would have been formulated. Indeed, *test data*, which *did not support a diagnosis of ASPD*, could have been presented.

EXH20:4

The above paragraph concludes the affidavit of Dr. Lundberg-Love, an expert who has reviewed the testimony of Dr. Shirley Gruen, the psychologist called by the defense at trial as a witness on Mr. Woodard's behalf. Dr. Gruen was "turned" by the prosecutor's cross-examination, and her testimony agreeing that Mr. Woodard fit the DSM-IV criteria for Anti-social Personality Disorder (ASPD) became the basis for the State's argument that Mr. Woodard was a "sociopath" and therefore was by definition a continuing threat to society.

Dr. Gruen, the defense psychologist, testified that she had "had a chance" to review documents defense counsel had provided to her and had interviewed Mr. Woodard in person

for about two hours. SR 31: 38, 68. Dr. Gruen told the prosecutor she had met with Mr. Woodard "a week ago Sunday," and had not done any psychological testing; she said she had not been asked to do any testing. SR 31: 68 Despite the fact that she did not "make a clinical diagnosis" on the basis of just one interview, Dr. Gruen volunteered, when asked about a diagnosis, that, "If you want the closest . . . I'd say borderline personality or systemic (sic) personality." *Id.*

When the prosecutor then asked Dr. Gruen whether Mr. Woodard best fit the DSM-IV criteria for "sociopathic personality," the witness found and read out the factors, ending by saying, "Yes, I agree with you," in other words, "He fits." SR 31: 69-71.

Even on direct examination it is apparent defense counsel was not prepared for Dr. Gruen's answers. After she gave evidence (that any witness could have gleaned from the records of Clarinda Academy, the juvenile facility where Mr. Woodard was sent at age 14) that after an initial rocky start he left (was discharged early) as a "model student," defense counsel asked Dr. Gruen for her opinion, based upon reviewing the records and interviewing Mr. Woodard, whether he "would continue to offend." She answered that, " . . . apparently he had chances all along to learn from these consequences and they were not enough to turn him around at that time, so, you know, *odds would be* that he *would* continue to act the same way." SR31: 46, 52, 60

Dr. Gruen did go on, under further defense questioning, to opine that Mr. Woodard would adapt well to prison society because of his history of functioning well in a structured environment SR31: 61 but as soon as cross examination began, the witness agreed with the ASPD or sociopath diagnosis that was the State's primary argument (not surprisingly) on future dangerousness. The State emphasized this in their closing argument as follows:

> "You heard an expert get up here and tell you from the defense he is a sociopath. He has no remorse. Everything is about me. Everything is about instant gratification. What can I get out of it? That's Robert Woodard right there. (He shed no tears) because he doesn't have the capacity.

SR31: 100-101

> "You know from the testimony of their doctor that he is a sociopath and a psychopath, whether or not she is going to admit it.

SR31: 131-132

Trial attorneys did not dispute that they hired Dr. Gruen at the last minute, but instead argued that Dr. Gruen did not tell them she needed more time and that she should have, in effect, prepared better. In other words, they laid blame on her, despite her efforts to come in and help out at the last minute.

The State Court did not have any problem with trial counsel's last minute efforts. The Court held that trial counsel was not ineffective because the expert did not inform trial counsel she needed more time, and the expert did not tell counsel in advance that she believed Mr. Woodard was a sociopath. Finally, the Court concluded that even if Dr. Gruen's testimony that Mr. Woodard would likely reoffend was harmful, trial counsel presented evidence of seven areas of mitigation applicable to defendant. Ultimately, the expert testified that Mr. Woodard would do well in structured environment, Mr. Woodard was not psychopathic, and there was no likelihood of gang affiliation in prison. Also, there were eight additional punishment witnesses that trial counsel presented. Overall, the State Court felt that trial counsels' performance during the punishment portion was not deficient and failed to hold trial counsel responsible for their 11th hour hiring of the expert to assist with mitigation on the case.

B. **It is a fundamental requirement of competent capital counsel to hire experts to assist in presenting and explaining mitigating evidence.**

In a capital case, counsel's duty to investigate includes the responsibility to seek out mitigating evidence for use in the penalty phase, in the event the defendant is convicted of a death-eligible crime. *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2537 (2003) (counsel is bound to undertake "efforts to discover all reasonably available mitigating evidence"); *Williams v. Taylor*, 529 U.S. 362, 396-97 (2000) (trial counsel in a capital case must "conduct a thorough investigation of the defendant's background") (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE § 4-4.1 & *Commentary*, § 4-55 (2nd ed. 1980)). "[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation into potential mitigating circumstances." *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003) (citing *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*)).

"Mitigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in any given case." *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999). As Justice O'Connor has explained, "evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citation omitted). *See also Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) (evidence of a "turbulent family history [is] particularly relevant" to an individualized sentencing determination.).

The sentencing phase is "the most critical phase of a death penalty case," *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004) (quoting *Romano v. Gibson*, 278 F.3d 1156, 1180

(10th Cir. 2002)), because "the jury is called upon to make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves,'" *Turner v. Murray*, 476 U.S. 28, 33 (1986) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)). The "fundamental issue," by definition, is only whether life imprisonment or death is the appropriate punishment. *Spaziano v. Florida*, 468 U.S. 447, 459 (1984).

The sentencing body's possession of the fullest information possible concerning the defendant's life and characteristics is, therefore, highly relevant, if not essential, to the selection of the appropriate sentence. *Lockett v. Ohio*, 438 U.S. 586 (1978). If the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). A jury can consider evidence in mitigation, however, only if defense counsel vigorously investigates and presents the available evidence.

In assessing whether counsels' conduct was reasonable, the Supreme Court held in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91; *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (counsel's failure to discover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on the defendant's voluntary confessions because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the

defendant's background").

As the Court observed in *Wiggins*, a case that was tried in 1988, the 1989 ABA Guidelines "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 510 (quoting 1989 Guideline 11.4.I(C) (emphasis added)).

In *Wiggins*, as noted previously, the Supreme Court held that the ABA Guidelines reflect "well-defined norms" for capital defense counsel's performance. 539 U.S. at 524. The well-defined norms in capital cases even as early as 1989 required that counsel's investigation for sentencing "should begin immediately upon counsel's entry into the case." 1989 Guideline 11.4.1(D)(2)(C). *See also* 2003 Guideline 10.7 Commentary ("The mitigation investigation should begin as quickly as possible"). "[I]investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guideline 11.4.1(C).

Like counsel in *Wiggins*, Mr. Woodard's counsels' conduct was deficient because the evidence revealed that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." 539 U.S. at 526. "Counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. "The scope of their investigation was also unreasonable in light of what counsel actually discovered" and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525 (citation omitted).

Federal Courts have held consistently that the failure to investigate and present expert testimony of mental health issues is ineffective. *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997); *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999). Consistent with requiring experts, is the proper investigation and preparations of experts to testify.

**C. Trial counsel's failure to properly prepare expert witness resulted in a deficient performance**

Dr. Gruen was inadequately prepared and was incorrect in her diagnosis and trial counsel must bear the responsibility for presenting her as a defense witness who harmed, rather than helped their client, a witness who literally sealed his fate. Experienced trial counsel may not blame Dr. Gruen for her performance.

The *Strickland v. Washington* standard holds defense counsel to the requirement that he must prepare his experts adequately and must be aware of any harmful answers the expert might give on cross examination. Otherwise, counsel cannot make a reasonable decision to put the expert on the stand. *See, e.g., Rylander v. State*, 75 S.W.3d 119 (Tex. App.-San Antonio 2000, no pet.); *Winn v. State*, 817 S.W.2d 756 (Tex. App.-Corpus Christi 1993, no pet.) and *Woods v. State* 59 S.W.3d 833 (Tex. App.-Texarkana, 2001, pet. granted). The cases cited *supra* stand for the proposition that counsel is ineffective if she fails to prepare expert testimony in support of the defensive theory. This duty to prepare expert witnesses is akin to counsel's duty to investigate the facts of the case. Appropriate strategy decisions cannot be made in this regard without first completing an appropriate investigation into the facts that the witnesses could present during their testimony. Inadequate investigation yields inadequate strategy. For example, in this case, it is hardly a defensive theory to provide expert testimony

that Mr. Woodard was a sociopath, incapable of remorse and therefore incapable of reform – in short, likely to continue in his dangerous behavior.

The United States Supreme Court recently reversed a capital punishment verdict that was based upon (to some degree) an expert's testimony that the defendant's being Hispanic made it more likely he would be a continuing threat. *See, Soldano v. Texas,* finding race/ethnicity to be an *improper* factor upon which to base a continuing threat verdict. This Court should find, just as certainly, that an expert's *incorrect* diagnosis of ASPD should not be allowed to support a jury's continuing threat verdict.

Counsel's conduct was deficient in failing to provide Dr. Gruen with sufficient records and failing to adequately prepare her for cross-examination. "[W]hen experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[ ] facts that the experts do not request." Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and bring it to the attention of the experts." *Hovey*, 458 F.3d at 925.

In *Koon v. Cain*, 2008 WL 1924217 (5th Cir. 2008), the fifth circuit recently held that Defense attorney's conduct, among other things, *in interviewing primary mental health expert only one day before trial, prejudiced defendant in murder trial, as element of claim of ineffective assistance*, and noted further had expert been retained a reasonable time in advance

of trial, he would have had plenty of time to evaluate defendant and interview his friends and family, allowing for a more informed opinion on defendant's mental state. Similarly, in *Stevens v. McBride*, 89 F.3d 883 (7th Cir. 2007), the court held that Counsel's failure to investigate and present mitigating evidence on defendant's mental state in penalty phase of capital murder trial was deficient performance, as required to establish ineffective assistance of counsel. The court in *Stevens v. McBride* specifically noted "Where an expert witness's opinion is crucial to the defense theory, defense counsel's failure to have questioned the expert prior to trial is inexcusable, and amounts to ineffective assistance. (Per Wood, Circuit Judge, with one circuit judge concurring.)

**D. Trial counsels' deficient performance in failing to prepare expert punishment witness prejudiced Mr. Woodard with harmful evidence.**

Here, counsel did not fulfill their obligations and Mr. Woodard was greatly prejudiced. *See, e.g., Karis v. Calderson*, 283 F.3d 1117, 1135 (9th Cir. 2002) ("the failure to present important mitigating evidence in the penalty phase can be as devastating as a failure to present proof of innocence in the guilt phase"); *Tokman v. State*, 564 So. 2d 1339, 1342 (Miss. 1990) ("It is critical that mitigating evidence be presented at capital sentencing proceedings"); *Marquez-Burrola v. State*, 157 P.3d 749, 764 (Okla. Crim. App. 2007) ("[M]itigation evidence can, quite literally, make the difference between life and death in a capital case").

A finding of prejudice under *Strickland* requires that Mr. Woodard "show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 529 U.S. at 537.

Dr. Lundberg-Love's affidavit demonstrates that Dr. Gruen's preparation was inadequate and her conclusions, so devastating to Mr. Woodard, were incorrect. EXH20 Nothing could be more prejudicial during punishment than having your own expert testify against you, nothing except your own expert testifying against you falsely. While the State Court chose to ignore the affidavit of Dr. Lundberg-Love, this Court cannot.

## VII. TRIAL COUNSEL WAS INEFFECTIVE DURING PUNISHMENT FOR FAILING TO OBJECT TO PROSECUTOR'S IMPROPER ARGUMENT.

### A. Factual background

State law prohibits the release of a convicted capital murderer for 40 calendar years. The jury was given this law in their instructions. The prosecutor dealt with this in her argument as follows:

> "One last thing I want to point out about Special Issue One is this. This question is not asking you to decide if in 20 years, in 5 years, 30 years, 40 years if this defendant is going to be a continuing threat to society. This question the way it's worded and the way it tells you to do it, is to decide right now as he sits is he a continuing threat to to society. Now. Right now. Not in 40 years, not in 5 years, not in 20 years but now. and you know he is."

(R. 31, 97).

In essence, the prosecutor told the jurors they could *ignore* the 40 year ineligibility instruction because the Special Issue did not ask them to decide if Mr. Woodard would be a threat in 5 years or 20 years or 40 years, but only if he "is a continuing threat ..right now…as he sits..".

The State court held that the argument was not improper, and even it was improper, it was not so prejudicial that it would affect the outcome of the case. The State court cites to *Campbell v. State*, 910 S.W.2d 475, 480 n.9 (Tex. Crim. App. 1995), for the proposition that society includes prison society, therefore, the State isn't required to prove future dangerousness over any number of years.

### B. The state's argument was improper and prejudicial

Such blatantly erroneous argument violates Texas statutory law mandating that the jury's decision be guided by the court's instructions on the law, and Texas case law holding that

neither side may argue contrary to the court's instructions; It also violates due process and due course of law guaranteed by the Federal and State Constitutions because it allows the prosecution to gain a death sentence by portraying Mr. Woodard as a greater threat to free society that he actually was, based on his parole ineligibility. If a prosecutor were free to argue outside the terms of sentencing information given in the charge, she could raise the specter of the defendant's dangerousness to "society" as a possibility at virtually any time. Indeed, prosecutors have been doing so in Texas for many years, arguing that "parole" is a speculative matter, improper for the jury's consideration.

**C. Trial counsels' failure to object rendered their performance deficient.**

Defense counsels' failure to object allowed the prosecutor to destroy totally their most mitigating evidence on the issue of future dangerousness: the fact that Mr. Woodard would be imprisoned for 40 calendar years, isolated from free society and confined in the kind of structured prison society in which the evidence had shown he had actually functioned as a nondangerous, successful inmate.

Defense counsel did argue that Mr. Woodard would "do just fine" in prison society, based on the evidence of his nondangerousness in the Clarinda juvenile facility and based on the evidence from Harris County Jail personnel and records showing his generally good jail record, with only minor infractions. However, the prosecutor's uncorrected statement to the jurors that they were to judge Mr. Woodard's dangerousness *not* as he might prove to be in the coming years of imprisonment, but as he was "right now, as he sits here" prevented the jurors from *using* the defense evidence properly under the 40-year charge as a predictor of Mr. Woodard's future dangerousness to free society. The jury following their instructions might well have found that Mr. Woodard's dangerousness "right now, as he sits" might be "incapacitated" by

imprisonment, so that during his imprisonment for 40 years he would be non-dangerous to prison society by reason of the conditions of confinement, and that by the time he was eligible for release into free society, after 40 years, he might be non-dangerous to that society by reason of rehabilitation or aging or any other reason. The prosecutor's argument neutralized and foreclosed the defense evidence by misstating the special issue and the 40-year instruction. The improper argument invited the jury to disregard the 40-year instruction because it told them to disregard any evidence that would have supported a conclusion that Mr. Woodard would be non-dangerous, and not a continuing threat, if he were imprisoned for 40 years before being considered for release into free society.

**D. Trial counsels' failure to object to the state's improper argument prejudiced Mr. Woodard during the critical punishment portion of his trial**

It is easy to see that the *process* was rendered fundamentally unfair by the prosecutor's altering the structure, the framework for the jury's consideration of the evidence. The very kind of due process violation occurred in Mr. Woodard's case as in *Simmons v. South Carolina, supra*, and this Court need look no further for prejudice than the prosecutor's single statement that Mr. Woodard's being a continuing threat--or not-- was a question that had nothing to do with his possible rehabilitation after 40 years. The truth for the jury is and must be the jury charge itself. The jurors evaluated every piece of evidence they had heard by the wrong standard. They made their decisions on the likelihood of Mr. Woodard's future dangerousness and the appropriateness of a "life sentence" based upon the incorrect statement that they were not to consider the likelihood that 40 years of imprisonment might render this defendant non-dangerous.

Mr. Woodard was prejudiced because trial counsel's "failure to object exacerbated the

prejudicial effect of the prosecutor's statements." *Girts v. Yanal*, 501 F.3d 743, 757 (6th Cir. 2007).

This Court need not engage in the more common exercise of deciding whether the capital jury, guided by a correct charge, might have decided differently if certain evidence had been presented or excluded (as in *Strickland* itself, in which the Supreme Court found no prejudice when state's overwhelming evidence of aggravating factors supported imposition of death penalty under Florida's weighing scheme. 104 S.Ct. at 2071). Instead, this Court is faced with the most blatant example of a breakdown in the adversary system. If the very framework of a fair trial, the statement of law set out in the jury charge, breaks down, then the result of the hearing is necessarily unreliable.

Mr. Woodard is entitled to a new punishment hearing because of counsel's deficient performance that rendered the result of that phase unreliable, and he asks this Court to so hold.

## VIII. TRIAL COUNSEL WAS INEFFECTIVE DURING GUILT INNOCENCE AND PUNISHMENT PORTION OF THE TRIAL AS A RESULT OF THE CUMULATIVE EFFECT OF TRIAL ERRORS.

### A. **Trial counsel committed numerous failures in investigation, strategy and error preservation at trial**.

Trial counsel failed to conduct a thorough independent investigation in this case. As a result, trial counsel failed to discover the following: (1) prior records indicating the State's witness Reginald was mentally retarded as well as had a juvenile sexual assault conviction; (2) police coercion of all of the State's Witnesses the night of their arrest; (3) prior records of a felony conviction by the State's witness Reginald Willis; (4) an incident involving the state's witness Reginald Willis wherein he threatened another state's witness, Casper Hines, with a gun just days before the crime.

Trial counsel failed to properly employ the use of an expert eyewitness testimony to impeach the state's scene witnesses. Further trial counsel failed to properly prepare their expert punishment witness Dr. Gruen, to testify as to mitigation in Mr. Woodard's case.

Finally and alternatively, trial counsel failed to object at trial and preserve error regarding the admission of eyewitness identification testimony that preceded the illegal arrest, the victim impact testimony given by witnesses of the crime, the improper argument during the punishment portion, and the systemic errors in the special issue submitted for assessing the death penalty in this case.

### B. **Trial counsel's numerous errors cumulatively rendered a deficient performance**.

This Court must also consider the cumulative impact of these constitutional violations. Where individual error is insufficient to raise a probability that the outcome of a trial would

have been different, the cumulative impact of *Strickland* error can suffice to warrant habeas relief. The errors in this case undermine confidence in the outcome, and the combined prejudice resulting from counsel's errors and omissions and from any other constitutional error(s) in this case require relief. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) (considering, in deciding whether to grant relief, the cumulative prejudice resulting from counsel's deficient performance and from testimony admitted in violation of *Giglio v. United States*); *Gonzales v. McKune*, 247 F.3d 1066, 1078 (10th Cir. 2001) ("we can see no basis in law for affirming a trial outcome that would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief"). Here, the combined prejudicial impact of counsel's deficient performance at the punishment phase and every other constitutional error alleged in this Petition, and all those errors considered cumulatively, requires relief.

### C. Trial counsel's errors prejudiced Mr. Woodard's right to a fair trial.

The "touchstone" of the prejudice test in ineffective assistance of counsel claims is "a 'reasonable probability' of a different result, and the adjective is important. The question is NOT whether the defendant would more likely than not have received a different verdict . . . but whether . . . he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Likewise, the prejudice test of Strickland "is not a sufficiency of evidence test." *Id*. Furthermore, the resulting prejudice from counsels' errors must be "considered collectively, not item-by-item." *Kyles*, 514 U.S. at 436.

In this case, the totality of counsel's errors during the trial cumulatively prejudiced Mr. Woodard's right to a fair trial and sufficiently undermined confidence in the outcome of this trial.

The following is the scenario had counsel performed effectively at trial: Counsel could have excluded Calloway's subsequent identifications and left the jury with an eyewitness who made one tentative but tainted identification. Then the jury would have heard testimony as follows:

> that police intimidated Reginald, Casper and Dan Webster into saying certain things;
> that the news coverage went into the details of what happened at the scene;
> that Reginald was a similar if not more likely suspect than Woodard;
> that another individual, Sipsey, lived in the area and was near the night of the murders;
> that Sipsey had committed such crimes before; and
> that Woodard first saw the vehicle at Reggie's apartment after someone else abandoned it with the lottery tickets and the gun.

Without the benefit of the above testimony, the outcome at trial was inevitably different. Without expert testimony, all the identifications came in and the jury was left to guess at why or how Cory Calloway could come into a courtroom and be so certain that Mr. Woodard was the individual he saw take his vehicle from the scene of the crime. They had no understanding of how the police botch up of the lineup procedures by failing to follow DOJ guidelines for preventing false identification, tainted Cory Calloway's memory of the suspect. Further the jury did not have the complete picture of Reginald Willis. All the jury knew was that Reginald lied about where he was that evening. The jury never heard that Reginald was quite capable of committing the murders, or alternatively, easily frightened and coerced by the police into giving statements to spare him from further investigation. The jury did not even hear that Reginald

had serious mental deficiency or aggressive tendencies, a felonious past, and that his nickname was in fact "Red".

Finally, the jury never heard from Mr. Woodard. The jury never heard that Mr. Woodard had an explanation for his involvement with the Lincoln that did not implicate him of capital murder. While it cannot be said who or what the jury would have believed, counsel's strategy at trial failed to cohesively present a defense. Counsel's deficiency prejudiced Mr. Woodard's right to a fair trial because the totality of the evidence overlooked by trial counsel would have given the jury adequate cause to find reasonable doubt of Mr. Woodard's guilt.

Consequently, as a whole, counsel's error rendered a deficient performance that undermined confidence in the outcome of the verdict on guilt. Accordingly, Mr. Woodard request this court grant this application, and/or order a hearing be held on the issue of counsel performance at trial.

## IX. MR. WOODARD RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.

### A. Appellate counsel failed to properly brief Mr. Woodard's Fourth Amendment claim.

The State Court held that appellate counsel waived Mr. Woodard's Fourth Amendment claims because they were inadequately briefed. Further, appellate counsel failed to argue that there was insufficient evidence of future dangerousness. These claims did not become issues until the Court of Criminal Appeals came down with opinion, which was after the due date for the State writ and therefore they were not raised in that writ.

### B. Mr. Woodard has a Sixth Amendment right to effective assistance of counsel on appeal.

There is no constitutional right to an appeal; that right is statutorily created. *McKane v. Durston*, 153 U.S. 684, 687 (1894). Where an appeal is granted by statute, equal protection and due process converge to require the assistance of an effective attorney. *Smith v. Robbins*, 528 U.S. 259, 276 (2000). "A criminal defendant has a constitutional right to receive effective assistance of counsel on direct appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir.2000)(citing *Hughes v. Booker*, 203 F.3d 894, 895 (5th Cir.2000)).

In the non-capital context, appellate counsel need not raise every non-frivolous claim of error. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).

However,

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100 year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Strickland*, 466 U.S. at 715 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)) (plurality). The ABA Guidelines take into account this need for heightened reliability in capital

cases in identifying what a reasonably competent appellate attorney must do in a capital case.

> Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

In discussing the precise duties of appellate counsel in the post-conviction setting, the ABA commentary notes the paramount importance of appellate counsel's duty to "proceed, like all post conviction counsel, in a manner that maximizes the client's ultimate chance of success." 2003 Guideline 10.15.1 Commentary:

As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. "Winnowing" issues in a capital appeal can have fatal consequences. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited. Id. (footnote omitted) (emphasis added).

Appellate counsel in capital cases must raise all arguable legal issues for the client; nothing less will facilitate the court's review of the death sentence. *See Ellis v. United States*, 356 U.S. 674, 674-675 (1958) (appellate counsel acted more like *amici curiae*; much more is required); *accord Thompson v. State* 492 N.E.2d 264, 278 (Ind. 1986) (appeal counsel simply listed possible errors for the court to independently review). Counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective

assistance in failing to brief and argue Reinhart's accountability as it related to his sentence); *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart*, 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in failing to raise *Apprendi* error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction).

### C. Mr. Woodard's appellate counsel's representation fell below an objective standard of reasonableness.

In determining whether counsel performed effectively on appeal, the *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 287 (2000); *accord Bell v. Lockhart*, 795 F.2d at 657. Movant must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. *See Strickland*, 466 U.S. at 687-88. As fully discussed, *supra*, the ABA Guidelines provide the best glimpse at what level of performance is required to meet the objective standard of reasonableness. One court has identified the following questions as relevant to the reasonableness inquiry:

(1) Were the omitted issues "significant and obvious"?
(2) Was there contrary authority on the omitted issues?
(3) Were the omitted issues clearly stronger than those presented?
(4) Were the omitted issues objected to at trial?
(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
(7) What was appellate counsel's level of experience and expertise?
(8) Did the applicant and appellate counsel meet and go over possible issues?
(9) Is there evidence that counsel reviewed all the facts?
(10) Were the omitted issues dealt with in other assignments of error?
(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt? *Whiting v. Burt*, 395 F.3d 602, 616 (6th Cir. 2005).

Appellate counsel is not deficient for not raising every non-frivolous issue on appeal. *Id.* (citing *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir.2000). To the contrary, counsel's failure to raise an issue on appeal will be considered deficient performance only when that decision "fall[s] below an objective standard of reasonableness." *Id.* This standard requires counsel "to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Id.* "Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *Id*.

**D. The failure of appellate counsel to render effective assistance on appeal prejudiced Mr. Woodard.**

Although analyzing for prejudice necessarily involves an evaluation of the underlying claims, it does *not* require a decision on or a determination of these issues. All that is required is a determination that, based on the nature of the underlying claims, there is "a reasonable probability that, but for his counsel's [failings] . . ., [the defendant] would have prevailed on his appeal." *Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004) (citing *Strickland*, *supra*); *accord Roe v. Delo*, 160 F.3d at 420.

Thus, Mr. Woodard must show that there is 'a reasonable probability' – 'a probability sufficient to undermine confidence in the outcome,' but less than a preponderance of the

evidence – that his appeal would have prevailed had counsel's performance satisfied constitutional requirements." *United States v. Cross*, 308 F.3d 308, 315 (3rd Cir. 2002) (citing *Strickland*, 466 U.S. at 694-695) ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome"). As noted in *Strickland:*

> The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies (sic) of the particular decision maker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.

*Strickland*, 466 U.S. at 695; *accord Roe v. Delo*, 160 F.3d at 420 ("Our review of these cases leaves us uncertain whether the Missouri Court of Appeals would have found plain error had this issue been raised in Roe's direct appeal. But the question before us is limited to whether there is a reasonable probability that the outcome would have been different, the test for determining whether Roe received constitutionally ineffective assistance of counsel").

"A reasonable probability is that which renders the proceeding unfair or unreliable, i.e., undermines confidence in the outcome." *Williamson,* 183 F.3d at 463. When a claim of ineffective assistance of counsel is premised on counsel's failure to raise an issue on appeal, "the prejudice prong first requires a showing that [this Court] would have afforded relief on appeal." *Phillips,* 210 F.3d at 350. Thus, we must "counter-factually determine the probable outcome on appeal had counsel raised the argument." *Id.* (citing *Williamson,* 183 F.3d at 463).

In this case, Appellate counsel's error prejudiced Mr. Woodard because the Appellate Court declined to review the errors that would warrant reversal. The State Court found Mr.

Woodard's Fourth Amendment claim inadequately briefed and refused to review it. Relief is required. Under the heightened standard for appellate counsel in capital cases, it is clear that appellate counsel's failures prejudiced Mr. Woodard because he did not get review of his meritorious Fourth Amendment claim.

## X. THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT MR. WOODARD WAS A FUTURE DANGER.

### A. Factual background

Writ counsel argued that the evidence was insufficient to support a finding of future dangerousness in light of 40 years he would have to serve before being eligible for parole and the fact that testimony established he would not pose a threat of danger in a controlled environment.

The evidence during sentencing established that following prior offenses: Juvenile Aggravated Robbery with an unloaded BB gun; Juvenile Truancy; Misdemeanor Trespass; Adult Possession of Marijuana and a revocation of probation for using marijuana.

Other evidence introduced was unconfirmed gang affiliation, suspicions of misdemeanor theft, misdemeanor assault and a few writeups for infractions while he was in custody at the Harris County Jail.

The State court refused to address this issue in the writ.[4]

### B. The evidence that Mr. Woodard was a future danger was insufficient.

When a habeas Mr. Woodard asserts that the evidence presented to the State Court was insufficient to find future dangerousness, the limited question before a Federal Habeas Court is whether the State Courts' decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia,* 443 U.S. 307, 323, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Martinez v. Johnson,* 255 F.3d 229, 241 n. 21 (5th Cir.2001) ("Therefore, our review of the CCA's decision is properly framed as whether that decision constitutes an 'unreasonable application' of *Jackson.*"); *Callins v. Collins,* 998 F.2d

[4] While state habeas counsel stated the writ argument would supplement appeal argument on sufficiency of evidence for the death penalty, there is no evidence that the state appeal contained a challenge to the sufficiency of the evidence of future dangerousness.

269, 276 (5th Cir.1993) (citing *Jackson*). Under *Jackson*, a conviction is constitutional if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. 2789.

The State Court lists as relevant factors the following:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the existence of prior criminal record, and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the offense;
7. psychiatric evidence; and
8. character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *See also*, *Barnes v. State*, 876 S.W.2d 316 (Tex. Crim. App. 1994).

An overview of the evidence from Mr. Woodard's trial shows that prior to the date of his arrest for the present offense, Mr. Woodard had never been involved with any seriously violent behavior. Therefore his criminal history could not be used to substantiate a finding of future dangerousness. The psychiatric and character evidence showed that Mr. Woodard was a victim of neglect and suffered greatly from a careless upbringing, but did not have a mental disorder that would create a threat of future violence. Finally Mr. Woodard's age is young such that he would benefit from maturity and counseling which he never had at an earlier age. His personal circumstances at the time of the offense indicated that he was emotionally troubled and struggling to overcome his history so he could thrive in society. He was working, he was a father, and he was facing normal challenges of his age.

The only remaining evidence from which to establish future dangerous would be the actual crime. The offense itself suggests there was no premeditation, and that there might have been another party involved. There was no evidence to establish what Mr. Woodard's state of mind was at the time of the offense, only that it was an act of frustration. An analysis with the above factors thus fails to show that Mr. Woodard would be a future danger sufficient to overcome the State's burden of beyond a reasonable doubt.

The reason the Supreme Court reversed the death sentence in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) was that the prosecutor asked the jury to sentence the defendant to death based upon a danger that did not exist, under South Carolina law. He suggested to them that the defendant would be a danger to free society when in fact the life without parole law meant the defendant would never be in free society.

In Texas the parole law means the same thing for a defendant like Robert Woodard: he will never be paroled into free society, no matter how "eligible" he may be. The prosecutors may not be forbidden to *make* a future dangerousness argument, because the possibility of parole into free society does exist, if only as a tiny light flickering at the end of a 40-year tunnel. However, for a certain kind of defendant – who allegedly killed more than one person, such as Mr. Woodard -- that light is extinguished by the powerful onrush of the evidence that precedes him into that tunnel. He will never be a continuing threat to free society.

## XI. THE MITIGATION SPECIAL ISSUE SUBMITTED AT MR. WOODARD'S TRIAL WAS UNCONSTITUTIONAL BECAUSE IT FAILED TO ASSIGN THE BURDEN OF PROOF BEYOND A REASONABLE DOUBT UPON THE STATE TO ESTABLISH MR. WOODARD SHOULD RECEIVE A SENTENCE OF DEATH AS REQUIRED UNDER *RING* AND *APPRENDI*.

### A. Factual background

Texas Special Issue states: 37.071

> (e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b), it shall answer the following issue:
>
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.
>
> (f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:
> (1) shall answer the issue "yes" or "no";
> (2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;
> (3) need not agree on what particular evidence supports an affirmative finding on the issue; and
> (4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

The following is the Court of Appeals opinion holding regarding Mr. Woodard's appellate challenges to the State statute:

> In points of error nine, ten, and eleven, the appellant complains about the mitigation special issue at punishment. The ninth point of error in the appellant's brief is that "especially after the *Mosley* decision declaring victim evidence admissible to 'rebut' mitigation, and also in light of the Supreme Court's decision in *Apprendi v. New Jersey,* the mitigation special issue at punishment is infirm as a matter of federal Eighth Amendment constitutional law because it omits a burden of proof." The tenth point of error is different only in that the appellant argues the mitigation issue is infirm because "it makes impossible any meaningful appellate review of the jury's determination." In point eleven, the appellant argues that "Art[icle] 44.251 ... requiring appellate review of

> sufficiency of all capital punishment special issues, when interpreted in conjunction with Art [icle] 37.071, Sec[tion] 2(e) ..., placing no burden of proof in the mitigation special issue, is facially unconstitutional, violating the Eight Amendment to the United States Constitution."
>
> We have previously rejected identical claims and decline to revisit these issues. *See Blue v. Smith,* 125 S.W.3d 491, 500-01 (Tex.Cr.App.2003); *Jackson v. State,* 33 S.W.3d 828, 840-41 (Tex.Cr.App.2000); *Tong v. State,* 25 S.W.3d 707, 715 (Tex.Cr.App.2000). Points of error nine, ten, and eleven are overruled.

*Woodard v. State*, 2005 WL 77143 (Tex. Crim. App. 2004)(citations omitted).

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 650, 111 L.Ed.2d 511 (1990) (State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors")(overruled on other grounds, *Ring v. Arizona*, 536 U.S.584 (2002)).

In order to understand why *Walton* applies to the statutory "*Penry*" special issue, rather than solely to the aggravating factors under the other special issues, this Court must recognize that this special issue is a conduit for aggravating factors (victim impact evidence, for example) as well as mitigating factors.

In *Walton v. Arizona*, *supra*, four members of the Supreme Court found constitutionally permissible the Arizona scheme that placed upon capital defendants the burden of establishing, *by a preponderance* of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency in spite of the fact that the State had established (by what standard, the opinion did not say) the existence of one or more often statutorily defined aggravating factors. [5]

[5] It is clear from a reading of *Walton* and also from this Court's opinions cited below in the brief, that the State, if it bears any burden at all under the mitigation special issue, bears only

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove. . .the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Walton v. Arizona, supra*, 497 U.S. 639, 650, 111 L.Ed.2d 511, 526 (1990)

The Texas statutory scheme does lessen the State's burden to prove the existence of aggravating factors that fall outside the scope of the special issues that preceded the mitigation special issue. (Again, victim-impact evidence is the most significant aggravating factor.) If the defendant had to establish mitigating evidence sufficient to overcome or outweigh only the statutorily defined aggravating circumstances, then the process would be similar to Arizona's - and the defendant could obtain review of the question just as the Arizona defendant did.

In fact, the Texas State court held in *McFarland v. State*, 928 S.W.2d 462 (Tex. Crim. App. 1996), that the State bears no burden to prove aggravating factors because there is no burden of proof to assign regarding aggravating factors outside the other special issues; in the Court's view, " . . . the special issue under Sec. 2(e) does not involve consideration of aggravating factors." *McFarland, supra*.

The Texas defendant, however, as the statute is now interpreted, may obtain review of the sufficiency of the evidence to prove only the aggravating factors upon which the State is assigned the burden of proof. He may not, however, obtain this Court's review of his proffered mitigation evidence to see if the Court agrees that it was not sufficient to call for a life sentence. *See, McFarland, supra*. The reality is that in Texas, the State submits in argument many aggravating factors that are not set out in the statute (factors upon which it has no independent

---

the burden of proving the existence of facts which it may argue are aggravating (or which are defined by statute as aggravating, under the Arizona scheme), while the defendant bears the burden of producing the existence of facts sufficient to warrant a sentence of life rather than death, or to call for leniency in the face of aggravating facts.

burden of proof) for the jury to weigh against the defense's mitigating evidence.

The mitigation special issue in Texas, by omitting a burden of proof entirely, opens up the range of aggravating factors to include whatever the prosecution wishes to argue from the evidence, yet places no burden of proof on the State with respect to those factors; it prevents a reviewing court from evaluating the sufficiency of evidence to prove those extra-statutory aggravating factors. It thus prevents a rational, meaningful review of the sufficiency of mitigating evidence (even if the sufficiency issue is more precisely a determination whether the jury's answer was against the great weight and preponderance of evidence).

By failing to provide for a burden of proof entirely, the State is allowed to present a multitude of aggravating factors beyond the first two special issues. Because it allows this to happen, it runs afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Although *Apprendi* was the vehicle the Supreme Court used in *Ring* to strike down that portion of the Arizona statute that invested trial judges, rather than jury, with fact-finding authority for aggravating factors, the impact of *Apprendi* reaches far beyond *Ring v. Arizona*, *supra*. It also gravely impacts upon the burden of proof issue discussed in Part III of the *Walton* opinion.[6]

The rule announced in *Apprendi* is that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

In *Apprendi*, the Supreme Court reviewed a New Jersey state prosecution in which a judge had increased the maximum punishment for possession of a firearm pursuant to a New Jersey statute that allowed increased punishment if a defendant "acted with a purpose to intimidate an individual or group of individuals because of race." The Court framed the

[6] Four Justices dissented from Part III of *Walton* and Justice Scalia concurred only in the result of Part III, so the second issue did not actually command a majority in *Walton*.

question as follows: "Whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 469. The Apprendi Court said yes. That does not square with Texas law, and Texas law must give way to the Supreme Court's command.

While the *Penry* issue purportedly imposes no burden, this Court has recognized the obvious – that the opposite is true. This Court in *Lawton v. State*, 913 S.W.2d 542 (Tex. Crim. App. 1995) recognized in practice "the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which militate against the imposition of death in his case." 913 S.W.2d at 557. This construction of the Texas statute is 180 degrees opposite the principles of *Apprendi*.

This Court also stated in *Lawton* that it was "unaware of any constitutional requirement that the burden of proof regarding mitigating evidence be placed on either party, and to the extent that the burden is on appellant, we note that it is not unconstitutional to so place the burden." *Id*. The authority cited for that conclusion was *Walton*. As noted above, the relevant issue in *Walton* concerning burden of proof and found in Part III of the opinion did not command a majority of the Supreme Court. Four Justices dissented and Justice Scalia concurred only in the result as to Part III. The Court's treatment of the constitutionality of the mitigation special issue in *Lawton*, therefore, is not based upon controlling authority from the Supreme Court. *Lawton* cannot be reconciled with, and is, in fact, overruled by *Apprendi*.

The jury and appellate court serve different functions, and the burden-of-proof prong of *Apprendi* enhances the jury's function. Application of *Apprendi*, otherwise, would make

appellate review easier, because it would give this Court a yardstick by assigning the State a burden of proof beyond a reasonable doubt.

At the very least, in light of M*cFarland's* recognition of the reality of the "implicit burden" placed on a defendant, application of *Apprendi* would allow for review of the sufficiency of evidence under the mitigation special issues.

This Court recognized in *McFarland* that the mitigation special issue does impose, at least by implication, a burden of proof and a standard of proof on the capital defendant: he must establish sufficient mitigating facts to overcome the jury's answers to the special issue or issues by a preponderance of evidence. He may argue on appeal only that the jury's verdict was against the great weight and preponderance of evidence, yet he may not obtain review of the question whether he met his burden.

If a listing of aggravating and mitigating factors, together with an assignment of a burden of proof and a requirement of special findings as to those factors, permits appellate review like the review in *Walton, supra,* and the Texas scheme with its lack of specific factors and its omission of burdens of proof forecloses appellate review, then the Texas procedure is unconstitutional on its face.

In its opinions, this Court could isolate certain factors as bearing upon the sufficiency of proof on mitigation, as it has on the future dangerousness issue, or it could hold that the present statute does not permit a fair review and is therefore unconstitutional, leaving the Legislature to formulate a structure that will permit review.

Article 44.251(a) of the Code of Criminal Procedure requires that this Court shall reform a sentence of death to a sentence of life imprisonment if the Court finds there is insufficient evidence to support "a negative answer to an issue submitted to a jury under Section 2(e),

Article 37.071" of the Code. Appellants have argued in the past that the statute mandates a sufficiency review of a negative 2(e) answer. This Court has answered by finding, essentially, that the Legislature in adding the mitigation-review was attempting to avoid a "loophole" by which an appellant who successfully challenged sufficiency under 2(e) could gain an entirely new trial, when in fact the intent of the statute when first passed was to avoid retrial. Such a review needs to be imposed to allow the Texas statute to comply with the requirements of the Eighth Amendment.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court considered a New Jersey statute which permitted a judge add a “hate crime” enhancement to the ordinary sentence for a defendant’s crime upon finding, by a preponderance of the evidence, that the crime was motivated by racial animus. *Id*. at 469-470. The Court held New Jersey’s “hate crime enhancement” unconstitutional, because it permitted a judge, acting alone and using only a preponderance standard, to enhance the possible punishment for a crime outside the normal statutory range. The “hate crime enhancement,” the high Court found, was not merely a sentencing factor but an “element of the crime.” *Id*. at 477. The Court drew on its earlier statement in *United States v. Jones*, 526 U.S. 227, 243 n.6 (1999), that “under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.” The Court dismissed New Jersey’s argument that the hate-crime finding was merely a “sentencing factor” as semantics: “Merely using the label ‘sentence enhancement’ to describe the [finding] surely does not provide a principled basis” for treating it differently than the substantive elements of the crime. *Id*. at 476.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court applied *Apprendi* to the capital sentencing context. The court drew a simple rule from *Apprendi*: "If a State makes an increase in a defendant's authorized punishment contingent on a finding of fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt." *Id*. at *9 (citing *Apprendi*, 530 U.S. at 482-83). This Court accordingly struck down the Arizona statute, which permitted a judge alone to make fact findings essential to the imposition of the death penalty. *Apprendi* and *Ring* teach that courts must look not to the "form" but the "effect" of statutory aggravating factors. The *Ring* Court stressed that there was simply no difference between a substantive element of the offense and a "sentencing factor," so long as that sentencing factor served to elevate the maximum permissible punishment. *Id*. at *10 (quoting four sections of *Apprendi* opinion to this effect, including a concurring opinion by Justice Thomas). Therefore, a "sentencing factor" which makes the defendant eligible for a more severe punishment than "the maximum authorized by a guilty verdict standing alone" is simply "the functional equivalent of an element of a greater offense" and therefore must be proven in accordance with the procedures developed for ensuring a fair and impartial decision as to the defendant's guilt. *Id*. at *11, *12 (quoting *Apprendi*, 530 U.S. at 494 n.19).

Under *Ring* and *Apprendi*, both of the factual findings set out in TEX. CODE CRIM. PROC. art. 37.071 are not mere sentencing factors. When a defendant is convicted of capital murder in Texas, the maximum punishment authorized by law is life imprisonment. The State may announce, before trial, whether it intends to pursue the death penalty. If it does not, the defendant, upon conviction, simply receives a life sentence identical to what he would have received had the State sought the death penalty unsuccessfully. TEX. CODE CRIM. PROC. art.

37.071(1). If the State seeks death, it must prove future dangerousness, and must also prove that the defendant's mitigation facts are insufficient to justify a life sentence.

The *Ring* Court noted in passing that Ring raised "no Sixth Amendment claim with respect to mitigating circumstances." *Id*. at 2437 n.4. However, the *Ring* Court cited the following passage in *Apprendi*, which describes a situation in which a mitigation finding could permissibly be made by a judge alone:

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.

*Apprendi*, 530 U.S. at 490 n.16. In this example, the jury, as demanded by the Constitution, made all fact-findings necessary to determine the upper limit of the potential sentence for the defendant. If the judge afterward decided to reduce the sentence because of mitigation, there is no constitutional barrier to his doing so. It is permissible for a judge to "ratchet down" the defendant's punishment after the jury has properly made the fact-findings necessary to determine its upper limit; it is not permissible for a judge to "ratchet up" the punishment beyond that authorized by the jury's fact-finding.

Thus, a state may require a jury to make a finding of future dangerousness–*immediately* rendering the defendant eligible for the death penalty–then permit a judge to decide whether mitigating evidence was sufficient to "ratchet down" the punishment.

However, Texas did not pursue this course: Under the Texas scheme, the jury must answer the mitigating special issue in order to determine the upper range of the punishment the defendant will receive. Although its subject matter is "mitigation," what is important, as the

Supreme Court emphasized, is the "effect" of the fact-finding, not its form. Functionally, the mitigation special issue operates precisely like an element of the crime – that is to say, it determines what sentence the defendant will receive. It must be determined by a process that meets relevant Constitutional standards, and *Ring* holds that this includes a jury that is convinced beyond a reasonable doubt.

The requirement that juries find every element of a crime beyond a reasonable doubt "reflect[s] a profound judgment about the way in which law should be enforced and justice administered." *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968); *see also id*. at 151-54 (tracing deep historical roots of "beyond a reasonable doubt" standard). Because a jury finding increasing a defendant's maximum punishment performs a function identical to an element of a crime, a criminal defendant's Sixth Amendment right to an "impartial jury" requires that any fact-finding that makes possible "an increase in a defendant's authorized punishment" be "found by a jury beyond a reasonable doubt." *Ring*, 122 S. Ct. at 2439.

In Mr. Woodard's case, the jury did not finish with its task of determining the upper limit of Mr. Woodard's "authorized punishment" until it answered *both* of the punishment-phase special issues. Therefore, each of these special issues should have been subjected to the reasonable doubt standard. The sentencing scheme under which Mr. Woodard was sentenced–which assigned to him the burden of production, and assigned no burden of proof to the jury's question–does not satisfy the Constitutional requirements of the right to trial by jury as articulated in *Ring.*

The Due Process Clause of the United States Constitution and the corresponding clause of the Texas Constitution require that a jury find, beyond a reasonable doubt, the defendant's guilt of all elements of a criminal offense. In re *Winship*, 397 U.S. 358, 364 (1970). Fact

findings that increase a defendant's authorized punishment are in all constitutional respects identical to elements of a crime, and therefore themselves must be found by a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 476-77 (2000). Because the finding of "insufficient mitigation" required by art. 37.071 determines the upper range of authorized punishment for a Texas capital murder defendant (i.e., whether he will live or die), it must be made by a jury that is instructed under the beyond a reasonable doubt standard.

The Eighth Amendment of the United States Constitution, which requires "heightened reliability" in capital sentencing, independently requires this exacting standard. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604, (1978) (opinion of Burger, C.J.) (stating that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"); *see also Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) ("[W]e have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of fact finding").

Several judges of the Supreme Court have declared that the Eighth Amendment requires jury sentencing in all capital cases. *See, e.g.*, *Ring*, 536 U.S. 584 , 122 S. Ct. at 2446 (Breyer, J., concurring) ("[T]he Eighth Amendment requires that a jury, not a judge, make the decision to sentence the defendant to death."); *Harris v. Alabama*, 513 U.S. 504, 515-526 (1995) (Stevens, J., dissenting) (holding that Eighth Amendment requires jury sentencing in capital cases). Because the Texas capital sentencing scheme permits a jury to make a fact-finding essential to the imposition of the death sentence by a standard of less than a reasonable doubt, it violates the Eighth and Fourteenth Amendments of the United States Constitution, Mr. Woodard's death sentence must therefore be reversed.

## XII. THE FUTURE DANGER SPECIAL ISSUE SUBMITTED AT MR. WOODARD'S TRIAL WAS UNCONSTITUTIONAL BECAUSE IT FAILED TO ASSIGN THE BURDEN OF PROOF ON THE STATE BEYOND A REASONABLE DOUBT TO ESTABLISH MR. WOODARD SHOULD RECEIVE A SENTENCE OF DEATH AND FAILED TO REQUIRE JURY FIND UNANIMOUSLY THAT STATE PROVED BEYOND A REASONABLE DOUBT MR. WOODARD COMMITTED THE EXTRANEOUS OFFENSES ADMITTED AT TRIAL.

### A. Factual background

Texas Special Issue states: 37.071

> (1) whether there is a *probability* that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
>
> (1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty;
>
> (3) members of the jury need not agree on what particular evidence supports a negative answer to any issue submitted under Subsection (b) of this article.

In making the "continuing threat" or dangerousness finding the jury was instructed that they had to find that there was a "probability" that Mr. Woodard would commit criminal acts of violence. *See* Art. 37.071, Sec. 2(c), V.A.C.C.P. This burden of proof was constitutionally deficient.

The rule in *Apprendi* and *Ring* is clear: any fact that increases punishment must be proven beyond a reasonable doubt. *Ring*, 536 U.S. 584, 122 S.Ct. at 2349. Facts that expose a defendant to a punishment greater than that otherwise legally prescribed are elements of the offense and must be proven beyond a reasonable doubt. The "facts" relied upon by the State to prove future dangerousness in this case were the facts of the unadjudicated extraneous offenses. However, the jury was not required to unanimously agree that the State proved "beyond a

reasonable doubt" that Mr. Woodard committed those crimes. Instead, some jurors could have found that these facts had been proven beyond a reasonable doubt and justified a finding of dangerousness, while others could have found that there were only proven by a preponderance of the evidence, while other jurors rejected the extraneous offenses entirely. Allowing individual jurors to decide for themselves whether an unadjudicated crime has been satisfactorily proved runs afoul of the principles set forth in *Apprendi* and *Ring.* As Justice Scalia wrote in his concurrence in *Apprendi*:

> "[A]ll the facts which must exist in order to subject the defendant to a legally prescribed punishment must be found by the jury."

*Apprendi*, 530 U.S. at 483. Those facts must be found beyond a reasonable doubt. No such requirement existed in this case.

"The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the fact-finding necessary to increase a defendant's sentence by two years, but not the fact-finding necessary to put him to death. We hold that the Sixth Amendment applied to both." *Ring*, 536 U.S. 584, 122 S.Ct. at 2443. Thus, Mr. Woodard's death sentence should be vacated and reversed.

As has been cogently put, the use of evidence of unadjudicated crimes becomes a ploy that "allows the state to secure a conviction on a strong murder case, then seek the death penalty by providing a weak case before a jury which is undeniably prejudiced. This opens the door to death penalty recommendations upon a level of proof lower than proof beyond a reasonable doubt." *State v. McCormick*, 397 N.E.2d 276, 280 (1979). Because Mr. Woodard's jury based his death sentence on factors the State did not have to prove beyond a reasonable doubt, this Court should vacate his death sentence and remand for resentencing.

## XIII. THE FUTURE DANGER SPECIAL ISSUE SUBMITTED AT MR. WOODARD'S TRIAL WAS UNCONSTITUTIONAL BECAUSE THE INDICTMENT FAILED PLEAD AGGRAVATING ELEMENTS CONTAINED IN THE INSTRUCTION AS REQUIRED BY *RING* AND *APPRENDI* TO ESTABLISH MR. WOODARD SHOULD RECEIVE A SENTENCE OF DEATH.

BACKGROUND FACTS

Mr. Woodard was charged by indictment with capital murder. That document alleged that he committed the crime of murder in the course of committing or attempting to commit a robbery. Under Texas law, the "maximum penalty" for that crime was imprisonment for life *unless* the jury made an additional finding: (1) that there was a probability that Mr. Woodard posed a continuing threat to society. Art. 37.071, Sec. 2(e)(1), Vernon's Ann. C.C.P. If the jury failed to find sufficient facts to support future dangerousness, the maximum sentence was life in prison. Thus, the aggravating factor increased the maximum penalty from life in prison to a death sentence.

Despite the fact that future dangerousness was a necessary prerequisite to increase the penalty from life in prison to a death sentence, that accusation was not contained in Mr. Woodard's indictment. The failure to include that necessary element in the indictment renders his death sentence unconstitutional.

*Jones v. United States*, 526 U.S. 227 (1999), held that "under the Due Process Clause of the Fifth Amendment and the notice and jury guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243, n.6. *Apprendi v. New Jersey*, 530 U.S. 466, 475 (2000), held that the Fourteenth Amendment affords citizens the same protections when they are prosecuted under state law. In *Ring v. Arizona*, 536 U.S. 584 (2002) the United States Supreme Court held that the rule of

*Jones* and *Apprendi* applies with equal force to capital cases. Aggravating factors operate as the functional equivalent of an element or a greater offense. *Ring*, 536 U.S. 584, 122 S.Ct. at 2443. "The relevant inquiry is one not of form, but of effect." *Apprendi*, 530 U.S. at 494.

Texas court has repeatedly held that aggravating circumstances in a capital murder case are not "elements" of the crime. *See*, *Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998); *Callins v. State*, 780 S.W.2d 176, 186-87 (Tex. Crim. App. 1989). However, as stated above, the critical inquiry is not the label, but whether the facts increase the maximum penalty otherwise available. Indeed, as Justice Scalia noted in his concurring opinion in *Ring*, the state could call the facts "elements of the crime," "sentencing factors," or "Mary Jane," and the analysis would be identical: failure to state those facts in the charging document renders the sentence unconstitutional. *Ring,* 536 U.S. 584, 122 S.Ct. at 2444.

Indeed, on June 28, 2002, after the Court's decision in *Ring*, the death sentence imposed in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), was overturned when the Supreme Court granted the writ of certiorari, vacated the judgment of the United States Court of Appeals for the Eighth Circuit upholding the death sentence, and remanded the case for reconsideration in light of *Ring*'s holding that aggravating factors that are prerequisites of a death sentence must be treated as elements of the offense. *Allen v. United States,* No. 01-7310, 2002 U.S. LEXIS 4893 (June 28, 2002).

The question presented in *Allen* was this:

> Whether aggravating factors required for a sentence of death under the Federal Death Penalty Act of 1994, 18 U.S.C.Sec.3591 et. seq. are elements of a capital crime and thus must be alleged in the indictment in order to comply with the Due Process and Grand Jury Clauses of the Fifth Amendment.

The Eighth Circuit had rejected Allen's argument because in its view aggravating factors are not elements of federal capital murder, but rather "sentencing protections that shield a defendant

from automatically receiving the statutorily authorized death sentence." *United States v. Allen*, 247 F.3d at 763.

The State may argue that *Allen* can be distinguished because it involves the Fifth Amendment's grand jury requirement, a federal constitutional clause that is not applicable to the states. This distinction makes no difference for two reasons. First, the notice requirements of the Sixth and Fourteenth Amendments, which are applicable to the states, likewise require the inclusion of every element of the crime in the charging document. *See, Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996)("the Sixth Amendment requires that an indictment 'enumerate each prima facie element of the charged offense.'").

The failure of the indictment to include the necessary elements that elevated Mr. Woodard's maximum sentence to death requires automatic reversal. *Ball v. United States*, 140 U.S. 118, 136 (1891); *United States v. DuBo*, 186 F.3d 1177 (9th Cir. 1999).

Reversal is also required because only Mr. Woodard's grand jury could have decided whether the indictment should include all the elements of capital murder. Like the Fifth Amendment to the United States Constitution, the Texas State Constitution guarantees that "no one shall be held to answer for a criminal offense, unless on an indictment of a grand jury" Tex. Const. Art. I Sec. 20. *See also*, Tex. Const. Art. V Sec.12 (b); Art 1.141 V.A.C.C.P.(prohibiting waiver of right to be accused by indictment of a capital offense).

The most "celebrated purpose" of the grand jury "is to stand between the government and the citizen" and protect individuals from the abuse of arbitrary prosecution. *United States v. Dionisio*, 410 U.S. 19, 33 (1973). The shielding function of the grand jury is uniquely important in capital cases. It is impossible to know whether the grand jury in this case would

have returned an indictment alleging the presence of the aggravating factors of deliberateness and dangerousness. The State's authority to decide whether to seek the execution of an individual charged with a crime hardly overrides "in fact is an archetypical reason for" the constitutional requirement of neutral review of prosecutorial intentions.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall be informed of the nature and cause of the accusation". A conviction on a charge not made by the indictment is a denial of due process. *Thornhill v. Alabama*, 310 U.S. 88 (1940). Because the State did not submit to the grand jury, and the indictment did not state, all the elements of the crime necessary to return a death sentence, Mr. Woodard's constitutional rights under both the Texas and United States Constitutions were violated.

## XIV. THE DUAL-TRACK HABEAS APPLICATION SYSTEM VIOLATES DUE PROCESS OF LAW, AS GUARANTEED BY U.S. CONST. AMEND. XIV.

### A. Factual background

Applicant contends that Art. 11.071, V.A.C.C.P. is unconstitutional, on its face and as applied, because it distorts the historic purpose of a postconviction application for writ of habeas corpus. Not merely the form of the writ of habeas corpus, but its efficacy as well, is guaranteed by the Texas Constitution. Furthermore, the role of the writ of habeas corpus is so well established in American law that it should be regarded as part of the due process of law guaranteed by U.S. CONST. amend. XIV.

This Court should grant relief by striking down Art. 11.071(4), V.A.C.C.P., staying all further habeas proceedings in this and other capital murder cases pending before the Court under Article 11.071 until the Legislature has redrafted the statute, and by permitting supplementation of this application as a first application as if it were filed under a redrafted timetable in the first instance.

(A) The Source of the Problem. The problem begins with the statute itself, as enacted in 1995. Prior to that time there was no fixed statutory timetable for filing a postconviction habeas application. As of the effective date of September 1, 1995, a habeas application must be filed within the time period specified by section 4 of Article.

Two alternative provisions apply. An application must be filed 180 days after appointment of counsel, or 45 days after the filing of the State's brief on direct appeal, whichever is later. Only one 90-day extension is permitted. Because this makes the direct appeal and habeas application time periods overlap, rather than having the direct appeal process

precede the habeas process, Applicant will refer to the amended system as the "dual-track" system.

Under the statute, Applicant's first application for writ of habeas corpus becomes due no later than March 31, 2003 and is being filed by that date, even though the direct appeal process in Applicant's underlying case is not complete. Indeed, the direct appeal in this case has not yet been decided. This does not even take into account the additional period of time for filing a petition for writ of certiorari on direct appeal, a step which has become indispensable for effective representation because of harsh constraints placed on federal habeas review by 28 U.S.C. §2254(d)(1).

(B) The importance of a postconviction habeas process. At least in the United States, the writ of habeas corpus commonly has been used for postconviction relief. In this context "postconviction" does not merely mean relief sought after the entry in the trial court of a judgment of conviction, but rather means relief sought after the direct appellate process has become final. There are two primary reasons for this.

First, postconviction relief is needed in order to cure shortcomings inherent in the direct appeal record. This consideration is illustrated by the three major sources of postconviction habeas litigation; i.e., involuntary plea claims, ineffective assistance claims, and claims that exculpatory evidence was withheld. As to each of those situations, a direct appeal generally cannot be efficacious because the appellate record is inadequate. Habeas remedy is thus necessary when a direct appeal record is inadequate.

In theory the dual-track system allows for development of an adequate record just as the old system did, but in practice something of great value is lost. The State Court of Appeals may find an appellate record inadequate in ways that defense counsel on direct appeal might not

foresee and which the State might not raise in response. It is much easier for habeas counsel to make sure an adequate record is presented once he has the benefit of the Court's assessment, on direct appeal, of the adequacy of the direct appeal record.

Second, a mechanism which operates after the direct appeal process is necessary because issues of ineffectiveness of counsel, either at trial or on direct appeal, probably cannot be developed adequately while the direct appeal is still in progress, and even if they can, the conflict generated is inherently damaging.

**B. The dual-track system established by Texas statue is prejudicial.**

There are several specific problems of this type, six of which are noted here.

(1) Whether or not trial counsel was effective in preserving error, and whether or not that mattered, might not be clear until after a direct appeal opinion is issued.

(2) In many instances the attorney on direct appeal may have been trial counsel. This is a factor which should be considered in examining the whole picture. Either due to pride, or simply due to having been too close to a case for a long time, counsel functioning in the double role of both trial counsel and appellate counsel may fail to notice shortcomings in his own performance, such as failure to preserve error, with the result that an issue is shot down on direct appeal due to something for which counsel, rather than an appellant, should take the blame. It is true that nothing inherently prevents habeas counsel in a dual-track system from pointing out this flaw, but the result may be a destructive contradiction in the positions taken by direct appeal counsel and habeas counsel – the former insisting that error is preserved (or that non-preservation is excusable), the latter insisting that error is not preserved due to inexcusable neglect by the trial/direct appeal attorney. This would be unseemly even in a non-capital case, but with a life at stake the creation of this dilemma borders on cruelty. This dilemma also

cannot improve the image of the judicial system's treatment of the death penalty in Texas, which already has suffered precisely because of criticism of counsel.

(3) Even if direct appeal counsel is not the same attorney who tried the case, the same type of conflict as discussed in Paragraph (2) above can exist. That is, even with no personal stake in what may be said about trial counsel, the attorney on direct appeal naturally must argue either that error was preserved or that non-preservation is excusable, while habeas counsel must argue the opposite view in pursuing an ineffectiveness claim. This leads to the further question whether habeas counsel, disagreeing with direct appeal counsel, must argue that direct appeal counsel is ineffective, in the sense of impeding habeas counsel's function, when he tries to avoid a finding of procedural default. Again, the likely finger-pointing cannot be good for justice or the image of justice.

(4) What if direct appeal counsel simply misses an issue? Habeas counsel cannot raise it on its merits if it was available to direct appeal counsel, under the principle that habeas review is not a substitute for direct appeal.7 Therefore habeas counsel who must file an application while a direct appeal is pending is compelled to argue that direct appeal counsel is ineffective, in the hope of forcing a new direct appeal which includes the missed issue. Applicant has included such a claim in this application. How does that make direct appeal counsel look at a time when his persuasiveness on direct appeal and the Court of Criminal Appeals' confidence in his arguments could make a critical difference? How does that make the system look?

(5) Normally money should not be a major consideration in questions of justice, but the adequacy of defense funding has continually been a problem in capital murder cases.

---

[7] That doctrine is not merely important in state court. It has taken on a gatekeeping role as to federal habeas relief in light of *O'Sullivan v. Boerckel*, 526 U.S.838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

Therefore, at least a latent conflict exists when both a direct appeal and a habeas application must be funded, even though the latter could turn out to be a complete waste of resources if the direct appeal succeeds.8 The financial resources for the representation of capital murder defendants are too scarce to be wasted.

No doubt this Court can postulate variations on these problems, but the illustrations should suffice to show that the Legislature has created a system for capital murder defense which inherently pits attorneys against one another when they should share a common goal of defending the condemned man. Any legislator who ever read the Bible should know that “a house divided against itself cannot stand,” but such a “divided house” is what the Legislature created for the defense of persons facing the death penalty when it took habeas representation out of its historic “postconviction” context.

In contrast to the United States Constitution, which protects the writ of habeas corpus only against “suspension” (except in time of war), U.S. CONST. Art. I, §9, the Texas Constitution not only assures the continuing existence of the writ, but its efficacy as well. TEX. CONST. Art. I, §12 states:

The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual.

(D) Due process. Applicant also contends that a postconviction habeas application, rather than a dual-track system, is a component of due process of law. It is true that not every procedural safeguard is automatically incorporated in due process, but some mechanisms are so well entrenched in the Anglo-American tradition of criminal procedure that they are

---

[8] Nor is the waste of resources limited to the defense, for the State must answer habeas applications as well as answering direct appeal briefs. Perhaps the Legislature could not be expected to have any mercy on Capital Murder defendants, but it could have had mercy on the taxpayers.

incorporated in due process. The Interpretive Commentary to VERNON'S CONSTITUTION OF THE STATE OF TEXAS, ANNOTATED, at 403 observed that the writ of habeas corpus is "regarded as a fundamental part of the English common law." It was incorporated in an English statute as early as 1697. The United States Constitution provided for it even before the Bill of Rights was adopted. U.S. CONST. Art. I, §9. Habeas has often been called the "Great Writ." While the writ of habeas corpus may be used in several contexts, all of them share one characteristic: the routine processes of the law are inadequate to provide redress. Nowhere is that more true than in the use of postconviction habeas applications.

This Court should hold that the dual-track system is unconstitutional and strike down Article 11.071(4)(a). The effect of that would be to restore prior law (and current law in non-capital cases) permitting the filing of a postconviction application only after a conviction became final through exhaustion of the direct appeal process.

**C. Mr. Woodard was prejudiced by the dual track system**

In this case, the Court of Criminal Appeals held that Appellate Counsel failed to adequately brief Mr. Woodard's Fourth Amendment claim and refused to review it. This is hardly the type of error the State writ counsel could have foreseen before the Appeal became final. Moreover, counsel would have put himself in a position of conflict if he prematurely raised an issue that the court of appeals could have overruled. There was no assurance that in this case, the Court of Appeals would have found the Fourth Amendment claim was forfeited due to Appellate counsel's inadequate briefing. Accordingly, the state statute was unconstitutional as applied to Mr. Woodard in this case.

## XV. THERE IS NEW EVIDENCE THAT MR. WOODARD IS INNOCENT OF THE CRIME THAT WOULD EXCUSE PROCEDURAL DEFAULT OF ANY OF HIS CLAIMS

While "actual innocence" is not an independent claim, it is a method of excusing default. *O'Dell v. Netherland,* 95 F.3d 1214, 1246 (4th Cir.1996), *aff'd,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). To prevail under this theory, a petitioner must produce new evidence not available at trial to establish his factual innocence. *Royal v. Taylor,* 188 F.3d 239 (4th Cir.1999). A petitioner may establish actual innocence as to his guilt, *Id.,* or his sentence. *Matthews v. Evatt,* 105 F.3d 907, 916 (4th Cir.1997).

"[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1992)*; *Lucas v. Johnson, 132 F.3d 1069, 1074-75 (5th Cir.1998).*

In *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the court held the allegation of actual innocence was not used as an independent basis for habeas relief, but merely " 'a gateway through which [the] habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.' " *Id.* at 861 (quoting *Herrera,* 113 S.Ct. at 862). In other words, "actual innocence" is another defense to the application of the procedural default doctrine. *See, e.g., Lucas,* 132 F.3d at 1076-77.

### A. There is new evidence of Mr. Woodard's innocence of the death penalty

The Affidavit submitted by Doctor Lunberg-Love stated that the tests she conducted on Mr. Woodard revealed that he did not have Anti-social personality disorder or Post Traumatic Stress Disorder, much less sociopathic personality. EXH20 The State relied upon the defense

expert's misdiagnosis in this case to obtain the death penalty by arguing that Mr. Woodard was a sociopath and a future danger. The new evidence with the correct diagnosis is highly relevant new evidence that Mr. Woodard is not guilty of the death penalty.

**A. There is new evidence of Mr. Woodard's innocence of the crime**

There is new evidence from Mr. Woodard that he did not come into contact with the grey Lincoln Town Car stolen from the scene until it was in the parking lot of his brother's apartment. Applicant states he saw someone hide something under the driver's seat and then exit the vehicle. Mr. Woodard believes the individual resembled Adrian *Dewayne* Sipsey, a friend of his. Original reports stated that "Red" and Dewayne told witnesses that they had pulled a stunt. Mr. Woodard believed that he placed drugs under the seat and Woodard planned to take them. When Mr. Woodard entered the vehicle, he found some Lottery tickets and a gun under the seat. At that time, he did not know that the vehicle, the gun and the tickets were from the scene of a capital murder that just occurred. Mr. Woodard then decided to sell the vehicle'S equipment for money and did so with the assistance of Reginald Willis and Dan Webster. Applicant's testimony is new evidence that he was innocent of the murders. EXH7

There is also new evidence that Reginald Willis was coerced and tricked by the police into saying that Woodard confessed the murders to him. EXH9 Reginald Willis also told others that he made up the statement regarding Applicant's third-party confession because the police threatened him. EXH9, EXH11 There is new evidence that Reginald Willis is mentally retarded, or at least borderline mentally retarded and therefore easily coerced. EXH19

There is new evidence that Reginald Willis tried to kill someone with a gun two days after the Wilcrest shootings. EXH9, EXH10, EXH13 Since the time of the incident, there are ten calls for service implicating Reginald Willis making threats and using violence and firearms.

EXH27 Finally, Reginald Willis had a felony record prior to the incident, and records show he went by the nickname "Red." EXH18

There is additional new evidence that Mr. Woodard never really told Dan Webster he committed the murders. Dan Webster told investigator that Webster just figured that he did. Further, the police threatened to charge him with one of the murders. EXH10 There is new evidence that Mr. Woodard did not ask Casper Hines to hide a weapon the night of the murder and that the police told Casper to write that in her statement after threatening her the night they brought her in for questioning. EXH8

New evidence is available that Adrian Dewayne Sipsey admitted that he had committed several robberies or "stunts" prior to this incident. Adrian Sipsey lived around the corner from the Conoco. He also told a defense investigator that everyone knows that Robert Woodard did not do this. EXH10

Mr. Woodard, Adrian Sipsey and Reginald Willis both fit the description of the suspect in this case and all three bear a striking resemblance to one another. EXH6, EXH1 With a hood, any one of the three could have been identified as the individual who took Calloway's vehicle from the scene.

**B. Mr. Woodard's new evidence would establish that he was innocent of the capital murder.**

Applicant has established there is new affirmative evidence that he did not commit the murders. Mr. Woodard's testimony is a fundamental part of his constitutional right to testify and warrants at least as much consideration as the self-serving testimony used at trial to convict him and sentence him to death. The prosecution did not have any physical evidence of Mr. Woodard at the scene to contradict his testimony and there is nothing that he may have retested

to exculpate him. Thus, the Mr. Woodard's testimony warrants this Court's attention and cannot be dismissed or discounted in this case merely because he stands charged of the crime. Moreover, in light of the testimony at trial and the police investigation, Mr. Woodard's testimony is the only type of affirmative evidence that can establish his innocence in this case and therefore is crucial new evidence.

Applicant's testimony is coupled with additional evidence not introduced at trial that casts further serious doubt on reliability of testimony used to convict him.

The new evidence Mr. Woodard brings forth establishes that the evidence at trial is insufficient to uphold a conviction that would withstand constitutional scrutiny. Initially, there are recantations from the trial testimony from Reginald Willis and Casper Hines. With regard to Reginald Willis's testimony, there now is proof that one of the people that the police and State argued was not likely to do this tried to kill someone the next day. Additionally, there is more new evidence of about ten calls for service to the home Reginald lives which implicated him in additional crimes involving threats and acts of violence, including the use of firearms. This evidence shows Reginald was not only violent, and had a temper, but that he was also quick to blame others for his actions. Reginald Willis also lied on the stand about his nickname being Red in order to avoid being implicated and had a prior felony conviction that would also establish he was not a credible witness.

The evidence that Reginald was retarded would show that the police would have had an easier time tricking him after having succeeded in the other intimidation techniques. The evidence established that the police lied to Reginald by stating Mr. Woodard was blaming him and further threatened to charge him unless he implicated his brother. At a minimum, this

evidence proves that Reginald Willis was easy to frighten and intimidate into saying what the police wanted, at worst, it shows he was simply trying to protect himself.

New evidence also establishes that the police used the same tactics on Dan Webster and Casper Hines. Casper Hines states the police threatened to have her daughter taken from her. EXH11, EXH8 Dan Webster states they threatened to charge him with one of the murders. EXH10 Casper admits that when they were questioning her, they would come in and out of the room and act like Reginald had just said something and forced her to say the same thing as Reginald. EXH8

In addition, Mr. Woodard's innocence claims introduces another suspect that was never investigated who at the time lived within walking distance from the Conoco. There is additional evidence that the call slips in this case state Cory Calloway reported that he had been assaulted by an individual in a *red Lincoln,* when in fact the car way grey. EXH13 Initially, it could be a mistake. It could also implicate Reginald Willis who is known as "Red" and was the first suspect. Adrian Sipsey freely admitted that he had been involved in several robberies just prior to the incident. EXH10 It finally bears mentioning that Adrian Sipsey's eyebrows, lips and nose bear a stronger resemblance to the characteristics in the composite than Applicant's did. A photo comparison of the composite and Sipsey is attached to this writ in support of this claim. EXH1, EXH6

Finally, new evidence from an interview with the eyewitness, Calloway, indicates that his testimony was tainted from the information he received from other people and that he did not actually identify Mr. Woodard from his memory, but through Mr. Woodard's friends. Further, Calloway states the police initially suspected he was involved in the crime, which would create a bias in his testimony. EXH28.

In summary, when the court weighs Mr. Woodard's sworn testimony that he did not commit the murders with the remaining evidence that weaken further the already weak trial testimony, there is clear and convincing evidence of sufficient reasonable doubt on whether he is guilty of capital murder. Although Applicant's new evidence claims may not conclusively prove who did commit the offense, Applicant does not bear that burden. Applicant's burden is to establish clearly and convincingly that he is innocent of this crime, not to solve it.

With Applicant's new evidence, the court is left with the fact that although Applicant was involved with stripping the Lincoln, someone else who he knows and is close to did the actual murder. The two other suspects left are either Mr. Woodard's brother or his close friend. Assuming it was Sipsey, it stands to reason that he never told Reginald in order to protect himself and, after they saw the news and knew he was involved with the vehicle, Reginald and Dan Webster just assumed he was involved. Assuming it was Reginald, Mr. Woodard is left with the option of pointing the finger at his mentally handicapped brother.

Under either scenario, the totality of the new evidence Applicant brings forth proves that his conviction does not meet constitutional requirement of due process and further, his execution would be wrong. The new evidence is as good as it may get in a case like this, that does not have DNA or other objective evidence that actually place a suspect at the scene. Because the evidence in the case against Mr. Woodard is such, this Court should give as much consideration as possible to the new evidence and find that it warrants a new trial. As the Supreme Court held …"[t]here is no question that in an appropriate case the principles of comity and finality "must yield to the imperative of correcting a fundamentally unjust incarceration," *Engle v. Isaac*, 456 U.S. 107 (1981). With the new evidence of Mr. Woodard's

innocence, there is clear and convincing evidence that the jurors could not have convicted him of the capital murder.

Accordingly, Mr. Woodard prays this court grant this writ or in the alternative, set a hearing to develop further evidence on this issue.

## XVI. THE STATE'S MISCONDUCT IN FAILING TO DISCLOSE EXCULPATORY AND IMPEACHMENT INFORMATION REGARDING THEIR WITNESSES PREJUDICED MR. WOODARD.

Mr. Woodard claims that the state withheld *Brady* information the investigation by failing to inform defense of the following:

1. Call slips from evening that contradicted Calloway's testimony.
2. Prior felony conviction of their State witness Reginald Willis.
3. Call slip involving Reginald Willis as a suspect days after the crime.
4. Police's initial suspicion of Calloway's involvement.
5. Any threats made to Casper Hines and Reginald Willis and Danny Webster to induce their cooperation.

This ground is alleged as an alternative ground to the ground of trial counsel's ineffective assistance for not investigating and discovering this information.

*Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." There are the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

**Favorable evidence**

The above listed evidence was favorable to Mr. Woodard as impeachment evidence for the State's witnesses. The relevance has been detailed in the previous grounds in the Petition. All of the above evidence would weaken the testimony provided by the State.

**Suppression by the State**

It has long been established that the prosecution's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States,* 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan,* 294 U.S. 103, 112, (1935). However, the evidence does not have to be proven to be known to the State in order to sustain a finding that the evidence was suppressed by the State. It is proper to impute to the prosecutor's office facts that are known to the police and other members of the investigation team. *Kyles v. Whitley*, 514 U.S. 419, 437, (1995), and *Giglio v. United States*, 405 U.S. 150, 153-54, 763, (1972). As *Kyles* put it, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." 514 U.S. at 437.

All of the above evidence that was not disclosed to the trial lawyers was known by the police investigating the case, or was available to them by simply checking the police computers. In fact, most of the evidence was discovered through a search of police records. The evidence regarding the police suspicions and police threats was known by the police investigating the case and directly imputable to the State prosecutors. Thus, the fact that the evidence was not specifically disclosed to Mr. Woodard's trial counsel indicates the evidence was withheld or suppressed.

**Prejudice /materiality**

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "The question is not whether the

defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995).

The totality of all of the evidence not disclosed rendered the trial unconstitutional. While the State could argue that individually, some of the evidence suppressed would not have altered the outcome at trial, as a whole, the sum of the evidence withheld left us a doubt sufficient to undermine confidence in the outcome of the trial.

The evidence withheld regarding Calloway would have discredited Calloway's identification, by pointing out bias in his cooperation with the police and impeachment of the accuracy of his testimony, all of which was not brought out at trial. Calloway's identification was key, as already argued, and his impeachment would have been material at trial.

Further, the fact that the potential suspects, Willis, Hines and Webster, were coerced would given additional evidence to argue that their testimony was biased.

There was no scientific evidence to disprove any of the testimonial evidence being offered at this point by Mr. Woodard and all of it would have given additional doubt to the finding of guilt.

**Error not waived**

"[C]ause and prejudice" usually "parallel two of the three components of the alleged *Brady* violation itself." *Id.*, at 282. Corresponding to the second *Brady* component, evidence suppressed by the State, a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and

prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes. 527 U.S., at 282, 119 S.Ct. 1936.

In this case, Mr. Woodard additionally argues that his actual innocence claim further excuses him from having raised his misconduct claim earlier. Therefore, Claim XV allows this court to circumvent the requirements of exhaustion under ADEPA and make a finding that the State improperly suppressed favorable evidence during Mr. Woodard's trial.

## PRAYER FOR RELIEF

WHEREFORE, petitioner ROBERT WOODARD, prays for the following relief:

1. Issue a writ of federal habeas corpus to have him brought here, to that end his unconstitutional confinement or restraint/ or to be relieved of his unconstitutional sentence of death.
2. Grant him the authority to issue subpoenas for witnesses for *in forma pauperis*, for discovery of documents and for other things necessary to prove the facts in this writ,
3. Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims and allow him a reasonable time subsequent to any hearing this Court determines to conduct in which to brief the issues of law raised by this petitioner and the subsequent hearing,
4. Grant such further relief as the ends of justice may require.

Respectfully submitted, on this the 17th day of November, 2008

____________/s/______________

Rosa Eliades
TBN 00789278
Attorney for Petitioner
306 Main Street, Floor 3
Houston, Texas 77002
713.222.0610
713.236.0733
rosa@eliadeslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2008, an electronic copy of this Petition for Habeas Corpus by a Prisoner in State Custody was served upon counsel for Respondent of the Attorney General by electronic filing through the EFS.

/s/ Rosa Eliades