UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT LEE WOODARD, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. H-08-2036 |
| | § | |
| RICK THALER,[1] | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Robert Woodard, an inmate on Texas' death row, seeks federal habeas corpus relief. Woodard has filed a federal petition for a writ of habeas corpus that challenges his capital conviction and death sentence. Respondent Rick Thaler has moved for summary judgment. This Court has considered the pleadings, record, and law, particularly the relevant provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). For the reasons discussed at length below, the Court finds that Woodard has not shown an entitlement to federal habeas relief. Accordingly, the Court will grant Respondent's summary judgment motion and deny Woodard's habeas petition. The Court will not certify any issue for appellate review.

## BACKGROUND

The State of Texas indicted Woodard for murdering Achamma and Thankachen Mathai during a robbery on February 12, 2000. Woodard stood trial in the 339th District Court of Harris County, Texas. The Texas Court of Criminal Appeals has summarized the facts surrounding the murders as follows:

The Mathais owned and operated a convenience store in Houston. On the night of

---

[1] On July 15, 2009, Rick Thaler replaced Nathaniel Quarterman as the Director of Texas Department of Justice-Correctional Institutions Division. Accordingly, Thaler "is automatically substituted as a party." FED. R. CIV. P. 25(d)(1).

February 12, 2000, Thankachen was working at the store, and Achamma had brought him dinner. Between 10 and 11 p.m., Cory Calloway bought gasoline from the store's pumps for his 1989 Lincoln. Leaving the engine running at the gas pumps, Calloway went to a pay telephone at the side of the building.

While Calloway talked on the phone, Garvina Sadiki came in the store to buy merchandise. As Sadiki paid for her items, a man dressed in a hooded jacket entered the store with a gun in his hand. The man fired a shot and said, "This is a robbery. Don't anybody move."

The robber ran behind the counter where Thankachen and Achamma stood, and ordered Thankachen to open the register. He ordered Sadiki not to look at him, and she obeyed. When Thankachen could not get the register open, the robber shot him. The man then ordered Achamma to open the register and threatened to shoot Thankachen again if she did not. Achamma cried and screamed, begging the man not to hurt them. As she fumbled with the register, the man pointed the gun toward Thankachen and fired another shot.

Hearing police sirens, the robber cursed and ran from behind the counter to the front door only to discover that it had been locked. The man screamed for Achamma to open the door. Sadiki heard the lock open, and she saw the man push open the door. Then the robber returned to the counter where Achamma and Sadiki were standing. He backed up to Sadiki, keeping his face hidden, and demanded her keys. Sadiki handed the man her keys. The man said to Achamma, "Bitch," and he shot her in the head. He then ran out the front door.

Outside the store, Calloway was still talking on the telephone. He heard the gunshots and then "a loud bust through the door." He looked up and saw a person wearing a hooded sweater run toward his Lincoln. Calloway ran toward the man, who pointed a gun at him. Calloway retreated to safety, and the man drove away in Calloway's Lincoln. Calloway went in the store and called for help.

Police officers arrived quickly. Achamma was already dead. Thankachen died shortly after being taken to a hospital.

*Woodard v. State*, No. 74,080, 2005 WL 77143, at *1 (Tex. Crim. App. Oct. 20, 2004) (unpublished).

Woodard's identity as the man wearing the hooded jacket was a central issue at trial. The State relied on eyewitness testimony from Garvina Sadiki and Cory Calloway to establish Woodard's identity as the murderer. Ms. Sadiki did not get a good look at the killer's face. Tr. Vol. 24 at 105. She did not conclusively recognize anyone in a live line-up, but Woodard "gave

[her] a real strange feeling. It just made [her] feel real eerie inside." Despite the uneasy feeling Woodard gave Ms. Sadiki, she told the police that she could not make a positive identification. Tr. Vol. 24 at 108-09. Nevertheless, she thought that Woodard had "slender hands" like the murderer

Cory Calloway made a stronger identification. Six days after the murders, Mr. Calloway viewed Woodard in a live lineup, but qualified that he could only make a "strongly tentative" identification. He said he would be "100 percent sure" if he could see Woodard in a hooded jacket like that worn during the robbery. Because the police could not locate similar clothing for the live lineup, they later showed Mr. Calloway a photo array wherein they superimposed hoods over the men's pictures. Mr. Calloway then conclusively recognized Woodard.

Both Ms. Sadiki and Mr. Calloway identified Woodard at trial. However, the prosecution's case against Woodard did not rely on eyewitness testimony alone. Circumstantial evidence and incriminatory testimony otherwise confirmed Woodard's guilt. A Crime Stoppers tip led to a police investigation which turned up evidence pointing to Woodard as the murderer. The police found Mr. Calloway's Lincoln at the apartment complex where Woodard's brother Reginald Willis lived. The police searched Mr. Willis' apartment and found items stolen from Mr. Calloway. The police linked Woodard to the robbery/murder through interviews with Woodard's friends and family members.

For example, Mr. Willis' girlfriend Caspar Hines told the police that around the time of the murders Woodard showed up at their apartment wearing black gloves and knocking on the door loudly. Woodard carried items taken from Mr. Calloway's car into her apartment. Woodard tried to give her a gun that was "hot."

Woodard's friend Dan Webster also saw him soon after the murders. Woodard had been

driving a Lincoln like that stolen from Mr. Calloway and possessed items that had been in Mr. Calloway's car. Woodard told Mr. Webster that he had robbed a store and fired shots because a woman would not open the cash register. Woodard said that he thought that he had killed the woman. Woodard said that he stole the car immediately afterwards. Woodard also confessed that "he had messed up, and he hope God forgive him." Tr. Vol. 26 at 83.

Mr. Webster explained that Woodard carried many lottery tickets which he stole during the robbery. Woodard, Mr. Webster, and Mr. Willis scratched off the tickets. Mr. Webster later took several tickets to stores for redemption. Store clerks later identified Woodard as also having turned in some of the stolen lottery tickets.

Woodard told his brother that he robbed the store, fired his gun, and stole Mr. Calloway's car. Mr. Willis saw Woodard with several stolen items. Mr. Willis told the police how Woodard had disposed of the murder weapon. A man performing cleanup for community service later found parts of a gun similar to that used in the murder in the same location where Woodard got rid of the weapon. Based on information from Mr. Willis, Ms. Hines, and Mr. Webster, the police began preparing an arrest warrant for Woodard.

On February 17, 2000, police officers arrested Woodard outside his apartment complex. The police had not yet secured an arrest warrant. Woodard, however, consented to a subsequent search of his apartment, which turned up a cell phone stolen from Mr. Calloway along with ammunition similar to that used in the killings. Before trial, on appeal, and in this proceeding, Woodard has challenged the legality of his arrest and the subsequent search.

The trial court appointed Robert Loper and Loretta Muldrow to represent Woodard.[2] The

---

[2]     The Court will generally refer to Woodard's trial attorneys as "trial counsel" unless necessary to identify one attorney. Woodard took an active interest in his case and filed several *pro se* pleadings. Of note, Woodard filed a pre-trial application for habeas corpus relief. The trial court, however, denied Woodard's *pro se* motions to allow hybrid representation. Clerk's Record at 35.

prosecution's case against Woodard rested on two main arguments: (1) eyewitnesses identified him as the killer; and (2) Woodard's statements and possession of incriminating items tied him to the murders. The defense responded with a two-fold strategy. First, the defense extensively attacked the reliability of the eyewitness identification through cross-examination. Second, the defense pointed to Woodard's brother Reginald Willis as the one who committed the robbery and murders. The defense called witnesses who testified that Mr. Willis made statements that implicated himself, along with Woodard, in the robbery/murders. The defense also challenged Mr. Willis' alibi.

The jury instructions allowed for Woodard's conviction under three theories: (1) he murdered Achamma Mathai during the course of a robbery; (2) he murdered Thankachen Mathai during the course of a robbery; or (3) he killed both victims during the same criminal transaction. Clerk's Record at 254-55. The jury convicted Woodard of capital murder.

In a separate punishment phase, the jury had to answer two special issue questions:

<u>Special Issue No. 1</u>
Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Robert L. Woodard, would commit criminal acts of violence that would constitute a continuing threat to society?

<u>Special Issue No. 2</u>
Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Robert L. Woodard, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 273-74.

The State presented evidence showing that, despite his young age, Woodard had a long history of criminal activity and violence. Woodard's lawlessness began at age fourteen with an arrest for possessing several rocks of cocaine. That same year he stole a car at gunpoint. Gang

activity marked Woodard's teenage years. While some of his offenses were comparatively minor, such as curfew violations and trespassing, he had also had previously committed assaults and thefts. Continued drug use led to the revocation of a probated sentence for possession of marijuana. While incarcerated for that crime, Woodard received disciplinary convictions for possession of contraband, extortion of other inmates, assault of fellow inmates, and interfering with a head count. Jail personnel described Woodard as confrontational, disruptive, and threatening. The prosecution also presented testimony about the impact the murders had on the victims' family members. In sum, the prosecution characterized Woodard as a violent man whose aggressive actions had escalated to capital murder, but for whom the jurors could have no confidence that incarceration would abate his lawlessness.

The defense presented evidence intending to humanize Woodard and show that he would not be a future threat to society. Family members described Woodard's turbulent, impoverished, abused, and neglected upbringing. Because of his father's absence and his mother's instability and early death, members of the extended family had raised Woodard. Jailors testified that Woodard's behavior before trial, in contrast to his earlier imprisonment, was not marred by disciplinary problems. A clinical psychologist, Dr. Shirley Gruen,[3] testified that Woodard behaved well in a structured environment like prison.

The jury answered the special issues in a manner requiring the imposition of a death sentence.

In compliance with Texas law, Woodard's direct appeal and state habeas proceedings ran concurrently. In both actions, the Texas Court of Criminal Appeals found no error and affirmed Woodard's conviction and sentence. These federal habeas proceedings followed.

---

[3] The state court record incorrectly gives her surname as "Gruener."

In his federal habeas petition, Woodard raises the following grounds for relief:

1. The police arrest and the introduction of evidence from the subsequent line-up violated Woodard's rights under the Fourth Amendment.

2. The procedures used by the police in the line-up were impermissibly suggestive and created a heightened chance for an incorrect identification.

3. Trial counsel inadequately advised Woodard of his right to testify at trial.

4. Trial counsel should have retained an expert witness to challenge the eyewitnesses' testimony.

5. Trial counsel ineffectively impeached the prosecution's witnesses.

6. Trial counsel inadequately prepared an expert to testify at the punishment phase of trial.

7. Trial counsel did not object to a prosecutor's alleged misstatement of the law.

8. Trial counsel's errors, when considered cumulatively, amount to a constitutional violation.

9. Appellate counsel rendered ineffective assistance.

10. Insufficient evidence proved that Woodard would be a future societal danger.

11. The future-dangerousness special issue unconstitutionally failed to place a beyond-a-reasonable-doubt burden on the prosecution.[4]

12. The future dangerousness special issue unconstitutionally (1) fails to allocate a burden to the State and (2) does not require jury unanimity with regard to aggravating unadjudicated offenses.

13. The mitigation special issue is unconstitutional because it does not incorporate a proof-beyond-a-reasonable-doubt standard.

14. Texas' habeas corpus scheme that runs concurrent to direct appeal violates the federal constitution.

---

[4]     Woodard's list of claims at the start of his amended petition differs somewhat from his arguments in the body of his pleading. For example, as his eleventh claim Woodard asserts that the "future dangerousness issue . . . was unconstitutional because it failed to assign a burden of proof on the State." (Instrument No. 8 at iv). The body of his petition, however, attacks the *mitigation* special issue on that ground. (Instrument No. 8 at 80). Another claim, nonetheless, addresses the future-dangerousness issue. As Respondent enumerates Woodard's claims as listed, not briefed, the Court will follow that template.

15.     Woodard is actually innocent of capital murder.[5]

16.     The State failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

`       Respondent has filed a motion for summary judgment arguing that procedural law bars federal consideration of several claims.  Respondent also asserts that all Woodard's claims are without merit.[6]  Woodard has requested that the Court hold an evidentiary hearing.  The Court finds that Woodard's petition is ripe for adjudication.

## LEGAL STANDARDS

The Constitution honors the writ of habeas corpus as "a vital instrument for the protection of individual liberty[.]"  *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229, 2246 (2008).  Federal courts and Congress, however, "adjust the scope of the writ in accordance with equitable and prudential considerations."  *Danforth v. Minnesota*, ___ U.S. ___, 128 S. Ct. 1029, 1040 (2008).  Congress has limited federal habeas jurisdiction to the question of whether an inmate "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials."  *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Moore v. Dempsey*, 261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the

---

[5]     Woodard's amended petition lists actual innocence as a ground for relief.  The body of the pleading, however, clarifies that he only raises the issue as a means to overcome procedural deficiencies, not as a vehicle to vacate his conviction and sentence.  The law unwaveringly has held that actual innocence cannot be a ground for habeas corpus relief.  *See Herrera v. Collins*, 506 U.S. 390 (1993).  The Court will only consider those claims raising cognizable grounds for relief.

[6]     In February 2009, Respondent filed an initial response and motion for summary judgment.  (Instrument Nos. 12, 13).  Woodard filed a reply, a supplemental reply, and a motion for an evidentiary hearing.  (Instrument Nos. 18-20).  Respondent then sought leave to amend his summary judgment motion.  (Instrument No. 25).  The Court terminated the original summary judgment motion and allowed Respondent to file a new motion for summary judgment.  (Instrument No. 26).  While Woodard sought an extension of time to file an amended reply (Instrument No. 28), he never replied to the new summary judgment motion.  The Court, therefore, will consider the arguments he made in his reply to the original summary judgment motion in adjudicating the pending motion.

petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.").

Through statutory and jurisprudential limitations, federal habeas proceedings honor the "presumption of finality and legality [that] attaches to [a petitioner's] conviction and sentence." *Barefoot*, 463 U.S. at 887. Federal courts give effect to the traditional limits of habeas review through the AEDPA's deferential review of state court judgments. "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases and to further the principles of comity, finality, and federalism[.]" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quotation and citation omitted). The AEDPA exists "to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). To that end, the AEDPA forbids habeas relief on issues "adjudicated on the merits" in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In application, these standards liberally defer to state adjudication. The Supreme Court has held that a state court decision is only "contrary to" federal precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413 (2000); s*ee also Cone*, 535 U.S. at 698; *Early v. Packer*, 537 U.S. 3, 7-8 (2002). A state court unreasonably applies federal law only if it "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a

new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Jurisprudential doctrines further limit the availability of habeas relief. No Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]" *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see also Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). Other judicial precepts, such as the harmless-error doctrine and the non-retroactivity principle, bridle federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). Any trial error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). A habeas court likewise cannot grant relief if it would require the creation of new constitutional law. *See Horn*, 536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

Respondent has moved for summary judgment. Summary judgment is proper when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ordinary civil cases, a district court considering a motion for summary judgment must construe disputed facts in a light most

favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  However, a court on summary judgment must view the evidence through "the prism of the substantive evidentiary burden."  *Anderson*, 477 U.S. at 254.  Congress, through the AEDPA, has constricted both the nature and availability of habeas review.  This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

The AEDPA's significant deference to a state court's resolution of factual issues guides summary judgment review in habeas cases.  Woodard presented many of his claims in state court.  The state courts issued detailed findings of fact and explicit conclusions of law with respect to each exhausted claim.  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.  Facts that the Texas state courts have decided adversely to Woodard bind this Court unless he sufficiently refutes them.

With these standards in mind, the Court turns to the procedural adequacy and substantive merit of Woodard's grounds for relief.

# PROCEDURAL ADEQUACY OF WOODARD'S CLAIMS

Before the Court addresses Woodard's grounds for relief, he must show that he advances them in a procedurally adequate manner. Respondent argues that three procedural hurdles prevent this Court from considering many of Woodard's claims. First, Respondent argues that Woodard failed to raise claim 16 in a manner that complies with the AEDPA's stringent limitations period. Next, Respondent asserts that this Court cannot consider claims 8, 9, and 16 because Woodard did not first give the state courts an opportunity to consider their merits. Finally, Respondent argues that the same state procedural law that prevented the state courts from considering claims 1, 10, 12, and 13 also forecloses federal review.

## I.     Application of the AEDPA Limitations Period

The AEDPA places strict limits on a petitioner's ability to file for habeas corpus relief. Under 28 U.S.C. § 2244(d)(1)(A), an inmate generally has one year to file a federal habeas petition after his criminal judgment becomes final on direct appeal. The United States Supreme Court denied certiorari review from Woodard's direct appeal on May 16, 2005, giving him one year to file in federal court unless some circumstance tolled the limitations period. The AEDPA allows a "properly filed application for State post-conviction or other collateral review" to toll that limitations period. 28 U.S.C. § 2244(d)(2). Woodard's state habeas action ran concurrent to his direct appeal. Accordingly, Woodard had one full year from when the Court of Criminal Appeals denied habeas relief on June 27, 2007, to file a federal petition. Because Woodard filed his initial federal petition on June 26, 2008, that pleading is timely.

Woodard's initial petition, however, did not contain his sixteenth claim that the prosecution withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Woodard first raised his *Brady* claim in his amended federal petition dated November 17, 2008. Because

Woodard filed the *Brady* claim outside the one-year limitations period, Respondent asserts that the AEDPA bars consideration of that one claim.

The Supreme Court has held that the AEDPA generally prevents insertion of new claims into federal habeas cases after the expiration of the AEDPA's limitations period. *See Mayle v. Felix*, 545 U.S. 644, 662 (2005). The Supreme Court has reasoned that "[i]f claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." *Id*. Unless a claim asserted in an amended petition "relates back" to the original pleading under Fed.R.Civ.P. 15(c), the claim is subject to dismissal under 28 U.S.C. § 2244(d). Because Woodard's initial petition did not contain nor allude to his *Brady* claim, Respondent contends that its insertion into these proceedings in the amended petition is time-barred.

Woodard has not responded to the time-bar argument. Woodard has not argued that his new *Brady* claim relates to his initial petition. Also, Woodard makes no attempt to prove that statutory or equitable exceptions to the AEDPA's limitations period would forgive the untimely presentation of this claim. The Court, therefore, finds that Woodard failed to raise his *Brady* claim in a timely manner, thus barring federal consideration of its merits.[7]

## II.   The Exhaustion and Procedural Bar Doctrines

Federal habeas review honors the principles of comity and federalism that define the American system of dual sovereigns. Federal courts, both through statutory mandate and judicially created rules, generally will not consider challenges to an inmate's conviction and sentence when (1) an inmate fails to exhaust his claims in state court or (2) an inmate fails to comply with adequate and independent state procedural law when he exhausted his claims.

---

[7]      Even if Woodard had presented this claim in a timely manner, its unexhausted nature precludes federal review. *See* 28 U.S.C. § 2254(b). In addition, procedural limitations notwithstanding, Woodard has not shown that the prosecution impaired his constitutional rights by withholding otherwise-undiscoverable, material evidence.

These doctrines are intertwined; an inmate's failure to exhaust his claims triggers a federal procedural-bar inquiry. Respondent argues that both doctrines foreclose federal habeas review and relief on several issues.

A.      Exhaustion and Procedural Bar

Section 2254 provides that habeas relief shall not be granted if the petitioner has failed to exhaust available state remedies. *See* 28 U.S.C. § 2254(b)(1).[8] Exhaustion requires a petitioner to present his claims in state court before federal review becomes available. Respondent correctly argues that Woodard raises claims 8, 9, and 16 for the first time on federal habeas review. Woodard's failure to exhaust those claims precludes federal review.

The related procedural-bar doctrine may also impede federal review of a petitioner's claims. A petitioner must not only raise a claim in state court, he must do so in a manner that fully allows for state consideration of its merits. "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). The state courts found that Woodard did not present his first, tenth, twelfth, and thirteenth claims in a manner consistent with state procedural law.[9] That finding likewise forecloses federal review.

The unexhausted nature of claims 8, 9, and 16 also results in a federal procedural bar. *See Horsely v. Johnson*, 197 F.3d 134, 137 (5th Cir. 1999). "A procedural default . . . occurs

---

[8]      "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of [a petitioner] to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). This Court, however, cannot grant relief under the AEDPA if a petitioner has failed to exhaust the available state court remedies. *See* 28 U.S.C. § 2254(b)(1)(A).

[9]      On direct appeal, the Court of Criminal Appeals procedurally barred Woodard's Fourth Amendment challenge to his arrest because he inadequately briefed the issue. On state habeas review, Woodard defaulted his insufficiency-of-the-evidence claim by not making a trial objection. State Habeas Record at 610. Woodard does not argue that either of these procedural rulings is in any way insufficient to foreclose federal review.

when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 734 n.1 (1991)); *see also Edwards v. Carpenter*, 529 U.S. 446, 454-55 (2000) ("[T]he judge may not issue the writ if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim.") (Breyer, J. concurring)*; Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (holding that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review"). An inmate who files a petition containing unexhausted claims usually cannot return to state court because Texas' abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5) generally prohibits the filing of successive state habeas applications.[10] Woodard agrees that Texas would not allow him to file a successive habeas application raising the unexhausted claims. The application of procedural law prevents federal consideration of claims 1, 8, 9, 10, 12, 13, and 16 which Woodard defaulted or did not present in state court.

A procedural default, however, is not an insurmountable barrier to federal review. The Supreme Court has noted that

[i]n all cases in which a state prisoner has defaulted his federal claims in state

---

[10] The Fifth Circuit has held that article 11.071 is an adequate state procedural bar, finding that Texas courts strictly and regularly enforce its standards. *See Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998). Woodard argues that because of article 11.071's strict requirements, exhaustion would be futile and thus should be forgiven. 28 U.S.C. § 2254(b)(1)(B)(i) forgives exhaustion if there "there is an absence of available State corrective process." Under pre-AEDPA law, a "futility exception" to the exhaustion doctrine existed where a petitioner was not required to exhaust state remedies if an attempt to exhaust state remedies would be futile. Woodard's argument that Texas' habeas statute makes exhaustion futile fails because his new claims "are 'technically' exhausted because, and only because, he allowed his state law remedies to lapse without presenting his claims to the state courts." *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir. 1998). The fact that art. 11.071 § 5 would now bar the unexhausted claims in the current petition does not guarantee federal review of those claims.

court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750. A petitioner bears the burden of making a sufficient showing of cause and actual prejudice, or that a fundamental miscarriage of justice will occur. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999). Woodard asserts that he can overcome the procedural bar by showing cause and prejudice and by showing a fundamental miscarriage of justice.

B.      Cause and Actual Prejudice

Woodard does not argue that he can show cause and prejudice for the claims that the Texas courts procedurally barred. Woodard only argues that he can make a sufficient showing of cause and actual prejudice to overcome the procedural bar of his unexhausted claims (claims 8, 9, 13 and 16). Woodard claims that the state habeas court's refusal to hold an evidentiary hearing constitutes adequate cause to forgive nonexhaustion.

Cause requires a petitioner to show that something external, and not attributable to him, prevented compliance with a state procedural rule or thwarted his ability to exhaust his claims. *See Coleman*, 501 U.S. at 753. Woodard confuses his ability to develop his claims with his opportunity to raise them.[11] The state habeas court's failure to hold a hearing may theoretically have hampered Woodard's ability to *develop* the factual basis of his constitutional claims, but it did not prevent him from *asserting* the claims themselves. Under Texas habeas procedure, by the time a state district court decides whether factual issues need development through an evidentiary hearing, statutory law precludes the amendment of the habeas application or the

---

[11]      As an initial matter, Woodard does not explain why he could not have raised his record-based claims on direct appeal.

insertion of new claims.  *Compare* TEX. CODE CRIM. PRO. art. 11.071 § 5(f) (treating any amended habeas application as a successive writ if filed either 180 days after the appointment of counsel or 45 days after the State files its brief in the appellate proceeding) *and* art. 11.071 § 8(a) (requiring the trial court to decide if a hearing is necessary within 20 days of the State answering the habeas application, which answer must be filed 120 days after the application).  Woodard should have advanced his claims well before the state habeas courts denied factual development. The failure to hold a hearing did not prevent Woodard from raising his claims.

C.      Fundamental Miscarriage of Justice

Woodard also claims that he meets the fundamental-miscarriage-of-justice safety valve for the consideration of defaulted claims.  Actual innocence requires a showing that "as a factual matter, he did not commit the crime for which he was convicted."  *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  In the context of claims attacking an inmate's sentence, a petitioner must show that, but for the complained-of error, no reasonable juror would have sentenced him to death "because some constitutional or state statutory prerequisite for the imposition of a death sentence could not have been satisfied."  *Moore v. Quarterman*, 454 F.3d 484, 498 (5th Cir. 2006) (quotation omitted); *see also Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).  Courts, however, have repeatedly emphasized how this exception is extremely narrow.  *See Moore*, 534 F.3d at 464.  The actual-innocence exception is only available in "an extraordinary case, where a constitutional violation has *probably* resulted in the conviction of one who is actually innocent." *Id.* (quotations omitted).

Woodard makes two arguments for actual innocence.[12]  First, Woodard argues that he is

---

[12]      While Woodard claims that he is actually innocent, he does not assert that his innocence is an actionable ground for habeas relief.  The Supreme Court has not recognized actual innocence as a cognizable basis for granting a habeas writ.  *See Herrera*, 506 U.S. at 400 ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in

actually innocent of his death sentence because, unlike the testimony that came before the jury at trial, a psychologist has recently opined that he is not a sociopath. The fundamental-miscarriage-of-justice exception in the sentencing context means that, because of the claim, no reasonable juror would have found him eligible for a death sentence. The "actual innocence requirement must focus on those elements that render a defendant eligible for the death penalty[.]" *Sawyer*, 505 U.S. at 347. While conceivably the jury relied on testimony showing that he was a sociopath to find that he would be a future danger to society, Woodard has not shown that to be the only, or even most influential, factor in the jury's deliberations. The jury had before it a full picture of Woodard's violent past and criminal activities. In light of the incriminating case against Woodard, and his violence in committing the double murder for which he was convicted, he has not brought forth evidence that would prevent reasonable jurors from returning answers to the special issues that would result in a death sentence.

Second, Woodard claims that recently presented evidence proves that he did not commit the double murders. The evidence is of three types: (1) affidavits that attack certain portions of the prosecution's case against Woodard, including from trial witnesses who claim that police pressure influenced their testimony; (2) affidavits from investigators who relate hearsay statements that would implicate others in the murder;[13] and (3) evidence showing that Woodard's brother was violent and mentally retarded, suggesting that he may have been the murderer or that the police manipulated him into providing a false statement. As the centerpiece of his evidence, Woodard himself has sworn an affidavit claiming that he did not kill the victims. Woodard

the underlying state criminal proceeding."). Texas, however, recognizes actual innocence as a viable constitutional claim. *See State ex rel. Holmes v. Court of Appeals,* 885 S.W.2d 389 (Tex. Crim. App. 1994). Here, the state habeas court found that Woodard "fail[ed] to meet a threshold showing of actual innocence[.]" State Habeas Record at 602.

[13]     The state habeas court found that the investigators' "hearsay affidavit[s]" were "not substantive evidence." State Habeas Record at 603-04.

argues that "when the court weighs Mr. Woodard's sworn testimony that he did not commit the murders with the remaining evidence that weaken further the already weak trial testimony, there is clear and convincing evidence of sufficient reasonable doubt on whether he is guilty of capital murder[.]" (Instrument No. 8 at 108). On that basis, he argues that his new evidence establishes that "the evidence at trial is insufficient to uphold a conviction that would withstand constitutional scrutiny." (Instrument No. 8 at 106).

Woodard misapprehends the nature of habeas review and his burden in asserting actual innocence. A habeas action is not a retrial. An inmate enjoys "no presumption of innocence in at a habeas proceeding." *Moore*, 534 F.3d at 464 (quotations omitted). Actual-innocence claims "'come[] before the habeas court with a strong -- and in the vast majority of the cases conclusive -- presumption of guilt.'" *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) (quoting *Schlup v. Delo*, 513 U.S. 298, 326 n.42 (1995)). This is not a question of whether reasonable doubt may have existed if new information had come before the jury, or whether sufficient evidence sustains the judgment, "but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329.

Woodard accumulates evidence to weaken the case presented by the prosecution at trial, creating a scenario that he hopes would increase the likelihood that a jury would have reasonable doubt about his commission of the murder. Several problems detract from the viability of Woodard's actual-innocence argument.[14] From the outset, some of the evidence Woodard relies on would not be admissible in court and he provides no guarantee that he could present the same

---

[14] The Fifth Circuit has not yet conclusively determined whether the evidence that a petitioner relies on to prove actual innocence must be "new," *see Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006), though it has stated that it must not be previously "within the reach of [an inmate's] personal knowledge or reasonable investigation." *Moore*, 534 F3d at 465. Here, the information should have been available to trial counsel with reasonable effort.

information in an admissible form. Inadmissible hearsay is insufficient to meet the *Schlup* standard. *See Moore*, 534 F3d at 465; *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding "particularly suspect" claims of actual innocence based on hearsay-filled affidavits). Also, the allegations Woodard relies upon are suspect as they arise years after the trial. *See Herrera*, 506 U.S. at 417. The passage of years diminishes the reliability of the information that challenges the trial testimony. Even so, the Fifth Circuit "views recanting affidavits with extreme suspicion." *Komolafe v. Quarterman*, 246 F. App'x 270, 272 (5th Cir. 2007) (citing *Spence v. Johnson,* 80 F.3d 989, 1003 (5th Cir. 1996)).

Importantly, the affidavits "must be considered in light of the proof of petitioner's guilt at trial[.]" *Herrera*, 506 U.S. at 417. Woodard's allegations of actual innocence are not facially compelling. Eyewitness testimony proved Woodard to be the murderer. His brother's testimony, though now possibly weaker on some points, still contains incriminating elements that would be unaffected by the new affidavits. Unrebutted physical evidence linked Woodard to the crime. He also admitted its commission to others such as Dan Webster who has not recanted his trial testimony. Woodard's new evidence does not significantly cast doubt on the evidence of his guilt.

Here, the state habeas court considered the substance of Woodard's complaint that he was actually innocent. After reviewing the whole of the evidence Woodard raised to show his innocence, the state habeas court found that he "fail[ed] to present evidence that constitutes substantive, dispositive newly discovered evidence and that [he] fail[ed] to meet the threshold showing for an actual innocence claim." State Habeas Record at 587. The state habeas court found that the information was not exculpatory, not admissible, unpersuasive, without evidentiary value, or was not newly discovered. In sum, the state habeas court found that

Woodard's evidence did not raise a valid actual innocence claim.

In the end, Woodard's recently procured affidavits and evidence develop previously undisclosed areas of trial investigation and offer trial strategies that differ from that used by his attorneys. At its most generous reading, an attorney could have used Woodard's new evidence to present a stronger defense. But rejecting an actual innocence claim

> is not to say that petitioner's affidavits are without probative value. Had this sort of testimony been offered at trial, it could have been weighed by the jury, along with the evidence offered by the State and petitioner, in deliberating upon its verdict. Since the statements in the affidavits contradict the evidence received at trial, the jury would have had to decide important issues of credibility.

*Herrera*, 506 U.S. at 418. Here, Woodard cobles together evidence that may have chipped away at the prosecution's case but does not reach the level of certainty required in habeas cases to question the finality of state court judgments. Woodard's allegations do not satisfy his burden of showing that no reasonable juror would have found him guilty.

In sum, only claims 2 through 7, 11, and 14 are available for full federal consideration. In the interests of justice, however, the Court will briefly address the merits of Woodard's other cognizable claims.

## WOODARD'S REQUEST FOR AN EVIDNTIARY HEARING

Woodard asks the Court to hold an evidentiary hearing. Specifically, Woodard wants to develop his actual-innocence claim and two of his ineffective-assistance-of-counsel claims. The AEDPA limits a federal court's ability to hold an evidentiary hearing. A petitioner must not have "failed to develop the factual basis of a claim in State court proceedings[.]" 28 U.S.C. § 2254(e)(2). A petitioner fulfills this requirement by showing diligence in developing his constitutional claims in state court. *See Williams v. Taylor*, 529 U.S. 420, 434 (2000); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998). Even if a petitioner has satisfied the requirements of

28 U.S.C. § 2254(e)(2), he is not entitled to an evidentiary hearing. "[O]vercoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing; it merely opens the door for one[.]" *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir 2000). Federal law leaves "[t]he decision whether to conduct an evidentiary hearing . . . to the sound discretion of the district court[.]" *Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000). "[W]here a district court has before it sufficient facts to make an informed decision regarding the merits of a claim, a district court does not abuse its discretion in refusing to grant an evidentiary hearing (even where no factual findings are explicitly made by any state court)." *Murphy*, 205 F.3d at 816; *see also McDonald v. Johnson*, 139 F.3d 1056 (5th Cir. 1998) ("The district court had sufficient facts before it to make an informed decision on the merits . . . and, accordingly, did not abuse its discretion in refusing to hold an evidentiary hearing."); *Young v. Herring*, 938 F.2d 543, 560 n.12 (5th Cir. 1991) ("[A] petitioner need not receive an evidentiary hearing if it would not develop material facts relevant to the constitutionality of his conviction.").

Even if Woodard had met the AEDPA standard of diligence, this Court has discretion to deny a hearing if a fair adjudication does not necessitate factual development. Woodard raised many of his claims in state court. The parties there developed a substantial factual record. Woodard has not shown that additional inquiry into those questions that he did not present to the state court is necessary to adjudicate his claims. The record before the Court is adequate to rule on the issues that Woodard wishes to flesh out through live testimony. The Court, therefore, will deny Woodard's motion for an evidentiary hearing.

**ANALYSIS OF THE MERITS**

**I.      Fourth Amendment Challenge to the Arrest (claim one).**

The police arrested Woodard and searched his apartment without a warrant. The search, which the police conducted pursuant to consent from both Woodard and his girlfriend, resulted in the seizure of incriminating evidence. Woodard claims that, because the warrantless arrest and search violated his Fourth Amendment rights, he merits federal habeas corpus relief from his conviction. Traditional and longstanding limits on the scope of habeas corpus review prevent the Court from addressing the substance of those allegations.

**A.      The Warrantless Arrest and Search**

On direct appeal, the Court of Criminal Appeals described the circumstances surrounding Woodard's arrest:

> About a day and a half after the Mathais were murdered and Calloway's automobile was stolen, someone reported to police that the automobile was parked at an apartment complex several miles from the crime scene. Police seized the vehicle.
>
> Five days after the crime, an individual gave investigators information that they used to get a warrant to search an apartment near the place where the stolen automobile had been found. In the apartment, they found property that had been taken from Calloway's automobile. At the apartment were three people (one of whom was [Woodard's] brother) who said [Woodard] told them he had shot and killed some people at a store and stolen a customer's car. They said that [Woodard] had brought stolen property with him, and that he had asked one of the occupants to hide his gun for a few days. [Woodard's] brother told investigators where [Woodard] lived.
>
> While the investigators were preparing an affidavit for a warrant to arrest [Woodard], other officers kept a watch on the apartment building where [he] lived. After midnight, the officers saw [Woodard] walking near the apartment building, and they seized him. They had no warrant, and the investigators abandoned their efforts to get a warrant when they heard that [Woodard] had been arrested.

*Woodard*, 2005 WL 77143, at *3. Under Texas law, the police may only arrest a suspect without

a warrant when he has committed a felony and is about to escape. TEX. CODE CRIM. PRO. art.

14.04.[15] The arresting officer described at trial how he took Woodard into custody:

> He was walking down the street and I was driving the car and I pulled out onto the little side street that he was walking down and . . . I paralleled him at which time I stopped my unmarked police car. And myself, I got out of the driver's side, and my partner got out of the passenger's side and I asked him his name at which time he identified himself as Robert Woodward. . . . We placed him in the back seat of my police car and drove back to the original location . . . [a]nd at that time, I got out of the car and gave him his Miranda warning. . . . I advised him he was under arrest for capital murder.

Tr. Vol. 25 at 105-07.

Because the police arrested Woodard without first securing a warrant, trial counsel filed a

pretrial "Motion to Suppress the Arrest and Search of Defendant." Clerk's Record at 189. The

motion broadly asserted that the State's "illegal acts . . . violate[d] [his] rights as guaranteed him

under both federal and state constitutions and State statutes." Clerk's Record at 189. Woodard

asked the trial court to "[s]uppress the arrest . . . and any evidence derived pursuant to the arrest"

including evidence taken from Mr. Calloway's car and evidence taken from the searched

apartments. Clerk's Record at 193.

The trial court held a hearing on Woodard's motion to suppress. The parties examined

witnesses, including the arresting officer. Woodard argued that his warrantless arrest was illegal.

Tr. Vol. 23 at 265-67. The prosecution countered that it was reasonable for officers to assume

that Woodard was fleeing, thus justifying his arrest. Tr. Vol. 23 at 267-68. The trial court

denied the motion to suppress. Tr. Vol. 23 at 269.

On direct appeal, Woodard challenged his arrest, and the admission of evidence that

flowed from it, under both federal and state law. The Court of Criminal Appeals found that

---

[15]    Specifically, Texas law allows a warrantless arrest: "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused." TEX. CODE CRIM. PRO. art. 14.04.

Woodard had not adequately briefed the federal aspect of his claim, thus procedurally barring

review.[16]  The Court of Criminal Appeals, however, considered his state law arguments.  The

Court of Criminal Appeals found that the circumstances did "not show, and the State does not

attempt to explain how a court could find, that [Woodard] was about to escape."  *Woodard*, 2005

WL 77143, at *5.  After finding no justification for his warrantless arrest, the Court of Criminal

Appeals found

> no evidence that the illegal arrest of [Woodard] was ever cured or that his
> detention at the time of the lineup was made legal by authority of a magistrate.
> The police investigators testified that they abandoned their efforts to obtain a
> warrant when they heard that [Woodard] was arrested without warrant. There was
> no evidence that [Woodard] was taken before a magistrate, or that his detention at
> the time of the lineup was under the authority of a magistrate rather than whatever
> authority an officer might have to arrest without a warrant.

*Woodard*, 2005 WL 77143, at *5 (footnote omitted).  The Court of Criminal Appeals, therefore,

concluded that Woodard's arrest was illegal.

That, however, was not enough to reverse his conviction.  On direct appeal, Woodard

challenged two categories of trial evidence stemming from his illegal arrest.  First, Woodard

complained about evidence secured during a subsequent search of his apartment, particularly the

police recovery of ammunition similar to that used in the murders.  The Court of Criminal

---

[16]     The Court of Criminal Appeals found:

Appellate complaints that purport to be based on both state law and federal constitutional law are
not rare. We have held more than once that the mere invocation of a provision of the state
constitution is not enough; the appealing party must present an argument, supported by authority,
that explains why each constitution has been violated

An appealing party is obliged to present argument and authority for complaints that the federal
constitution was violated as well as for complaints that are based on state law.

[Woodard] has presented neither argument nor authority to support the nominal complaints in
point one that the denial of his motion violated the state constitution or the complaint in point two
that the ruling violated the Fourth, Fifth, and Fourteenth Amendments of the United States
Constitution. Therefore, we hold that the six constitutional complaints in points one and two are
inadequate for review. Point of error two is overruled.

*Woodard*, 2005 WL 77143, at *3.

Appeals found that Woodard, and most importantly his girlfriend, consented to the search:

> [Woodard] gave the officers written consent to search the apartment, which was the "apartment 414" to which his brief refers. The officers went to the apartment, where Andrea Nero opened the door. She said it was her apartment. Officers testified that she and [Woodard] lived there together. She consented to the search, and she added her signature to the written consent that [Woodard] had signed. In the apartment, the officers found a "gym bag" or "canvas bag" that contained a box of ammunition, which was admitted in evidence as State's Exhibit 111. Also in the bag were clothing, a camera and film, two telephones, some jewelry, and "some I.D. cards attached to a neck strap and had Reginald Willis and looked like an I.D. number of some type on each card."

*Woodard*, 2005 WL 77143, at *3.[17]  While noting that "[e]vidence obtained in violation of the laws of the state may not be admitted in evidence against the accused on the trial of a criminal case," the Court of Criminal Appeals found that "[t]he issue of the validity of [Woodard's] consent is moot. [His girlfriend's] consent to search her apartment was sufficient authority for the officers' search." *Woodard*, 2005 WL 77143, at *4.

Second, Woodard complained that the eyewitness identifications flowed from his illegal arrest. The Court of Criminal Appeals described the subsequent identifications and relevant trial testimony:

> Later [on the day of Woodard's arrest], investigators put [him] in a lineup for viewing by Garvina Sadiki and Cory Calloway, the customers who were at the store during the robberies and murders. State's Exhibit 4 was a copy of a videotape recording of the lineup, which was shown to the jury.
>
> Calloway testified on direct examination that he recognized [Woodard] in the lineup, and that he told a police investigator that he "strongly agreed" that [Woodard] was the person who stole his automobile. He requested to see [Woodard] in a hood, because the person who stole his car was wearing a hooded sweatshirt, but the police could not find one to put on the people in the lineup. On cross-examination, Calloway testified that he told the police officer, "I was strongly tentative.... I said I would be 100 per cent sure if I see the hood," that "I strongly believed that it was" [Woodard], and that "I would be more sure if I had

---

[17]     Trial testimony showed that Woodard was "very cooperative" after his arrest, signing a consent to search. Tr. Vol. 25 at 107.  Woodard's girlfriend also consented to the search.  Tr. Vol. 25 at 108.

the hood.... But that's what I meant by saying positive, is being strongly tentative about it. The only reason I had doubt was the hood."

A police investigator who conducted the lineup gave similar testimony about Calloway's identification of [Woodard] at the lineup.

*Woodard*, 2005 WL 77143, at *3-4.

The Court of Criminal Appeals refused to address Woodard's complaint about Mr. Calloway's identification because he did not object at trial. *Woodard*, 2005 WL 77143, at *4 (finding that Woodard "made no objection at trial to Calloway's testimony about his identification . . . [t]herefore, error may not be predicated on the admission of that testimony"). Woodard's only remaining complaint was the prosecution erred in introducing a videotaped recording of the lineup. The Court of Criminal Appeals found:

> Here, the erroneously admitted evidence was a videotape recording of a lineup. The other evidence that was admitted without a finding of error in this appeal included oral testimony about the lineup, testimony about the identification of the appellant at the lineup, and an in-court identification of [Woodard] by one of the witnesses who viewed the lineup. Considering this evidence, as well as the other properly admitted evidence of guilt and the other aspects of the trial, we hold that the erroneous admission of State's Exhibit 4 was harmless.

*Woodard*, 2005 WL 77143, at *5. Against that background, this Court must consider Woodard's claim that he deserves habeas relief because the police arrested him in a manner that violated his Fourth Amendment rights.

B. The *Stone* Exclusionary Rule

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnote omitted). The existence of state processes allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a

defendant's use of those processes, serves the policies underlying *Stone*'s exclusionary rule and bars federal habeas corpus consideration of claims. *See Caver v. State of Alabama*, 577 F.2d 1188, 1192-93 (5th Cir. 1978). The *Stone* bar "applies to all claims arising under the Fourth Amendment," including challenges to an arrest or the seizure of evidence. *Hughes v. Dretke*, 412 F.3d 582, 596 (5th Cir. 2005).

*Stone* presumptively forecloses federal review of Woodard's Fourth Amendment claims. Woodard recognizes the *Stone* bar, but complains that he did not receive a fair chance to litigate his Fourth Amendment claim on appeal. Woodard states that

> it was completely *unfair* to Mr. Woodard to have the court find that the arrest was unlawful under State grounds, but inadequately briefed under Federal Constitutional ground. Mr. Woodard objected at trial, and raised the issue of the constitutionality of his arrest on appeal in conjunction with his challenge under the state statute. It was not clearly foreseeable that the appeals court would not review this claim. Further, it was unconscionable under these circumstances to deny review of his meritorious challenge to his arrest.

(Instrument No. 8 at 19).

Here, the state courts provided a forum both at trial and on appeal for Woodard to challenge the legality of his arrest. The state trial court heard testimony and refused to suppress any evidence or testimony. The Court of Criminal Appeals gave Woodard a chance to present his Fourth Amendment challenge on direct appeal. The Court of Criminal Appeals found that Woodard failed to meet procedural requirements in the presentation of the federal aspects of his challenge, a ruling that would foreclose federal review under the procedural bar doctrine even if *Stone* preclusion did not apply. Even if the state court improperly applied its own procedural law in refusing to consider Woodard's Fourth Amendment argument, "[e]rrors in adjudicating Fourth Amendment claims are not an exception to *Stone*'s bar." *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006); *see also Swicegood v. Alabama*, 577 F.2d 1322, 1324-25 (5th Cir. 1978). The

Fifth Circuit has emphasized that the "'opportunity for full and fair litigation' [means] just that: 'an opportunity.'" *Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002) (quoting *Caver*, 577 F.2d at 1192). "[A]bsent additional allegations that state processes routinely or systematically are applied in such a way as to prevent the actual litigation of Fourth Amendment claims, mistakes that thwart the presentation of Fourth Amendment claims do not render the *Stone* bar inapplicable." *Janecka*, 301 F.3d at 321. Disagreement with the outcome in state court does not remove the *Stone* bar.

Because Woodard had a full and fair opportunity to present his claims in state court, *Stone* requires this Court to forgo a renewed examination of the circumstances leading to his arrest. *Stone*'s exclusionary rule prevents this Court from addressing whether Woodard's arrest, the subsequent seizure of evidence, and the videotape of his lineup met Fourth Amendment standards. The Court denies Woodard's first ground for relief.

## II.     Challenge to the Pre-Trial Identification (claim two)

Woodard claims that the police set up a situation where suggestive and improper procedures allowed a witness to identify him as the murderer. Woodard complains that the identification by Corey Calloway lacked sufficient reliability. On state habeas review, the Texas courts summarized Mr. Calloway's trial account of the events immediately after the murders:

> Calloway left his 1989 Lincoln Town car with the engine running by the Conoco station gas pumps while he used the outside pay phone on February 12, 2000[.] . . . Calloway heard two gunshots and saw [Woodard] run toward Calloway's car[.] . . . [Woodard] opened the driver's door and pointed a gun at Calloway when he ran toward his car[.] . . . [Woodard] drove away in Callwoay's car and made a u-turn[.] . . . Calloway made eye contact with [Woodard] as he drove by the station[.]

State Habeas Record at 578.

Mr. Calloway identified Woodard three times, two of which resulted in strongly positive

identifications and the other resulted in an affirmative, but tentative, identification. At some point Mr. Calloway viewed a photo array containing Woodard's picture, but he could not identify Woodard as the robber.[18] On February 18, 2000, the police arranged a live lineup that included Woodard. Mr. Calloway "strongly agreed" that Woodard was the robber, but qualified that he wanted to see the suspects wearing a hood. The police could not at the time of the live lineup find similar clothing. On April 24, 2000, however, the police arranged for a photo array in which they had superimposed a hood over each picture. Mr. Calloway identified Woodard in an array that apparently contained the same photographs as the initial photo array. Finally, at trial Woodard donned a hooded jacket in the courtroom and Mr. Calloway positively identified him.

Woodard challenged Mr. Calloway's identification in a pre-trial motion to suppress. Clerk's Record at 186. The trial court held a lengthy hearing on the suppression motion. The trial court found that "both the live lineup procedure as well as the photographic identification procedures were not impermissibly suggestive and a violation of Mr. Woodard's rights." Tr. Vol. 23 at 275. In particular, the trial court noted that the "level of certainty" of the identifying witnesses "goes to the weight, not admissibility" of their identification. Tr. Vol. 23 at 275. Also, the trial court found "no substantial likelihood of misidentification." Tr. Vol. 23 at 275.

Trial counsel's opening argument highlighted problems with the identification. Tr. Vol. 24 at 16-18. Cross-examination of the identifying witnesses focused on problems with their ability to point out Woodard as the killer.[19]

On direct appeal, Woodard raised three arguments about the invalidity of Mr. Calloway's

---

[18] The record suggests that Mr. Calloway viewed the first photo array sometime before the live lineup.

[19] During deliberations, the jury sent out a note requesting to see "the evidence of the composite sketch, and the photo exhibits of both Robert Woodard and Reginald Willis." Clerk's Record at 263.

testimony.  As noted by the Court of Criminal Appeals:

> [Woodard] contend[ed] that the identification was impermissibly suggestive based on the combination of three factors: (1) seeing [him] in a live lineup with dissimilar individuals, (2) viewing a photospread of [him] during the investigation, and (3) then seeing that individual in court wearing a hooded garment without other individuals for comparison.

*Woodard*, 2005 WL 77143, at *5.  On federal review, Woodard points to other factors that made the identification impermissibly suggestive.  Woodard argues that the police created an environment that encouraged misidentification because they had Mr. Calloway identify items stolen along with the car, suggesting that they had made an arrest and that the array contained a photograph of the suspect.  Woodard also complains that his live lineup was suggestive because only five individuals instead of six participated.  Of those, Woodard again argues that all the others were markedly dissimilar from him because of facial hair, disfigurement, or differences in height.  Also, Woodard complains once more that repeated showing of his photograph in at least two, and possibly more, photo arrays made Mr. Calloway disposed to picking him where he otherwise might not have.[20]

The Due Process Clause prohibits the prosecution from presenting identification testimony at trial that derives from impermissibly suggestive procedures. *See Stovall v Denno*, 388 U.S. 293, 302 (1967).  Under that constitutional guarantee, a conviction based on resultant eyewitness identification may be set aside "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must

---

[20]	Woodard does not emphasize, as he did in state court, that the at-trial identification was tainted because he was the only person in the courtroom who had to wear a hood for Mr. Calloway to identify him.

determine whether, 'under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.'" *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006) (quoting *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990)). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

The Court of Criminal Appeals' resolution of this issue was not contrary to, or an unreasonable application of, federal law. The Court of Criminal Appeals considered the totality of the circumstances and found that the identification process was not unduly suggestive. The Court of Criminal Appeals emphasized that, while some differences may have existed between Woodard and the other men in both the lineup and photo array, the men were sufficiently similar to allow for a fair identification.[21] The state court found that while "it is good practice that the individuals in a lineup be as similar as possible, a pretrial identification procedure is not impermissibly suggestive simply because the lineup members are not identical in appearance." *Woodard*, 2005 WL 77143, at *6.

The differences in this case are minor when compared to those in which the Supreme Court has questioned the integrity of the lineup process. *See Foster v. California*, 394 U.S. 440, 441, (1969) (finding a "compelling example of unfair lineup procedures" when "[t]here were three men in the lineup. One was petitioner. He is a tall man-close to six feet in height. The other two men were short-five feet, five or six inches."). The Court's review of the photo array does not show that differences between the six pictures would intrinsically draw attention to Woodard as the suspect. *See Simmons*, 390 U.S. at 383 (rejecting a line-up procedure where one individual is "in some way emphasized"). Woodard emphasizes differences such as facial hair

---

[21] The police explained any differences between the defendant and the others in the lineup: "The height was not identical; but we try to do the best we can as to what we've got[.]" Tr. Vol. 25 at 128.

and injury which distinguished each man from himself. While not all features were common to all men in the photographic array, none of the individuals had physical characteristics "'drastically dissimilar to those of [the suspect], thus clearly singling him out and suggesting him for identification to the government witnesses.'" *United States v. Taylor,* 530 F.2d 639, 641 (5th Cir. 1976). As the Court of Criminal Appeals recognized in this case, "differences [in facial hair and hair lengths] did not render the lineup impermissibly suggestive." *Woodard*, 2005 WL 77143, at *6.

Additionally, the fact that Mr. Calloway viewed Woodard in more than one photo array did not make the procedure unduly suggestive. As the Court of Criminal Appeals found:

> On February 18, 2000, Calloway viewed the lineup in which he made a strong tentative identification of the appellant, qualified only by the fact that he wished he could see the individuals in the lineup wearing hoods on their heads, as did the suspect on the night of the robberies and murders. Approximately one month later, Calloway viewed a photospread in which all the individuals appeared to be wearing hoods. Calloway positively identified the appellant. Because Calloway had previously identified the appellant, viewing another display was not impermissibly suggestive.

*Woodard*, 2005 WL 77143, at *6. Woodard has not shown that any federal law prevents repeated showings of a suspect's photograph, particularly when the circumstances are not otherwise suggestive and the witness has tentatively identified the suspect in the initial round of viewings. Woodard has not shown that the lineup and photo array procedures were unduly suggestive.

Woodard has not shown that the circumstances irreparably led to a high probability of misidentification.[22] The police never told Mr. Calloway that the photo array contained someone

---

[22]     In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court applied a five-factor test to determine whether an identification is reliable notwithstanding a suggestive pretrial line-up procedure: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Livingston v. Johnson*, 107

they had arrested, and the trial testimony does not suggest that the police employed evocative techniques. While the circumstances surrounding Mr. Calloway's identification may not have been ideal, Woodard has not shown that the circumstances inextricably led to an improper identification. Woodard has not shown that the state courts were unreasonable in denying his federal constitutional challenge to the identification.[23]

Woodard has failed to meet his burden under 28 U.S.C. § 2254(d)(1) of showing that the state court judgment was contrary to, or an unreasonable application of, federal law. The Court, therefore, denies his second ground for relief.

### III.  Ineffective Assistance of Counsel (claims three through nine)

Woodard raises several complaints about the representation provided by his trial and appellate attorneys.[24] The Court will address each allegation below.

A.  *Strickland* Standard

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

---

F.3d 297, 310 (5th Cir. 1997) (listing the factors outlined in *Biggers*, 409 U.S. at 199-200). While the circumstances do not suggest any a likelihood of irreparable misidentification, the state courts did not address the factors listed above.

[23]  Respondent also argues that, in the context of the other information pointing to Woodard as the killer, admission of Mr. Calloway's testimony was harmless.

[24]  As a background matter, the state habeas court made the following general findings about trial counsel's efforts:

> The Court finds, based on the credible affidavits of counsel Loper and counsel Muldrow, that counsel reviewed the State's file, including the offense report, autopsy report, ballistics information and written statements . . . ; that counsel spoke with [Woodard] numerous times about the facts of the case and the law; that counsel prepared and filed pre-trial motions, including suppression motions that resulted in hearings concerning identification and [Woodard's] arrest and search; that counsel retained [a private investigator]; and, that counsel interviewed witnesses, visited the scene of the offense, obtained discovery and talked with [Woodard's] family and [Woodard] about his background in an attempt to obtain mitigating evidence.

State Habeas Record at 588.

Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense."  *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521.  Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689.  An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90.

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534.  The Court does not consider prejudice in a vacuum.  "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or

jury." *Strickland*, 466 U.S. at 695. "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Wong v. Belmontes*, ___ U.S.___. 130 S. Ct. 383, 390-91 (2009).

"It bears repeating that the test for federal habeas purposes is not whether [a petitioner] made that showing [required by *Strickland*]. Instead, the test is whether the state court's decision – that [a petitioner] did not make the *Strickland*-showing – was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his [ineffective-assistance] claim." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003); *see also Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004) "Of course, in reaching our decision, we must consider the underlying *Strickland* standards." *Schaetzle*, 343 F.3d at 444. As discussed below, Woodard fails to show that the state habeas court's adjudication of his exhausted *Strickland* claims was contrary to, or an unreasonable application of, federal law, *see* 28 U.S.C. § 2254(d)(1), or that he otherwise merits habeas relief.

B.     Failure to Admonish Woodard on his Right to Testify (claim three)

Woodard did not testify at trial. In an affidavit he submitted in state habeas court, Woodard accused his attorneys of not allowing him to testify:

> I informed [my] trial attorneys that I wanted to testify at my trial during the guilt innocence and during the punishment part of trial. . . . I was told I could not testify and that they would not let me. I never understood that it was my right to testify and that I had the right to decide if I wanted to testify or not. The judge did not tell me either. . . Ms. Muldrow specifically told me she would not let me testify.

State Habeas Record at 127. Woodard describes the story he would have told the jury:

> I wanted to tell the jury that I did not kill the people at the Conoco convenience store[.] . . . I also wanted to tell the jury that I saw someone getting out of a Lincoln Town car that evening who I might have recognized to be Adrian Spisey. I decided to steal the vehicle. . . . When I got into the vehicle I discovered a gun underneath the driver's seat and some lottery tickets. . . . I got my brother Reggie

[Willis] and his friend to help me scratch off the tickets and help me unload the items from the car so I could sell them and make money. . . . I told my brother I stole the vehicle but did not tell them I killed anyone. I think the police scared them into saying that. . . . I know my brother kept the gun and the next day he tried to use it on a his [*sic*] girlfriend's baby's daddy. That's why I destroyed the gun, took it apart. . . . I did not hear about the killings until the police arrested me.

State Habeas Record at 128. Woodard claims that this information would have influenced the jury's determination of his guilt because "[t]his would have established his innocence of capital murder and established an explanation for possession of the items from the stolen vehicle. [His] testimony would have also brought forth evidence of another suspect that the jury *never heard*." (Instrument No. 8 at 34). Woodard's state affidavit and federal pleadings do not describe what his testimony might have been had he taken the stand at the punishment phase.[25]

An attorney must safeguard a criminal defendant's fundamental constitutional right to testify, a protection that is "'essential to due process of law in a fair adversary process.'" *Rock v. Arkansas,* 483 U.S. 44, 50 (1997) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)). The right, however, belongs to the defendant personally. "This right can be waived only by the defendant, not by his counsel." *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997). A defendant can only abandon the opportunity to testify on his own behalf voluntarily and knowingly. *See Bower v. Quarterman*, 497 F.3d 459, 473 (5th Cir. 2007).

Notwithstanding the importance of that constitutional right, a "defendant who argues that his attorney prevented him from testifying must still satisfy the two prongs of *Strickland*." *United States v. Harris,* 408 F.3d 186, 192 (5th Cir. 2005); *see also Bower*, 497 F.3d at 473; *United States v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001). Under *Strickland*'s performance

---

[25] After Respondent moved for summary judgment, Woodard filed a new affidavit which in many ways tracks the one he filed in state court. His new affidavit, however, more explicitly states that "Ms. Muldrow specifically told me she would not let me testify. I also recall that Ms. Muldrow told me I could put it in the writ and she would not let me testify unless I said I committed the crime or I named who did." (Instrument No. 19). The affidavit that Woodard submits for the first time on federal review again does not outline any punishment-phase testimony.

prong, this Court's inquiry in such claims must be on "whether or not [the petitioner] made a knowing waiver of his right to testify." *Bower*, 497 F.3d at 474. After assuring that counsel adequately informed the defendant of his right to testify, the *Strickland* inquiry also takes into account the strategy employed in counsel's advice whether or not his client should exercise the right. *See id.* (turning to the question of trial counsel's strategy after discerning that he had adequately informed his client of his constitutional rights). Even then, "it cannot be permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice." *United States v. Mullins,* 315 F.3d 449, 453 (5th Cir. 2002) (citation omitted). Trial counsel's actions with respect to a defendant's right to testify are subject to *Strickland* prejudice.

Trial counsel provided two affidavits in state court that provide an account that sharply differs from that in Woodard's affidavit. Ms. Muldrow explained:

> [Woodard] seemed totally unfazed about the charges. At several pretrial meetings [he] would advise us that he had a hunch who the real shooter was but could not tell us or help us find him, but would be willing to give us "clues." We spent the BULK of the pretrial sessions explaining to [Woodard] that he was hamstringing his/our investigative efforts and the state was seeking the death penalty. He would say that he just couldn't just tell us who it was. Then he would tell us that his family was still out there. Then he would smile and tell us that he would give us clues.

> [Woodard] was asked if he expected to testify about the above mentioned 'clues' and expected a jury to accept this. [Woodard] did not believe it would get to this point.

> [Woodard] was FULLY aware of his right to testify. He was aware that his brother and Casper Hines would testify about his alleged involvement. He NEVER MADE A SOBER REQUEST TO TESTIFY. He joked about it during two trial recesses. He smiled just as he did during our pretrial meetings regarding his leaving us 'clues' about the real shooter.

> He was aware that he alone controlled his ability to be a witness.

State Habeas Record at 352-53. Mr. Loper provides even more detail:

I understand that [Woodard] has alleged that co-counsel Muldrow and I did not properly admonish him regarding his right to testify, and that [Woodard] further alleges that he wanted to testify both at guilt and punishment but we prevented him from doing so. That is simply not true. Both Loretta Muldrow and I repeatedly discussed the right to testify with [Woodard], from the beginning of our representation of him, through our pretrial investigation, during voir dire, and up until the time the State rested at trial. [Woodard] repeatedly questioned us about the consequences of his testifying; specifically, he asked whether or not he should testify, what the prosecutors might ask him, and what effect that would have on his case. At all times, I freely and openly discussed this matter with [Woodard]. I am confident that from the beginning of my representation through the end of trial, [Woodard] was fully aware of his right to testify, as well as the possible consequences of his testimony. At no time did [Woodard] ever tell me or, to my knowledge, co-counsel Muldrow that he wanted to testify. This was an ongoing topic of conversation throughout the entire trial. If [Woodard] had ever manifested a desire to testify, then we would not have prevented him from doing so. The fact that he did not testify at trial, either in the guilt stage or in the punishment stage, is the result of [Woodard's] own decision; I am confident that his decision not to testify was made freely, knowingly and intelligently. . . . Again, even though we fully discussed this matter with him, [Woodard] never expressed a desire to testify at trial, nor was he in any way prevented from doing so. [Woodard's] claims to the contrary are false.

State Habeas Record at 359, 360-61.[26]

---

[26] Trial counsel explained their efforts to investigate the putative testimony Woodard described in his affidavit:

> I also understand that Woodard has declared that not only did he want to testify at trial but was prevented from doing so, but also that he would have testified regarding a person named Adrian Sipsey, whom he claims was inside Cory Calloway's Lincoln and left it in the parking lot. During our trial preparation, I repeatedly questioned [Woodard] in hopes of obtaining some lead on information to assist with the preparation of his defense, particularly in terms of whether he knew of anyone who could have been involved in the convenience store murders and theft of Calloway's car. [Woodard] gave us nothing to go on. Instead, it was almost as if he were taunting me, co-counsel Muldrow and our investigator. He told us that he would give us a first name of some person involved in a gang, and that he was going to test how good our investigator was to see if he could find that person. He refused to give us any more information. Instead, we were forced to waste precious time and resources attempting to investigate [Woodard's] rabbit trails. On January 24, 2001, or five days before jury selection started, [Woodard] told our investigator, Randy Cunningham, about a person named Adrian Sipsey. He never gave any consistent information about him or where he could [sic] found. [Woodard] did say that Adrian Sipsey had a criminal record. Within the next day or two Randy Cunningham informed Ms. Muldrow and I that he could find no information on the computer regarding an Adrian Sipsey. In a last ditch attempt to locate him, if he existed, we sent Cunningham out to an apartment complex a few blocks from the station where the offense had been committed. He informed us that the apartment manager said that Sipsey had been evicted. Cunningham could find no other information or trail that would lead to Sipsey. [Woodard] never admitted being present at the scene, much less did he admit to stealing Calloway's car searching through it and discovering a gun and lottery tickets.

State Habeas Record at 359-61.

Trial counsels' affidavits directly contradict the allegations in Woodard's affidavit. Woodard claims that counsel prevented him from testifying. Trial counsels' affidavits state that Woodard never said he wanted to testify. This issue comes down to credibility. The state habeas court explicitly found trial counsel's affidavits to be credible. The state habeas court found "incredible [Woodard's] claim that he wanted to testify and counsel prevented him." State Habeas Record at 588. Federal habeas review gives heavy deference to a state court's credibility determinations. *See Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). "A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir.1999)).

Finding trial counsel's account to be credible, the state habeas court made the following fact finding:

> The Court finds . . . that counsel repeatedly talked to [Woodard] about his right to testify; starting during pre-trial investigation until the State rested at trial; that [Woodard] repeatedly questioned counsel about the consequences of testifying, specifically asking whether he should testify, what the prosecutors might ask him, and what effect that would have on the case; that counsel freely and openly discussed this matter with [Woodard] at all time; that [Woodard] never told counsel that he wanted to testify; that [Woodard] only "joked about it" during two trial recesses; that counsel would not have prevented [Woodard] from testifying if he chose to do so; that it was [Woodard's] decision not to testify at either guilt-innocence or punishment; and, that [Woodard's] decision was freely, knowingly, and intelligently made.

State Habeas Record at 588. Woodard "was aware of his right to testify and he made a free,

knowing and intelligent decision not to testify." State Habeas Record at 588. The state habeas court concluded that Woodard "fails to show that trial counsel did not advise [Woodard] of his right to testify or advise him of the consequences of testifying or prevented him from testifying," and thus had not met his burden under *Strickland*. State Habeas Record at 605-06.

Notwithstanding the state habeas court findings, Woodard claims that trial counsels' affidavits could still allow relief on his ineffective-assistance claim. Woodard wants this Court to find that, even taking trial counsel's statements on their face as credible, the affidavits still could show that his attorneys did not alert Woodard that he had a legal right to decide whether to testify or not. Woodard reads too much ambiguity into the affidavits. Trial counsel repeatedly stated that they informed Woodard of his right to testify and that he understood that the choice was his to make. From the detailed affidavits, the state habeas court could reasonably find implausible Woodard's self-serving statement that his attorneys prevented him from testifying. The Court finds that Woodard has shown that trial counsel prevented him from testifying.

Even if trial counsel performed deficiently, Woodard cannot prevail without showing actual prejudice. The state habeas court concluded that the omission of the Woodard's proposed testimony did not harm the defense. State Habeas Record at 605. Woodard now claims that he has met the *Strickland* prejudice prong because "[n]one of the material facts that Mr. Woodard would have testified to were brought out during the trial," especially since Woodard's "testimony would have also brought forth evidence of another suspect that the jury *never heard*." (Instrument No. 8 at 33-34).

The absence of Woodard's testimony does not automatically equate to *Strickland* prejudice. Woodard must still show a reasonable probability of a different result. The Court must contrast the substance of Woodard's putative testimony against the full landscape of trial

testimony. Trial testimony directly contradicted Woodard's account. Had he testified, the prosecution would have subjected Woodard's story to cross-examination. His proposed story was inconsistent with various accounts coming from eyewitnesses, those to whom he made incriminating statements, and other inculpatory evidence. Woodard has not provided any reliable or admissible support for the information he provides in his affidavit. Woodard gives no reason to assume that, in the face of substantial independent testimony showing otherwise, the jury would credit his story as a true account. Woodard has not indicated what testimony he would have given in the punishment phase, much less how it would have added to the jury's consideration of his fate. The state habeas court was not unreasonable in finding that Woodard failed to meet either *Strickland*'s performance or prejudice prongs on this claim.

C.    Failure to Hire an Expert on the Reliability of Eyewitness Identifications (claim four)

The eyewitness testimony from Garvina Sadiki and Cory Calloway linked Woodard to the murders. Trial counsel cross-examined the eyewitnesses thoroughly about their ability to identify Woodard as the robber/murderer. Woodard, however, complains that they did not do enough. Woodard asserts that trial counsel should have challenged the testimony against him through an expert on the unreliability of eyewitness identification.

On state habeas review, Woodard presented an affidavit from Dr. Ronald P. Fisher, a professor of psychology at Florida International University whose professional expertise includes research into eyewitness memory. After reviewing the police reports, the photo arrays, and the videotape of the lineup, Dr. Fisher consulted with state habeas counsel and provided a detailed affidavit which outlined "[m]any factors in this case that cast doubt on the accuracy of the witnesses's [*sic*] descriptions and identifications of the perpetrator." State Habeas Record at 152. Throughout his affidavit, Dr. Fisher sketched out problems with eyewitness identifications

generally and concerns about the testimony in the instant case.  For instance, Dr. Fisher worried that the use of a gun distracted the witnesses, the hood that Woodard wore lessened the chance for correct identification, the witnesses initially expressed uncertainty, and one eyewitness only had a glancing view of the suspect.  Based on those factors, Dr. Fisher emphasized that an expert on eyewitness identification "will make [jurors] more discriminating."  State Habeas Record at 158.[27]

Woodard's trial attorneys explained in their state habeas affidavits their efforts to challenge the identification and discussed why they did not retain the services of an expert on eyewitness identification.  Trial counsel Mr. Loper stated:

> With regard to our decision not to employ a defense expert to testify to the reliability of eyewitness testimony, I recall discussion that issue with co-counsel Muldrow.  I believe that we considered that possibility but ultimately chose not to do so.  I recall at that time, we were not convinced that such expert testimony would be admissible, nor did we believe that employing such an expert would be the best use of defense resources.  I understand that since the time of this trial, use of these types of experts has increased.  However, at the time of this trial, and based upon our assessment of the case, we made the strategic decision not to employ an eyewitness testimony expert.

State Habeas Record at 363.  Ms. Muldrow provided a similar statement in her affidavit.  State Habeas Record at 353.  Ms. Muldrow also thought that testimony from the other witnesses who linked Woodard to the crime would undermine the effectiveness of an expert witness who challenged the eyewitnesses' testimony.

The state habeas court found the trial attorneys' affidavits to be credible.  The state habeas court's findings suggested that trial counsel had sufficient familiarity with the facts and law (1) to determine whether to retain an expert witness and (2) to challenge the testimony

---

[27]     Woodard also relies on a statement from an experienced trial attorney about whether the failure to call an eyewitness expert constituted ineffective assistance in this case.  (Instrument No. 9, Exhibit 22).  The analysis required by the *Strickland* standard is not beyond the comprehension of the Court without expert assistance.  Statements by members of the legal community which reach ultimate legal issues are not helpful to the adjudication of federal habeas claims.

sufficiently through cross-examination of the eyewitnesses. The state habeas court found that trial counsel's cross-examination, both in pretrial hearings and at trial, adequately pointed out weaknesses in the identifications. First, "during a pre-trial hearing on [Woodard's] motion to suppress identification, trial counsel vigorously cross-examined the State's witnesses and elicited testimony that Cory Calloway was unable to identify anyone in the first photo array, and that Calloway's identification of [Woodard] in the live lineup was only 'strongly tentative.'" State Habeas Record at 588-89. Second, the state habeas court found that trial counsel's cross-examination at trial also covered the areas which expert testimony would have addressed. Specifically, the state court found that, during the cross-examination of Garvina Sadiki, Cory Calloway, and E.T. Yanchak (a Houston Police Department Officer who conducted the lineup), "trial counsel elicited testimony concerning the distinctive appearances of persons in the live lineup, Sadiki's inability to identify [Woodard], Calloway's initial 'strongly tentative' identification; and Calloway's request for a hood to aid his identification." State Habeas Record at 589.

Aside from cross-examination, the state habeas court found that trial counsel's jury argument emphasized weaknesses in the eyewitness testimony, impugned the witnesses' credibility, and highlighted other inconsistencies and peculiarities in the photo identification. State Habeas Record at 589. The state habeas court also credited trial counsel's affidavit testimony that they had considered using an eyewitness expert, but decided to use their defense resources in a more efficient fashion because of "the combined effect of [other trial testimony inculpating Woodard] outweighed the benefit, if any, of using an eyewitness expert." State Habeas Record at 589. [28] Accordingly, "trial counsel made a plausible, reasonable trial decision

---

[28] The state habeas court did not make any finding regarding trial counsel's statement that they feared such testimony would be inadmissible. Expert testimony about common problems related to eyewitness identification is

to attempt to attack identification through a pre-trial motion to suppress, vigorous cross-examination at trial, and jury argument."  State Habeas Record at 590.

"Counsel's decision not to hire experts falls within the realm of trial strategy." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Colburn v. Cockrell*, 37 F. App'x 90 (5th Cir. 2002) ("The hiring of expert witnesses and the presentation of their testimony is a matter of trial strategy.").  Trial counsel actively cross-examined witnesses along the same general themes identified by the expert on state habeas review.  Without the imprimatur of psychological science, trial counsel allowed the jury to see the weaknesses in the eyewitnesses' testimony. Trial counsel's closing argument forcefully discussed problems with the identification.  Tr. Vol. 29 at 20-21, 28-32.  Woodard has not shown that trial counsel's decision to rely on lay logic, rather than scientific expertise, in this regard was deficient performance.  *See Cantu v. Collins*, 967 F.2d 1006, 1016 (5th Cir. 1992) (finding that cross-examination instead of expert testimony would be "sufficient to refute the accuracy of the identification").

Woodard has also not shown that the absence of expert testimony actually prejudiced his defense.  The entire breadth of evidence against Woodard influenced trial counsel's decision not to employ an expert witness.  While some weaknesses existed in the identification, testimony from other sources bolstered their reliability.  Woodard's possession of items stolen from the store and from Mr. Calloway, the testimony linking him to ammunition similar to that which killed the victims, and his highly incriminating statements would strongly detract from his efforts to cast doubt on the eyewitnesses' reliability.  Woodard has not shown a reasonable probability of a different result if trial counsel retained an expert on eyewitness identification.  The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of,

---

— and has long been —  admissible in Texas under the *Daubert/Kelly* standard, s*ee Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996), as long as it is shown to be reliable, s*ee Weatherred v. State*, 15 S.W.3d 540, 542-43 (Tex. Crim. App. 2000).

federal law.  *See* 28 U.S.C. § 2254(d)(1).

D.      Failure to Adduce Impeachment Evidence (claim five)

Woodard alleges that trial counsel provided ineffective assistance by inadequately investigating the stories told by prosecution witnesses and by not fully impeaching their testimony.  Woodard's federal petition makes broad arguments about trial counsel's alleged failure to perform an adequate investigation, which in turn handicapped their ability to challenge the prosecution's case.  In specific, Woodard claims that trial counsel incompetently challenged the testimony of two witnesses: (1) his brother, Reginald Willis, who said that Woodard possessed items stolen in the robbery and made incriminating statements; and (2) Cory Calloway, the eyewitness whose green-colored car was stolen by Woodard immediately after the murders.

Woodard alleges that, with investigation, trial counsel could have uncovered robust evidence to impeach Mr. Willis' testimony.[29]  For example, Mr. Willis had a recent felony conviction, was possibly mentally retarded, lied about being known as "Red," had a history of violence and unpredictable behavior, often blamed others for his own actions, and threatened someone with a gun the day after the murders.  Woodard also claims that trial counsel should have impeached Mr. Calloway's testimony, primarily with what he alleges was an earlier statement which stated that someone in a "red Lincoln" assaulted him.  According to Woodard, this earlier statement implies that someone else drove by in a red car and assaulted him and discounts testimony that Woodard assaulted him as he fled from the store.  Also, Woodard implies that Mr. Calloway's statement somehow refers to his brother, Reginald Willis, who

---

[29]      Trial counsel filed a "Motion to Discover Arrest and Conviction Records of Witnesses."  Clerk's Record at 63.  The trial court granted the motion with respect to all conviction records, but only required the prosecution to divulge arrest of juvenile records of witnesses if "exculpatory."  Clerk's Record at 65.  The trial court elsewhere ordered the prosecution to divulge all exculpatory information.  Clerk's Record at 94-100; Tr. Vol. 2 at 9.

allegedly went by the nickname "Red."

Trial counsel's state habeas affidavits responded to Woodard's claim that they missed opportunities to impeach the two witnesses. Ms. Muldrow stated:

> As far as I can recall, I met Reginald Willis two times prior to trial, at Mr. Loper's office. Mr. Loper, Randy Cunningham and I saw him and others. I don't recall if Mr. Willis said he was coerced [to provide an account implicating his brother in the murders]. [Woodard] told us previous to our meetings that Willis was a chronic liar. It was obvious that he was somewhat 'slow.' I had Randy [Cunningham] pull Willis['] employment records to impeach his 'alibi' in front of the jury.

State Habeas Record at 353. Mr. Loper's affidavit indicated that the defense team had met with Mr. Willis before trial and investigated the basis for his testimony. He stated that Mr. Willis, and other witnesses they interviewed before trial, "never gave [them] any indication that they had lied to the police about anything in their statements." State Habeas Record at 360.

The state habeas court found that "trial counsel thoroughly and adequately investigated law and the facts in [Woodard's] case to prepare for trial[.]" State Habeas Record at 592. To that end, "trial counsel continued the obvious trial strategy of attempting to impeach and implicate Willis during guilt-innocence argument, by arguing that Willis was not credible and was at least an accomplice to the offense, if not the actual murderer[.]" State Habeas Record at 591. The state habeas court considered that to be "reasonable . . . trial strategy" with trial counsel carried out through "vigorously attempt[ing] to impeach Willis through cross-examination and presentation of witnesses in an effort to attack his credibility and alibi." State Habeas Record at 592. That cross-examination included showing Mr. Willis' inculpatory actions and statements after the offense, questioning his alibi, and highlighting his criminal activity. State Habeas Record at 590. Trial counsel called a witness who testified that Mr. Willis implicated himself in the robbery and murders. The state habeas court also found that efforts to

paint Mr. Willis "as mentally deficient, susceptible to manipulation, would have undermined the reasonable trial strategy that Willis was a knowing participant in the capital offense." State Habeas Record at 592. Also, the state habeas court dismissed the impeachment value of Woodard's proposed cross-examination of Mr. Calloway. State Habeas Record at 607.[30] On that basis, the state habeas court concluded that trial counsel was not ineffective in the efforts to impeach Mr. Willis. State Habeas Record at 606-08.

Woodard has not met his burden under the AEDPA of showing an entitlement to habeas relief on this claim. Trial counsel investigated the testimony that the prosecution intended to present against him. Trial counsel's cross-examination challenged the State's case, particularly that coming from Mr. Willis. Trial counsel sought out witnesses who would inculpate Mr. Willis in the crime, thus minimizing Woodard's culpability. While trial counsel's cross-examination did not follow all the precise issues raised by Woodard's federal petition, it is not likely that increased development of those issues at trial would have been more effective that the efforts trial counsel made. Woodard has not shown that he meets *Strickland*'s performance or prejudice prongs with respect to this issue.

E.     Failure to Prepare Punishment Phase Expert Testimony (claim six)

Woodard claims that trial counsel rendered ineffective assistance by failing to prepare an expert witness, Dr. Shirley Gruen, for her punishment phase testimony. The defense called Dr. Gruen, a clinical psychologist in private practice, in an effort both to put mitigating information before the jury and to show that Woodard would not pose a future societal threat. To that end, Dr. Gruen interviewed Woodard before trial and reviewed numerous documents pertaining to his life. The thrust of Dr. Gruen's trial testimony was that a life sentence would be the best

---

[30]     Specifically, the state court found no factual basis for Woodard's proposed cross-examination of Mr. Calloway. State Habeas Record at 592.

punishment because Woodard did not act violently when in a highly structured environment. She summarized: "[W]hen [Woodard] is in an environment that is not structured he tends to get into trouble. He can't form a structure for himself. When he is in an environment that is structured he can do very well." Tr. Vol. 31 at 46. Thus, she testified:

> [i]f he is incarcerated for 40 years he's not going to be in society to be a threat to them. And I see that the prison systems as I have been able to look at them and have been through some of the prisons are highly structured environments. And his history is that he adapts to that environment and functions well. . . . I believe that if [Woodard] were in a structured environment that we mentioned he would not be a threat. That he would be able to maintain appropriately in that environment.

Tr. Vol. 31 at 62. Dr. Gruen also identified several categories of mitigating evidence evident in Woodard's life.

The prosecution briskly cross-examined Dr. Gruen. The prosecution started by challenging whether she had an adequate basis to give any expert opinion on Woodard's case, particularly because she had only met with him once for a short period of time. Tr. Vol. 31 at 68. The prosecution then led Dr. Gruen through the factors that comprise a diagnosis of a sociopathic or anti-social personality. After discussing each factor, Dr. Gruen agreed that Woodard's behavior would fit under the diagnosis of the anti-social personality disorder. Tr. Vol. 31 at 71. She qualified, however, that her opinion was based on "the amount of work [she had] done with him without additional psychological testing[.]" Tr. Vol. 31 at 72. The prosecution then attempted to chip away at her opinion that Woodard would not be a danger in a structured environment.

Trial counsel's redirect minimized discussion of his anti-social personality disorder, drawing a distinction between it and a disorder "that is considered more severe, which is like a psychopathic personality . . . [t]hat kind of person who has absolutely no regard for society.

Focus on nothing but himself[.]" Tr. Vol. 31 at 84. By way of contrast, Woodard had never "taken it to the point where he is acting . . . in the same way psychopath would[.]" Tr. Vol. 31 at 85.

The closing arguments began after Dr. Gruen left the stand. Mr. Loper's closing, without mentioning Dr. Gruen's testimony, emphasized that the structure of prison would prevent Woodard from being a societal threat. Tr. Vol. 31 at 92-119. Ms. Muldrow, on the other hand, discussed Dr. Gruen's testimony as supporting the defense argument for leniency through the mitigation special issue. The prosecution's closing, however, stressed that "[y]ou know from the testimony of their doctor that he is a sociopath and a psychopath, whether or not she is going to admit it." Tr. Vol. 31 at 132.

Woodard claims that trial counsel inadequately prepared Dr. Gruen for her testimony, particularly because she was unprepared to do anything but agree that Woodard had an anti-social personality disorder. Woodard bases this claim on an affidavit prepared by Dr. Paula Lundberg-Love, a psychologist who interviewed Woodard in 2003. Before meeting Woodard in prison, Dr. Lundberg-Love reviewed the records that Dr. Gruen relied on, as well as the trial transcript of Dr. Gruen's testimony. Dr. Lundberg-Love then interviewed Woodard for 6.5 hours. She administered three psychological tests (the personality Assessment Inventory, the Trauma Symptom Inventory, and the Dissociative Experiences Scale).

Dr. Lundburg-Love opined that "it appears highly likely that such time constraints may have compromised Dr. Gruen's opportunity to evaluate Robert Woodard thoroughly." State Habeas Record at 215. Dr. Lundburg-Love expressed her opinion that the short time frame probably prevented Dr. Gruen from doing any testing. Dr. Lundburg-Love stated that her examination revealed that there was no basis for Dr. Gruen's testimony that Woodard suffered

from post-traumatic stress disorder and depression. Thus, "the prosecuting attorney was able to allege that Robert Woodard should be labeled as having [anti-social personality disorder], and Dr. Gruen was unable to counter that allegation." State Habeas Record at 215. Dr. Lundburg-Love's testing indicated that he did not suffer from anti-social personality disorder. State Habeas Record at 215.

Also, Dr. Lundburg-Love also felt that "while [Dr. Gruen] reviewed the same records provided to me, there are some important details contained in those records that Dr. Gruen did not clearly explain to the jury." State Habeas Record at 215. She felt that Dr. Gruen presented the jury with an incomplete picture of the hardships Woodard faced as a youth. In conclusion, Dr. Lundburg-Love opined:

> Had an expert such as myself been given a greater time frame, in which to interview Mr. Woodard and perform objective testing, the information conveyed to the jury would have been more detailed, more specific, and different diagnostic conclusions would have been formulated. Indeed, test data, which did not support a diagnosis of [anti-social personality disorder] could have been presented.

State Habeas Record at 216.

On state habeas review, Dr. Gruen provided an affidavit in which she explained that Mr. Loper retained her two weeks before trial. State Habeas Record at 219. Dr. Gruen, however, complained that this did not provide her sufficient time to evaluate Woodard:

> It is my opinion that if I had been notified in a timely manner regarding the need for my services in this matter, I would have been better prepared to testify in this case. Due to time restraints, I was not able to obtain objective data by performing the necessary psychological tests. . . . These tests would have provided me with objective data, resulting in my testimony being more detailed, more specific, and may have possibly indicated different diagnostic conclusions.

State Habeas Record at 219.

Trial counsel's affidavits, however, showed that they retained Dr. Guen with adequate time for her to make an assessment that would strengthen their chosen defense. Mr. Loper

described his interaction with Dr. Gruen, including his concern that she have enough time to prepare for trial:

> Our purpose in retaining Dr. Gruen was to present the defendant as someone who would do well in a structured environment, thereby reinforcing our argument for a life sentence rather than death. When I first retained Dr. Gruen, I asked her whether she believed she had sufficient time to meet with [Woodard] and form an expert opinion to support our defense theory prior to trial. She assured me she had enough time. I did not place a limit on the amount of time she spent with [Woodard] in forming her opinion; that was of Dr. Gruen's own doing. When time for trial came, Dr. Gruen again assured me that she was prepared for testimony and that she had had sufficient time with [Woodard].

State Habeas Record at 362. Trial counsel discussed their defense strategy with Dr. Gruen, and she indicated that he she was prepared for trial:

> It was our strategic decision to case [Woodard] as someone who was not deserving of death, but rather someone who had made bad decisions due to terrible circumstances earlier in life and someone who would do well in the structured environment of prison (rather than death). I discussed Dr. Gruen's testimony with her, and it was my belief that her trial testimony would support our defense strategy. She never told me that she did not believe she had sufficient time to test [Woodard] or form an expert opinion. . . . [H]er testimony that [Woodard] would be likely to re-offend because he had not learned from previous behaviors was completely contrary to what she had represented to me prior to trial. However, I believe that I was able to turn Dr. Gruen's testimony to still support our defense theory, namely that [Woodard] was not a psychopath and that he would do well in the structure environment of the TDCJ. It was our strategic decision to use Dr. Gruen's testimony at trial; she indicated to us that she was prepared for trial, and she gave us no reason to believe otherwise. She never told is that she did not have enough time to prepare to meet with [Woodard].

State Habeas Record at 362.

The state habeas court found the statements in Mr. Loper's affidavit to be credible.

Specifically, the state habeas court found that

> counsel did not limit the amount of time that [Dr.] Gruen spent with [Woodard] to form her opinion; that counsel inquired whether she had sufficient time and [Dr.] Gruen assured counsel that she did and was prepared for testimony, that counsel discussed [Dr.] Gruen's testimony with her beforehand; that counsel believed that [Dr.] Gruen's testimony would support the defense strategy; and, that [Dr.] Gruen never told counsel that she did not have sufficient time to test [Woodard[ and

form an opinion.

State Habeas Record at 596.  Even considering the fact that Dr. Gruen did not tell counsel that she would need more time, and in fact testified in some areas different from what she had told trial counsel earlier, the state habeas court found that she put mitigating evidence before the jury and provided the jury with a basis to find that he would not be a danger if incarcerated in a structured environment.  State Habeas Record at 595.  On that basis, and because trial counsel presented ample additional mitigating evidence supporting their theory in calling Dr. Gruen, the state habeas court denied relief.  State Habeas Record at 608-09.

Woodard does not claim that trial counsel should have presented a defense based on mental illness or defect.  Woodard's claim is that, when hiring a mental-health expert to testify on future danger and recidivism, trial counsel should have anticipated that the State would portray him as a sociopath. Woodard's claim is not that trial counsel should have headed off the mention of an anti-social personality disorder, but that he should have had Dr. Gruen test Woodard in a way that would defend against that accusation.

Woodard's claim challenges the effectiveness of his expert witness, and his attorneys for being lax in their oversight of her efforts.  This Court "must be particularly wary of 'argument[s] [that] essentially come[] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)).  Here, trial counsel apparently informed Dr. Gruen of why they wanted her to testify and expected her to tell them what time or resources she would need to comply with that charge.

Trial counsel's efforts reveal a good-faith expectation that Dr. Gruen would fulfill her

assigned duties.  The record suggests that trial counsel assured that she had sufficient intimacy with the facts to testify.  Woodard argues that, with additional time, Dr. Gruen could have disputed labeling him a sociopath. Even now, though, Dr. Gruen has not unequivocally stated that she would still not have agreed that he had some elements of an anti-social personality disorder. This is not a case where the defense's expert witness has recanted her trial testimony or that additional examination has undercut the entire basis for her conclusions.  Dr. Gruen has not disclaimed her testimony relating to the presence of anti-social personality disorder; she has only stated that additional testing may prove that diagnosis inapplicable.  Dr. Lundburg-Lund opines, in essence, that additional testing would have provided Dr. Gruen with a shield to defend against the suggestion that Woodard was a sociopath.  Dr. Gruen's affidavit, however, does not display certainty in that regard, only stating that it *may* have allowed for a different diagnosis.

Even with or without that diagnosis, the prosecution used the cross-examination of Dr. Gruen as a means of placing a label on the information already before the jury.  The prosecution only sought to place a psychological term on Woodard's bad behavior, which the State repeatedly accentuated in the punishment phase.  Even if trial counsel should have supervised Dr. Gruen's efforts more closely to mitigate discussion of an anti-social personality disorder, the pervasive factors underlying that diagnosis were fully and convincingly before the jury.

True, Dr. Gruen's testimony did not uniformly help the defense, but Woodard has not shown that his trial attorneys were inept in preparing her for trial or that her testimony created a reasonable probability of a different result.  Even without resorting to the label "sociopath," the prosecution would have been able to argue that Woodard was violent, unstable, and unable to conform to the law. The state habeas court, therefore, was not unreasonable in rejecting this *Strickland* claim.

F.       Failure to Object to Prosecutorial Argument (claim seven)

Woodard claims that trial counsel should have objected to statements the prosecution made during closing arguments.  As previously noted, the defense's punishment case relied heavily on the jury finding that Woodard would not pose a future societal threat.  The future dangerousness issue asked: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Robert L. Woodard, would commit criminal acts of violence that would constitute a continuing threat to society?"  Clerk's Record at 273.  The prosecution attacked the defense's argument that, after 40 years of incarceration before parole eligibility if Woodard received a life sentence, he would not be a societal danger:

> One last thing I want to point out about Special Issue One is this.  This question is not asking you to decide if in 20 years, five years, 30 years, 40 years if this defendant is going to be a continuing threat to society.  This question the way it's worded and the way it tells you to do it is to decide right now as he sits is he a continuing threat to society.  Now. Right now.  Not in 40 years, not in five years, not in 20 years, but now.  And you know he is.

Tr. Vol. 31 at 97.  Woodard argues that the prosecution's argument misstated Texas law by confining the jury's review to the threat that he currently poses, rather than allowing the jury to consider the effect of time on the threat he poses to society.

For habeas relief to be available, Woodard must show that the prosecutor misstated Texas law, that trial counsel had an obligation to correct that misstatement irrespective of trial strategy, and that the statement caused actual prejudice.  Capital inmates have brought numerous challenges to both the language and interpretation of the statutorily mandated future dangerousness issue.  A common complaint has been that the issue's wording is impermissibly vague.  Both state and federal courts have refused to add any definition to the phrase.  While Woodard strenuously argues that the prosecution's interpretation of the special issue is in error, he has cited no case which supports his interpretation of the language.  The statute itself does not

clarify at which point in time the jury should consider a capital defendant to be a danger: at the time of trial, during his incarceration, or after completion of a possible life sentence.  Here, the state habeas court found that "[t]rial counsel are not ineffective for not objecting to the State's proper punishment argument that the jury should determine whether [Woodard] was presently a continuing threat when answering the first special issue."  State Habeas Record at 609.  The state habeas court then cited *Campbell v. State*, 910 S.W.2d 475, 480 n.9 (Tex. Crim. App. 1995), for the proposition that "'society' includes both prison and non-prison population and that [the] State [is] not required to prove [a] defendant's dangerousness over any give[n] number of years."  State Habeas Record at 609.[31]

The Court of Criminal Appeals has not required Texas trial courts to provide a specific explanation for the language in the future dangerousness issue.  Texas courts presume that the jury "understand[s] the phrase without further instruction."  *Russeau v. State*, 291 S.W.3d 426, 435 (Tex. Crim. App. 2009).  This lack of definition gives a "plain meaning of sufficient content" which leaves some discretion to the jury in its interpretation, but "no more than that inherent in the jury system itself."  *Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984).  The Fifth Circuit has found that

> [t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system. . . . The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean.

*James v. Collins,* 987 F.2d 1116, 1120 (5th Cir. 1993) (quoting *Milton,* 744 F.2d at 1096).

Texas law, however, has also found that that scope of the future dangerousness issue broadly reaches a defendant's current unlawfulness, the threat he poses while incarcerated, and

---

[31]     *Campbell* states that "[b]ecause we have defined "society" to include both prison and non-prison populations, the jury should consider appellant's potential danger in the context of both prison and non-prison populations."  *Campbell*, 910 S.W.2d at 480.

the hypothetical danger he would be if released decades later.  Thus, the Court of Criminal Appeals has indicated that the term "society" in the special issue broadly encompasses both a prison and free-world setting: "the State had the burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future, so as to constitute a continuing threat to people and property, whether in or out of prison." *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001); *see also Smith v. State,* 898 S.W.2d 838, 851 n. 19 (Tex. Crim. App. 1995).  Accordingly, the future dangerousness issue addresses both the time period advocated by the prosecution and by Woodard on federal habeas review.

Yet even if the prosecution unfairly limited the jury's consideration of the future dangerousness issue, the state habeas court found that trial counsel had a good reason for not objecting.  The state habeas court found:

> In the alternative, trial counsel are not ineffective for making the reasonable, plausible trial decision not to object to the State's argument about 'continuing threat' based on such argument favoring [Woodard] who had not been involved in any incidents while incarcerated at the Harris County jail and reinforcing counsel's punishment strategy that [Woodard] would do well in a structured environment.

State Habeas Record at 609-10.  Trial counsel Mr. Loper stated in his habeas affidavit that

> As to the criticism that I did not object to the prosecutor's argument at punishment that the Jury, in determining "future dangerousness," should focus on whether [Woodard] was a danger at present, I thought at the time that the argument worked to our favor in that in the year that [Woodard] had been in jail leading up to trial, he had not been involved in any incident that would provide he would be a danger while living in the structured environment of prison.

State Habeas Record at 362.  Whether or not the special issue focused the jury's inquiry only on his dangerousness contemporaneous with trial, Woodard's attorneys felt that would let the jury see that pre-trial incarceration had provided the structure that would allow him to control his

actions. The state habeas court would not be unreasonable in finding that this strategy could inure to the defense's benefit.

Finally, the state habeas court found no error even if trial counsel should have objected:

In the alternative, in light of the entire record, [Woodard] fails to show that the State's cited jury argument is extreme or manifestly improper or inject new and harmful facts into the trial. . . . [Woodard] fails to show that trial counsel are ineffective based on counsel not objecting to the cited argument

State Habeas Record at 609. The complained-of statement was the only instance in which the prosecution possibly cabined the jury's consideration of the special issues. Even if trial counsel did not object, the tenor of the defense's closing arguments put before the jury information suggesting that long-term incarceration would stifle Woodard's violent tendencies, leaving him no longer a menace when freed. While the effect of the prosecution's statement may have foreclosed the jury's consideration of that theory, the statement was not endorsed by the jury instructions. The trial court's instructions amply allowed the jury to give effect to the defense's efforts to show that time would make Woodard less of a societal threat.

Moreover, Woodard has not shown that this single statement conclusively influenced the jury's evaluation of the future dangerousness issues. Woodard has not shown a reasonable probability that it was the prosecution's lone statement, rather than his life-long pattern of aggressive acts and criminal behavior, that motivated the jury to find him a future danger. If trial counsel should have objected, Woodard has not shown that the prosecution's argument actually harmed the defense.

Woodard has not shown that the state court's finding with respect to *Strickland*'s performance and prejudice prongs was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court will deny this claim.

G.     Cumulative Effect of Trial Counsel's Errors (claim eight)

Woodard argues that all his complaints about counsel's efforts when taken together amount to a constitutional violation.  Woodard has not exhausted this claim, thus barring federal review.  Even so, cumulative-error claims are predicated on the finding of error to aggregate.  Trial counsel presented a vigorous defense in this case.  Trial counsel's efforts did not succeed.  Nevertheless, this Court has found that Woodard fails to make a showing of any specific constitutional error attributable to counsel.  Taking into consideration all of the allegations in Woodard's petition, this Court cannot say that trial counsel did not provide the effective assistance that the Constitution promises.  The Court denies Woodard's cumulative-error claim.

H.     Ineffective Assistance of Appellate Counsel (claim nine)

Woodard raises an unexhausted claim that appellate counsel provided ineffective assistance by insufficiently briefing his Fourth Amendment claims on direct appeal.  Woodard does not make a strong showing of ineffective assistance.  "A criminal defendant has a constitutional right to receive effective assistance of counsel in his first appeal."  *Hughes v. Booker*, 220 F.3d 346, 348 (5th Cir. 2000).  "In reviewing a claim alleging ineffective assistance of appellate counsel, we again apply the traditional *Strickland* standard."  *Blanton v. Quarterman*, 543 F.3d 230, 243 (5th Cir. 2008).  First, a petitioner must demonstrate deficient performance.  A court gives "great deference to counsel's assistance, strongly presuming that counsel exercised reasonable professional judgment."  *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993).  "Counsel is not deficient for not raising every non-frivolous issue on appeal."  *Hughes*, 220 F.3d at 348; *see also Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998) ("On appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available.").  In this context, the *Strickland* standard requires counsel "to research

relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999) (citations omitted).

Second, a petitioner must demonstrate that the deficient performance prejudiced the defense. "[T]he presence or absence of prejudice, both with respect to claims of ineffective assistance of counsel at the trial and appellate levels, hinges upon the fairness of the trial and the reliability of the judgment of conviction resulting therefrom." *See Goodwin v. Johnson*, 132 F.3d 162, 174 (5th Cir. 1998). In order to comply with the prejudice prong in this context, a petitioner claiming ineffective counsel on appeal must not only demonstrate that a new trial would have been granted had counsel acted in a different manner, but also that, as a result of counsel's incompetence, the outcome was fundamentally unfair or unreliable. *See Green*, 160 F.3d at 1043.

Here, appellate counsel raised a multifaceted attack on Woodard's arrest. In the first and second grounds for relief, appellate counsel made three arguments that the arrest violated the Texas state constitution and three arguments that it violated the federal constitution. The Court of Criminal Appeals only considered the arguments in the first two appellate claims that Woodard based on statutory law. Even then, the Court of Criminal Appeals found that Woodard waived all his arguments but one by failing to raise a sufficient trial objection. Woodard does not point to any place in the record where trial counsel made the otherwise-waived objections on constitutional grounds. Appellate counsel cannot be faulted for not raising claims that would be procedurally inadequate.

The only point that the Court of Criminal Appeals found that Woodard did not waive was

his argument that the prosecution should not have presented a copy of his videotaped line-up into evidence. The Court of Criminal Appeals, however, found that, where compared to the whole trial record, admission of the video-taped line-up did not harm Woodard. There is no indication that the Court of Criminal Appeals' analysis would have fundamentally changed had it viewed the issue through the prism of the federal constitution. The Court, therefore, finds that Woodard has not met *Strickland*'s performance or prejudice prongs on his ineffective-assistance-of-appellate-counsel claim.

## IV.    Sufficiency of the Evidence (claim 10)

Woodard claims that insufficient evidence supported the jury's finding that he would be a future danger to society. Minimizing his criminal acts before the murders, Woodard argues that:

> prior to the date of his arrest for the present offense, Mr. Woodard had never been involved with any seriously violent behavior. The psychiatric and character evidence showed that Mr. Woodard was a victim of neglect and suffered greatly from a careless upbringing, but did not have a mental disorder that would create a threat of future violence. Finally, Mr. Woodard's age is young such that he would benefit from maturity and counseling which he never had at an earlier age. His personal circumstances at the time of the offense indicated that he was emotionally troubled and struggling to overcome his history so that he could thrive in society. He was working, he was a father, and he was facing normal challenges of his age.

(Instrument No. 8 at 78). Woodard also discounts the prosecution's argument that the jury could use the crime for which he was convicted to evaluate his future societal danger, arguing that nothing about the crime shows premeditation or his state of mind at that time.

When Woodard praised this issue on state habeas review, the state court procedurally barred his claim because Texas law does not allow inmates to present insufficiency-of-the-evidence claims on state habeas review. State Habeas Record at 610. That procedural ruling also prevents federal consideration of this claim.

In the alternative, the Court finds that the evidence supported the jury's verdict. In

determining the sufficiency of the evidence, this Court asks "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This Court may not substitute its view of the evidence for that of the fact finder, but must consider all of the evidence in the light most favorable to the prosecution and decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*[32] In this context, the Court must decide whether a rational jury could have answered the future dangerousness issue in a manner requiring the imposition of a death sentence.

The Court of Criminal Appeals has described the review of the future dangerousness issues as follows:

> we first look at the facts of the crime itself. If the offense was shown to be sufficiently cold-blooded or calculated, then the facts of the offense alone may support a finding that the defendant will pose a continuing threat to society. If, however, the facts of the case were not sufficiently compelling, we look for other evidence to support the jury's finding, such as psychiatric evidence, character evidence, prior criminal record, prior extraneous offenses, and possible mitigating factors such as the defendant's youth or state of mind at the time of the offense.

*Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986); *see also Johnson v. Texas*, 509 U.S. 350, 371 (1993) (noting Texas's reliance on eight factors to determine the sufficiency of evidence supporting a jury's future-dangerousness decision) (citing *Ellason v. State*, 815 S.W.2d 656, 660 (Tex. Crim. App. 1991)).

In that context, and even giving full consideration of Woodard's arguments as to why he would not be a future danger, ample evidence sufficiently supported the jury's answers to the special issues. Woodard downplays his criminal history. Woodard had a long history of

---

[32] Because the state habeas court procedurally barred this claim, the court did not address its merits. This Court's alternative review, therefore, does not rest on AEDPA deference.

unlawfulness. Gang membership and involvement in the drug culture marked his youth. Woodard had been caught driving stolen vehicles. He had mugged people. Woodard had been arrested in areas known for drug dealing and gambling while carrying a large amount of cash. He stole items from his job when he had been hired as a security officer. He had repeatedly been arrested for criminal trespass. While Woodard now paints himself as nonviolent, he fails to account for assaults he committed. Even when offered opportunities for rehabilitation through probated sentences, Woodard failed to conform to societal norms. His behavior when first incarcerated did not improve. Woodard was caught with contraband, extorted from other inmates, committed assaults, refused to obey prison officials, and tried to control the cell block.

In addition, the jury could consider the needlessness of the instant murders. Woodard killed two people in cold blood during a robbery attempt. Woodard argues that "[t]here was no evidence to establish [his] state of mind was at the time of the offense, only that it was an act of frustration." (Instrument No. 8 at 79). While the jury did not know what was going through his mind when he shot the two people, whether he was annoyed that they did not hurry or whether he succumbed to blood lust, the context of his background and the circumstances of the offense give no assurance that his behavior would improve with time. Given Woodard's past, a rational juror unquestionably could find him to be a future danger. Even if this claim were before the Court in a procedurally correct manner, it is without merit.

## V. Constitutional Challenges to Texas' Capital Sentencing Scheme (claims eleven, twelve, and thirteen)

Woodard raises thee challenges to Texas' system of imposing and reviewing death sentences. First, Woodard claims that the mitigation special issue violated the Constitution because it does not assign the prosecution a burden of proof (claim 11). Woodard also faults the future dangerousness issue because it places a constitutionally insufficient burden of proof on the

prosecution by asking the jury to find a "probability" that he will commit criminal acts in the future (claim 12).[33]   Additionally, Woodard criticizes the Texas sentencing system for not imposing a beyond-a-reasonable-doubt burden on the prosecution's presentation of extraneous offenses in the punishment phase.  Finally, Woodard alleges that his indictment was insufficient because Texas does not treat aggravating circumstances that support a death sentence as elements of a capital murder charge (claim 13).  Woodard did not present these claims in a procedurally actionable manner.  Nonetheless, each of these challenges to Texas' capital sentencing scheme does not provide a valid basis for habeas relief.

Woodard bases these constitutional challenges on the jurisprudence following from *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  In *Apprendi*, the Supreme Court found that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.  Since then, capital inmates have raised multifarious and novel challenges to the Texas capital sentencing statute.  To date, the federal courts have rejected each challenge, particularly because the structure of Texas' capital process places it beyond *Apprendi*'s purview.

*Apprendi* has not required Texas to alter its capital sentencing scheme because a capital jury fully considers the factors necessary to sustain a death sentence beyond a reasonable doubt. When the jury considers the future dangerousness and mitigation special issues, the jury has

---

[33]        Texas law requires a capital jury to determine "whether there is a *probability* that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CODE CRIM. PRO. art. 37.071(b)(1) (emphasis added).    Texas law imposes the beyond a reasonable doubt standard in the future dangerousness inquiry.  TEX. CODE CRIM. PRO. art. 37.071(c).  Notwithstanding the statutorily imposed burden, Woodard argues that the text of the future dangerousness special issue dilutes the standard required to secure a death sentence because, rather than proving he *will be* a future danger, the prosecution must only show him *probably* to be one.  Woodard contends that the future dangerousness special issue's use of the "probability" language drops the prosecution's actual burden of proof below the reasonable doubt standard mandated by the Constitution.

already found an aggravating factor beyond a reasonable doubt in the eligibility portion of trial, thus authorizing a potential capital sentence. The maximum punishment available then is death. *Apprendi* does not apply to Texas' capital sentencing scheme because the factual issues involved in answering the special issues do not *increase* an inmate's *authorized* punishment, they merely actualize or prevent the imposition of that punishment. The fact that the jury could answer either special issue in a manner resulting in a life sentence by no means detracts from the potential statutory maximum.

With regard to the specific allegations raised by Woodard, the Fifth Circuit has found that *Apprendi* does not: (1) place a burden of proof on the prosecution to show the absence of mitigation beyond a reasonable doubt, *see Paredes v. Quarterman*, 574 F.3d 281, 292 (5th Cir. 2009); *Granados v. Quarterman,* 455 F.3d 529, 536-37 (5th Cir. 2006); *Scheanette v. Quarterman,* 482 F.3d 815, 828-29 (5th Cir. 2007), *Ortiz v. Quarterman,* 504 F.3d 492, 504-05 (5th Cir. 2007); (2) render the use of the term "probability" in the future dangerousness issue unconstitutional, *see Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005); (3) require the jury to find that a defendant committed any extraneous offenses under a beyond-a-reasonable-doubt standard, *see Jackson v. Dretke*, 181 F. App'x 400, 410-11 (5th Cir. 2006); or (4) require the indictment to contain the aggravating circumstances considered by the jury in answering the special issue questions, *see Anderson v. Quarterman*, 204 F. App'x 402, 409 (5th Cir. 2006). This Court could not grant relief on Woodard's *Apprendi*-based claims without creating a new rule of constitutional law in violation of *Teague v. Lane*, 489 U.S. 288 (1989). The Court will summarily deny Woodard's challenges to the constitutionality of Texas' capital sentencing statute.

## VI.     Texas' Capital Habeas Procedure (claim fourteen)

Under Texas law, capital habeas proceedings run concurrently with an inmate's direct appeal. *See* TEX. CODE CRIM. PROC. art. 11.071 § 4(a).[34] The time to file a state habeas application expires after an inmate's brief is due on direct appeal, but well before the conclusion of his appellate proceedings. In essence, appellate and habeas review run concurrent to each other. Woodard claims that this dual-track system violates his rights under the federal due process clause. Among other concerns, Woodard worries that a capital inmate cannot develop a complete factual record quickly and that ineffective-assistance-of-appellate-counsel claims are unripe until the conclusion of the direct appeal.[35]

The federal constitution does not require the States to provide a habeas avenue of relief. *See Lackawanna County Dist. Att'y v. Coss,* 532 U.S. 394, 402 (2001) (noting that "each State has created mechanisms for both direct appeal and state post-conviction review, even though there is no constitutional mandate that they do so"); *Pennsylvania v. Finley,* 481 U.S. 551, 557 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions[.]"). Because no constitutional right ensures state habeas review, the Fifth Circuit has consistently refused to find constitutional error in various aspects of the state habeas process. *See Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). "This is because 'an attack on the state habeas proceeding

---

[34]     The state habeas court also found that Woodard did not comply with Texas' contemporaneous objection rule with respect to this claim, thus resulting in a procedural bar. State Habeas Record at 611. As the state courts alternatively found that Texas' capital habeas scheme meets constitutional requirements, the Court will address the merits under the AEDPA.

[35]     Woodard does not address Respondent's argument that the exceptions to TEX. CODE CRIM. PRO. art 11.071's otherwise strict one-bite-at-the-apple procedure allow inmates to raise claims that were not available when they filed their initial state habeas application, including claims of appellate irregularities.

is an attack on a proceeding collateral to the detention and not the detention itself.'" *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (quoting *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001)).

Ultimately, habeas relief under 28 U.S.C. § 2254 is only available if a petitioner shows that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). State habeas review is, by its basic nature, collateral to the proceedings resulting in a prisoner's custody. Woodard's challenge to the state habeas proceedings does not contest the validity of his confinement. His argument does not call into question the constitutionality of his conviction and sentence. *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'"). Accordingly, Woodard's challenge to Texas' habeas statute does not provide a cognizable basis for federal habeas relief. *See Reneau v. Cockrell*, 2001 WL 1747637, at *7 (5th Cir. 2001) (rejecting similar arguments under the Sixth Amendment and equal protection clause).[36] Moreover, since no Supreme Court authority imposes requirements on the administration of state habeas procedure, Woodard cannot show that the state court's adjudication of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court, therefore, denied this claim.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Woodard has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though

---

[36] The state habeas court also found that Woodard "fail[ed] to show that the dual-track system forced him to neglect specific meritorious claims or that he was harmed by such a system." State Habeas Record at 612.

this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.

A court may only issue a COA when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As discussed at length above, precedent forecloses relief on Woodard's claims. Under the appropriate standard, Woodard has not shown that this Court should certify any issue for appellate consideration. This Court will not certify any issue for review by the Fifth Circuit.

## CONCLUSION

Woodard has not met the high standards required for federal habeas corpus relief. The Court **GRANTS** Respondent's motion for summary judgment, **DENIES** Woodard's motion for an evidentiary hearing, and **DENIES** Woodard's petition for a writ of habeas corpus. The Court will not issue a Certificate of Appealability.

SIGNED at Houston, Texas, this 25th day of March, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE